

**MATALON** PLLC
ATTORNEYS AT LAW

March 25, 2019

**BY ECF**

Hon. James L. Cott, U.S.M.J.
United States Courthouse, Southern District of New York
500 Pearl Street, Room 1360
New York, NY 10007

        Re:  Thor 680 Madison Ave LLC v. Qatar Luxury Group S.P.C. et ano.
            Docket No. 17-cv-8528 (PGG)(JLC)

Dear Judge Cott:

     My firm represents plaintiff Thor 680 Madison Ave LLC ("Thor") and I write in response to the March 15, 2019 letter from Aneca E. Lasley, counsel for defendant Qatar Luxury Group S.P.C. ("QLG"), requesting that the Court enter an order compelling Thor to produce (1) documents relating to its negotiations with the tenant (Tom Ford) which leased the subject premises (and other space) after the subject lease with Qela was terminated; (2) more than 500 leases and related guaranties between Thor's affiliates and other tenants and guarantors; and (3) documents in connection with those other leases and guarantees relating to: (a) the condition of the leased premises when tenants tendered vacant possession, (b) notices of intention to tender vacant possession received by Thor from its tenants, and (c) brokerage commissions and tenant allowances paid by Thor's affiliates.  The parties' counsel conferred by telephone on March 20, 2019 in a further attempt to narrow the issues raised by QLG's March 15, 2019 letter, but were unsuccessful.  As demonstrated below, the requested documents are not relevant to the claims or defenses in this action; producing them would be unduly burdensome; and QLG thought so little of these documents that it waited until discovery was complete to make this request, and did not even question plaintiff's witnesses about the issues.

     Critically, QLG deposed Thor's General Counsel and corporate representative (Justin Xenitelis), and its Executive Vice President of leasing (Sam Polese) on March 19 and March 20, 2019.  QLG had every opportunity to explore the issues relating to the foregoing documents with these knowledgeable witnesses.  Yet QLG chose *not* to explore the topics with these witnesses, and made no effort to determine whether the extensive and burdensome document production is actually necessary.   Depositions have now concluded.   For these reasons and those below, Thor's objections should be sustained, and Thor should not be compelled to locate, review and produce the demanded documents.



### A. Documents Relating To Thor's Negotiations With Tom Ford

Even though Thor had no duty to mitigate its damages under Section 19.2 of the Lease,[1] QLG contends that documents relating to Thor's negotiations with Tom Ford are relevant to the determination whether the terms of the Tom Ford lease were the product of good faith and fair dealing in re-letting the premises. (QLG alleges as affirmative defenses that Thor failed to mitigate its damages and acted unreasonably in incurring its damages.) Accepting for the sake of argument that Thor had such an implied obligation, the issue whether Thor satisfied it must be resolved based on the final terms of the Tom Ford lease and market conditions when that lease was signed (more than two and a half years after Qela's lease). The lengthy negotiations leading up to execution of the Tom Ford have no bearing on the determination.

QLG tries to justify its document request by suggesting that Tom Ford's rent was approximately 50% of Qela's (not true) and speculating that Thor "*may have* agreed to an artificially low rent for Tom Ford because Thor believed it could recoup the difference from Qela or QLG." But that insinuation is nonsensical; why would Thor accept a lower-than-market rent from a credit-worthy tenant, Tom Ford, merely to increase the damages against an entity that claims to have no assets and which would take years to recover in a litigation? Rather, Mr. Polese testified that the market had declined dramatically during the more than two and half year period between the execution of the Qela and Tom Ford leases.[2] Clearly, the negotiations with Tom Ford have no bearing on the "reasonableness" of its rent. Given the at-best minimal relevance of the Tom Ford negotiations, Thor should be spared the undue burden of collecting, reviewing and producing emails and other documents written over the course of a one-year period relating to the negotiation of the Tom Ford lease.

### B. Leases And Guaranties With Other Tenants And Guarantors

---

[1] Section 19.2 of the Lease, relating to damages, provides that "in no event shall Landlord have any obligation to relet the Premises or any part thereof."

[2] On March 18, 2019 (after its March 15, 2019 letter to the Court), QLG attempted to bolster its request for production of documents relating to the negotiations with Tom Ford and its attempt to find a replacement tenant, arguing that such documents are relevant to the reasonable rental value of the premises under the alternative damages remedy in Section 19.3 of the Lease. As explained above, the lease negotiations have no bearing on whether the rent under the Tom Ford lease is a reasonable rental value of the premises.



QLG does not demonstrate how Thor's and its affiliates' other leases and guaranties might be relevant to the interpretation of the Lease and the Guaranty, so Thor should not be burdened with the duty to produce the more than 500 leases and guaranties entered into or obtained over a six- year period.[3] QLG identifies disputes concerning the meaning of various provisions of the Lease and the Guaranty, and then posits that other leases and guaranties "could establish a course of dealing or customary practice on the part of [Thor] . . . relevant to the construction of the parties' agreement." Notably, QLG does not articulate what "customary practice" or "course of dealing" might exist, much less show how or why it might be relevant to interpreting any particular provision in dispute. Critically, QLG never bothered to ask Thor's corporate representative (and General Counsel) whether there was any "customary practice" or "course of dealing" in connection with Thor's leases and guaranties. Nor is QLG willing to limit the scope of the document requests to the situation at hand, in which parties disputed the meaning of the provisions at issue here. In any event, the request is overbroad insofar as it is not limited to leases and guaranties containing "similar provisions" to those in dispute. Moreover, the leases and guaranties from hundreds of other Thor deals -- whether drafted in house, or by any one of several law firms engaged by Thor, its partners and co-investors -- do not necessarily have any bearing on the intent of the parties' here.

Finally, Thor's cursory questioning of QLG's transactional counsel about his experience drafting other leases does not justify requiring Thor to produce more than 500 leases and guaranties its affiliates entered into or obtained over a six-year period. The (at best) attenuated relevance of the requested documents does not justify imposing the undue burden that production would impose on Thor.

### C. Documents Relating To Brokerage Commissions And Tenant Allowances Paid By Thor In Connection With Other Leases

Contrary to QLG's argument, Thor's payment of leasing commissions and tenant allowances for other leases is not relevant to the reasonableness of the Tom Ford leasing commission and tenant allowance. Thor's own payments in connection with other leases is irrelevant (or of minimal importance) because such reasonableness is a matter for expert testimony, based on comparable transactions, not restricted to Thor. In any event, the $3 million in leasing commissions paid to the outside broker on the Tom Ford lease is even less than the commission that was originally due on the QELA deal, so the reasonableness of the leasing commissions is a non-issue. Moreover, the brokerage commission and tenant allowance

---

[3] On March 18 (following its March 15 letter to the Court), QLG also attempted to bolster its request for production of all leases entered into for commercial retail space in Manhattan from 2010-2016, contending that they bear on the reasonable rental value of the premises on December 23, 2015 (the termination date of the Lease). Clearly, the only leases that may shed light on the reasonable rental value are those relating to comparable properties, which were entered into close to December 23, 2015. So QLG's request is extremely overbroad.

3



that Thor pays in connection with a lease is based upon numerous unique circumstances relating to the premises and the terms of the lease. For that reason, documents concerning brokerage commissions and tenant allowances for other leases have no bearing on the reasonableness of the Tom Ford commission.

Compliance with the requests for documents relating to brokerage and tenant allowances would be unduly burdensome, requiring Thor to obtain and produce hundreds of leases (about 500 is the best estimate), and review each of the tenant files to locate other documents relating to leasing commissions and tenant allowances. Again, the (at best) minimal, if any, relevance of the information does not justify imposing the undue burden of requiring Thor to review hundreds of tenant files to provide the requested information.

### D. Documents Related To Tenants' Tender Of Vacant Possession

Again, QLG's conclusory suggestion that Thor's "practices under other leases and guaranties" are relevant to the interpretation of the Lease and Guaranty is unavailing. Documents relating to the condition of the leased premises when a tenant tendered vacant possession, and documents relating to every communication in which a tenant gave Thor notice of its intent to tender vacant possession (in relation to all Manhattan commercial leases that Thor entered into from 2013-2016) do not bear on the issues here; whether Qela's purported surrender without Tenant's Work having been done precluded it from tendering "vacant possession of the Demised Premises to Landlord in the condition required pursuant to the terms of the Lease" (within the terms of the Guaranty), and whether Qela's purported notice of intent to surrender vacant possession constituted "not less than two (2) years' prior written notice . . . of Tenant's intention to tender vacant possession of the Demised Premises to Landlord " (within the terms of the Guaranty). The relevant provisions of the Guaranty are clear and unambiguous and extrinsic evidence concerning other leases and guaranties has no bearing on their construction.

Moreover, it would be unduly burdensome for Thor to review tenant files for hundreds of leases to identify documents relating to a tenant's surrender of vacant possession (which are not coded or tracked in a way that would facilitate the identification of such documents). Here too, the substantial burden of producing these documents does not outweigh their (at best) marginal relevance.



**Conclusion**

      Thor respectfully requests that the Court deny QLG's request for an order compelling Thor to produce the above-described documents.

      Respectfully submitted,

      MATALON PLLC

      /s/  Joseph Lee Matalon
      Joseph Lee Matalon

cc: all counsel of record (via ECF)