**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

THOR 680 MADISON AVE LLC,  :

                                :  Case No.:  1:17-cv-08528 (PGG) (JLC)

           Plaintiff,  :

    v.  :  STIPULATION AND [PROPOSED]
                                  :  ORDER

QATAR LUXURY GROUP S.P.C., and  :
QATAR FOUNDATION FOR  :
EDUCATION, SCIENCE AND  :
COMMUNITY DEVELOPMENT,  :

                 :

           Defendants.  :

-------------------------------------------------------------x

WHEREAS plaintiff Thor 680 Madison Ave LLC ("Thor") wishes to file a Second Amended Complaint in the form annexed hereto as an exhibit; and

WHEREAS defendants Qatar Luxury Group S.P.C. ("QLG") consents to the filing of the Second Amended Complaint; and

WHEREAS defendant Qatar Foundation For Education, Science And Community Development has not been served and has not appeared in this action.

NOW therefore, the parties hereby stipulate, and the Court orders, as follows:

1.  Plaintiff shall have leave to file the Second Amended Complaint in the form annexed hereto.

2.  Plaintiff shall file the Second Amended Complaint within three days after this Stipulation and Order is entered.

3.  This Stipulation and Order is without prejudice to QLG raising the same arguments set forth in its withdrawn request to file a Motion for Judgment on the Pleadings as to Count I and withdrawn opposition to the Second Amended Complaint in its forthcoming Motion for Summary Judgment.

Dated: April 23, 2019

**MATALON PLLC**

By: _s/Joseph Lee Matalon_
Joseph Lee Matalon
450 Seventh Avenue, 33rd Floor
New York, New York 10123

_Attorneys for Plaintiff_
_Thor 680 Madison Ave LLC_

**SQUIRE PATTON BOGGS (US) LLP**

By: _s/Aneca E. Lasley_
Aneca E. Lasley
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215

_Attorneys for Defendant Qatar Luxury Group_
_S.P.C._

SO ORDERED:

_____
The Honorable Paul G. Gardephe
United States District Judge          April 25, 2019

# EXHIBIT

**MATALON PLLC**
**Joseph Lee Matalon**
**450 Seventh Avenue, 33rd Floor**
**New York, New York 10123**
**Tel: (212) 244-9000**
  *Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
                                                 :
**THOR 680 MADISON AVE LLC,**                    :   **Case No. 1:17-cv-08528(PGG)(JLC)**
                                                 :
            **Plaintiff,**                       :
                                                 :
      **-against-**                              :
                                                 :
**QATAR LUXURY GROUP S.P.C., and**               :   **SECOND AMENDED**
**QATAR FOUNDATION FOR EDUCATION,**              :   **COMPLAINT AND JURY DEMAND**
**SCIENCE AND COMMUNITY**                        :
**DEVELOPMENT,**                                 :
            **Defendants.**                      :
-------------------------------------------------------------X

Plaintiff Thor 680 Madison Ave LLC ("Thor" or "Landlord"), through its attorneys

Matalon PLLC, complaining of defendants Qatar Luxury Group S.P.C. ("Guarantor") and Qatar

Foundation For Education, Science and Community Development ("Qatar Foundation," together

with Guarantor, "Defendants"), alleges:

## INTRODUCTION

1.       Thor is the ground lessee of the building at 680 Madison Avenue in Manhattan.

In 2013, it entered into a commercial net-lease with Qatar Luxury Group Fashion USA Inc.

("Tenant"), under which Tenant was required to perform a first-class buildout of the premises,

consistent with "Madison Avenue Standards," and operate a retail store for the high-end luxury

fashion brand QELA – owned and controlled by the ruling family of Qatar. The lease had a 15-

year term, with annual rents beginning at $6.3 million and escalating to nearly $8.9 million. In

breach of the lease, however, Tenant stopped paying rent, did not build out the premises, never opened for business, and the lease has since been terminated.

2.      As a condition for Thor to enter into the lease, Guarantor executed a guaranty of Tenant's lease obligations. Although Guarantor could have limited its liability by satisfying certain conditions, it did not, rendering its obligations coextensive with Tenant's.

3.      Thor now brings this action to recover sums owed by Guarantor under the guaranty.

4.      Thor also brings this action to pierce the corporate veil against the Qatar Foundation, and hold it liable for Guarantor's obligations.

## PARTIES

5.      Plaintiff Thor is a limited liability company, with an address c/o Thor Equities, LLC, 25 West 39th Street, New York, New York 10018.

6.      Defendant Guarantor represented that it was a "segregated portfolio company" organized under the laws of Qatar, with an address at 203 NE Front Street, Suite 101, Milford, Delaware 19963. Upon information and belief, Guarantor was, in fact, a "single person company."

7.      Upon information and belief, defendant Qatar Foundation is a private, non-profit organization in Qatar, with an address at P.O. Box 5825, Doha, Qatar.

## JURISDICTION AND VENUE

8.      Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship among the adverse parties, and the amount in controversy, without interest and costs, exceeds $75,000.

2

9. Plaintiff Thor is a citizen of New York and Maryland for diversity purposes. As a limited liability company, Thor's citizenship is the citizenship of its members. The ultimate members of Thor are citizens of New York and Maryland. Upon information and belief, neither of the Defendants are citizens of New York or Maryland.

10. Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in the Southern District of New York.

11. This Court has personal jurisdiction over Defendants pursuant to New York Civil Practice Law & Rules § 302 because, among other things, Defendants transacted business within the State, and the transactions giving rise to Thor's claims took place within the State.

12. This Court also has personal jurisdiction over Guarantor because it consented to jurisdiction in the State.

13. This Court also has personal jurisdiction over the Qatar Foundation because the corporate veil will be pierced, subjecting Qatar Foundation to liability for the acts and omissions of Guarantor in this State.

## FACTUAL ALLEGATIONS

### QELA

14. Tenant was permitted under the lease to operate and do business as a retail establishment under the trade name "QELA."

15. QELA launched in September 2013 as a luxury clothing and accessories label. According to its press release, QELA was "Qatar's first home-grown global fashion brand," with "business aspirations to develop as an international fashion brand[.]" The idea to develop a luxury brand to compete with, for example, Chanel and Gucci, originated with, and was promoted by, the Royal Family in Qatar.

3

16. Upon information and belief, the ruling family of Qatar controls, and is the ultimate owner of, Tenant, Guarantor and the "QELA" label. Tenant (Qatar Luxury Group Fashion USA Inc.), is directly or indirectly wholly-owned by the Guarantor (Qatar Luxury Group S.P.C.), which in turn is owned, directly or indirectly, by the Qatar Foundation.

17. Upon information and belief, Tenant and Guarantor are alter egos of the Qatar Foundation. Tenant and Guarantor have common and overlapping officers and directors, such that the Qatar Foundation was able to exercise and did exercise complete control and domination over the business, activities, management and policies of Tenant and Guarantor, such that Tenant and Guarantor were the mere alter egos of the Qatar Foundation.

18. Upon information and belief, at all relevant times, there exists common ownership and the presence of an interlocking directorate and executive staff between the Tenant, Guarantor and Qatar Foundation, all of which are ultimately controlled by the Qatar Foundation.

19. Upon information and belief, at all relevant times, Tenant and Guarantor were completely financially dependent on the Qatar Foundation.

20. Upon information and belief, at all relevant times, the Qatar Foundation completely interfered with the selection and assignment of the Tenant's and Guarantor's executive personnel, neither of which observed corporate formalities.

21. Upon information and belief, at all relevant times, the Qatar Foundation completely controlled the Tenant's and Guarantor's marketing and operational policies.

22. Upon information and belief, Tenant and Guarantor had no separate records, mind, will or existence of their own, were undercapitalized, and acted solely at the direction and in the interest of the Qatar Foundation.

4

23. Upon information and belief, Tenant's and Guarantor's funds were intermingled with those of the Qatar Foundation.

**The Lease**

24. Thor is the landlord of the ground and second floors ("Premises") in the building located at 680 Madison Avenue, New York, New York ("Building").

25. Thor and Tenant are parties to a lease dated as of December 31, 2013 ("Lease"), whereby Thor leased the Premises to Tenant.

26. The term of the Lease was "approximately fifteen (15) years and one hundred ninety five (195) days and shall begin on the Commencement Date."

27. The Lease was a "net lease," such that "Tenant shall have sole responsibility for the care, maintenance, management, operation, control, use and occupancy of the Premises in all respects, and Tenant shall be liable for and shall bear all of the costs and expenses of the operation and maintenance of the Premises."

28. Under the Lease, Tenant agreed to pay "Rent," composed of "Fixed Rent" and "Additional Rent." "Fixed Rent" was due in monthly installments, initially $525,000 per month ($6.3 million annually), and escalating every three years thereafter. "Additional Rent" was defined as all amounts due other than Fixed Rent, including reimbursement for increases in real estate taxes.

29. If Tenant did not timely pay Rent, and did not cure the default after notice, Thor could terminate the Lease, and upon termination, Thor could regain possession.

30. The Lease provided for alternative damages remedies upon Thor's termination of the Lease, to be elected by Thor. Under one method, set forth in Section 19.2, Tenant is liable,

5

as damages, for sums computed by the aggregate of all rent that would have been payable by Tenant had Thor not terminated the Lease, payable upon the dates due under the Lease.

31.     Under that methodology, the amount owed by Tenant could be reduced by the "net rent" (that is, rent less applicable expenses) received from a replacement tenant: "if Landlord shall relet all or any part of the Premises for all or any part of the period commencing on the day following the date of such termination and ending on the date hereinbefore set forth for the expiration of the Term, Landlord shall credit Tenant with the net rents received by Landlord from such reletting, when received, net of expenses incurred or paid by Landlord in terminating this Lease and re-entering the Premises and securing possession thereof, as well as the expenses of reletting, including altering and preparing the Premises for new tenants, brokers' commissions, and all other expenses properly chargeable against the Premises and the rental therefrom in connection with such reletting . . . if the Premises or any part thereof should be relet in combination with other space, then proper apportionment on a square foot basis shall be made of the rent received from such reletting and of the expenses of reletting."

32.     An alternative remedy, contained in Section 19.3, made Tenant liable, as liquidated damages, for an amount equal to the difference, for the unexpired portion of the term, between (a) the aggregate of all rent that would have been payable by Tenant had Thor not terminated the Lease, and (b) the then fair and reasonable rental value of the Premises (as proven by Tenant), both discounted to present value at the rate of 4% per annum over the prime commercial lending rate announced by Citigroup to be in effect at its principal office in New York City. Tenant, moreover, agreed that if the Premises are re-let within a reasonable time after Thor's termination, then the rent realized by such re-letting is deemed *prima facie* to be the reasonable rental value. Thor may also prove and obtain as liquidated damages an amount equal

6

to the maximum allowed by law, whether such amount is greater, equal to, or less than the difference described above.

33. The parties also agreed that nothing contained in the Lease would limit or preclude Thor from recovering any additional sums or damages to which Thor may lawfully be entitled by reason of any default by Tenant under the Lease.

34. Under the Lease, Tenant was obligated to build out the Premises, defined as "Tenant's Work." Tenant was required to promptly perform Tenant's Work and timely submit plans for Landlord's approval.

35. Tenant further agreed, with time being of the essence, that it would "(i) use diligent efforts to complete Tenant's Work substantially in accordance with such approved plans and specifications as promptly as reasonably feasible and (ii) open for business to the public fully fixtured, stocked and staffed in accordance with Madison Avenue Standards (as hereinafter defined) for at least one (1) day on or prior to the date in the fifteenth (15th) month after the Commencement Date that is the same numerical date as the Commencement Date (the 'Work Completion Date.'"

36. Madison Avenue Standards was defined as "the operation, maintenance and repair of the Premises (and the business therein) or the Building, as the case may be, in a manner commensurate with the standards applicable to first-class luxury mixed-use properties consisting of residential and retail uses located on Madison Avenue between 59th Street and 72nd Street in the Borough of Manhattan, New York, New York[.]"

37. Tenant's agreement to build out the Premises, at Tenant's own cost, and in accordance with Madison Avenue Standards, was a prime consideration for Landlord to enter into the Lease on the rent and other terms specified therein.

7

38. Upon termination of the Lease, Landlord contracted to receive a fully-functioning and built-out space, in accordance with Madison Avenue Standards.

39. Tenant's failure to timely perform Tenant's Work and open the Premises for business was a Lease default giving rise to damages. In particular, the Lease stated: "If after the Work Completion Date Tenant has still failed to complete Tenant's Work and open the Premises to the public for business fully fixtured, stocked and staffed in accordance with Madison Avenue Standards, then Landlord shall have the right, but not the obligation, to treat such failure as a default hereunder, giving rise to all of Landlord's rights and remedies hereunder, at law and in equity."

40. Accordingly; the parties specifically intended that if Tenant failed to complete Tenant's Work timely, Landlord had available to it all of the rights and remedies available under law for such breach.

41. Upon Lease execution, Tenant also had to deliver to Thor "the Guaranty executed by Qatar Luxury Group S.P.C. . . . in the form annexed" to the Lease.

**Guaranty**

42. Guarantor executed a guaranty ("Guaranty"), dated as of December 31, 2013.

43. Guarantor's execution and delivery of the Guaranty was "a condition to the execution by [Thor] of the Lease[.]"

44. According to the Guaranty, Tenant is "a wholly-owned subsidiary of Guarantor[.]"

45. The Guaranty states that "Guarantor . . . does hereby unconditionally and irrevocably guaranty to Landlord . . . full and timely payment, performance and observance of, and compliance with, *all of Tenant's obligations under the Lease* and damages, costs and

8

expenses arising from the holding over by Tenant . . . including, without limitation, the full and prompt payment of all Fixed Rent, Additional Rent and all other charges and sums due and payable by Tenant under the Lease (including, without limitation, Landlord's reasonable attorneys' fees and disbursements) (collectively, the 'Obligations')" (emphasis added).

46.     The Guaranty would continue "through and including the date that Tenant . . . shall have (i) tendered vacant possession of the Demised Premises to Landlord in the condition required pursuant to the terms of the Lease, (ii) delivered the keys to the Demised Premises to Landlord and (iii) provided Landlord with not less than two (2) years' prior written notice, in the manner provided in this Guaranty, of Tenant's intention to tender vacant possession of the Demised Premises to Landlord (the date on which the last to occur of (i), (ii) and (iii) shall be deemed to be the 'Final Obligation Date')."

47.     None of those conditions were satisfied. Tenant never tendered vacant possession, but remained in possession until Thor used self-help to re-enter and dispossess Tenant. In addition, at that time the premises were not in the condition required by the Lease – Tenant did no construction work at all at the premises. Nor did Tenant provide two or more years' notice of its intention to vacate. To the contrary, Tenant provided a notice stating that it intended to surrender possession within a period of substantially *less* than two years from the date of the notice. Finally, Tenant made no effort to obtain and return the keys to Landlord.

48.     As a result, no Final Obligation Date pursuant to the Guaranty was ever properly established by Tenant, and Guarantor's liability under the Guaranty is co-extensive with Tenant's liability under the Lease.

49.     The Guaranty further provides that Guarantor shall reimburse Thor all such costs, "including without limitation, Landlord's reasonable attorneys' fees and disbursements."

9

**Negotiation And Drafting Of Lease**

50.     The business terms of the Lease were negotiated by and between principals of

Landlord and Tenant, with the involvement of a real estate broker. The Lease's legal terms were

agreed to, and the Lease was drafted, by and between the parties' outside attorneys. Landlord

was represented by Pryor Cashman LLP, and Tenant by Eric Schoenfeld of the law firm

Tannenbaum Helpern Syracuse & Hirschtritt LLP.

51.     Pryor Cashman drafted and circulated the first version of the Lease, using a

standard form of lease Thor had furnished as a template. Thor's standard form provided for two

alternative remedies upon Thor's termination of the Lease, to be elected by Thor. Under the first

method, Tenant is liable for damages computed by the aggregate of all "Additional Rent" that

would have been payable by Tenant had Thor not terminated the Lease, payable upon the dates

due under the Lease. "Additional Rent" is defined in the standard form as "all sums of money,

*other than Fixed Rent*, as shall become due and payable from Tenant to Landlord under or

pursuant to [the] Lease." (Emphasis added) (Thus, Additional Rent includes real estate

escalations and late charges owed under the Lease, but excludes regular monthly rent.) The

standard form defines "Rent" to include Fixed Rent and Additional Rent.

52.     The inclusion of the word "Additional" before "Rent" in the damages formulation

of Thor's standard form was a typographical error that went unnoticed. Thor's intention was to

make its tenants liable, as damages, for sums computed by the aggregate of all Rent that would

have been payable by such tenants had Thor not terminated their leases -- not merely for

Additional Rent -- so that Thor would be made whole in the event it terminated leases based

upon tenants' breaches. Clearly, it would have been illogical and nonsensical for Thor to agree

to limit its damages to "Additional Rent" and forego any right to recover fixed rent in the event

10

of a lease termination.  In fact, the standard liquidated-damages formulation in commercial real estate leases includes fixed rent payable under such leases, and is not limited solely to other additional items of rent.

53.  Since Pryor Cashman used the standard form as a template for the first draft without correcting the unnoticed typographical error, the mistake carried over into the first draft of the Lease sent to Eric Schoenfeld.  Thus, Article XIX in the first draft set forth the two alternative remedies upon Thor's termination of the Lease, to be elected by Thor, and mistakenly used the words "Additional Rent" instead of "Rent" in the first alternative remedy.

54.  Thor did not intend to limit its damages recovery to "Additional Rent" and forego any right to recover fixed rent in the event of a lease termination.  Rather, Thor's purpose was to avail itself of a damages formulation which would make Landlord whole for the Rent and Additional Rent that would have been payable by the Tenant had the Lease not terminated based on Tenant's default.  The inclusion of the word "Additional" before "Rent" was a mistake that resulted from Pryor Cashman's reliance on the incorrect standard form of lease provided by Thor.

55.  Neither the parties nor their counsel ever discussed or agreed to limit Thor's remedy to the recovery of "Additional Rent."

56.  Tenant's counsel, Eric Schoenfeld, also overlooked the typographical mistake contained in the first draft of the Lease.  So the words "Additional Rent" were mistakenly repeated in the next version of the Lease.

57.  Ultimately, the mistake continued to appear in all subsequent versions of the Lease, including the executed Lease, without being noticed by the parties' counsel or by the parties themselves in any of the drafts.

11

58. The repetition of the mistake in all subsequent drafts of the Lease is not surprising given the length of the Lease (78 pages, not including exhibits), and the propensity of attorneys to review drafts of agreements without reading every single word, but instead anticipating words they expect to read based on the provisions that customarily appear in such documents.

59. It would be nonsensical to exclude fixed rent due on a monthly basis – the essence of any lease – from Landlord's damages, and measure damages solely by Additional Rent such as real estate taxes and late charges.

60. Notably, inclusion of the word "Additional" before "Rent" in Section 19.2 (and basing Landlord's damages upon Additional Rent, rather than Rent) is inconsistent with several provisions in the Lease and Guaranty. For example, the alternative damages remedy in Section 19.3, provides a calculation on the basis of "the aggregate of all Rent reserved hereunder." Additionally, the Guarantor guarantees "the full and prompt payment of all Fixed Rent, Additional Rent and all other charges and sums due and payable by Tenant under the Lease" through the Final Obligation Date. (Guaranty, § 2) Finally, Section 19.2 itself allows Tenant to receive a credit from the "rents" received from a replacement tenant. (Lease, § 19.2) It would be ludicrous in calculating damages to reduce the "Additional Rent" (i.e., all sums due by Tenant *other than* Fixed Rent) by the subsequent tenant's rent (which invariably includes monthly fixed rent). The inconsistencies between Section 19.2 and other provisions of the Lease and the Guaranty further demonstrates that the inclusion of the word "Additional" before "Rent" in Section 19.2 was a mistake and not intended by the parties.

61. The inclusion of the word "Additional" before "Rent" makes the damages formulation in Section 19.2 contradictory to the methodology customarily included in commercial real estate leases for the computation of liquidated damages.

12

## Tenant's Breaches, And Lease Termination

62. Tenant failed to perform Tenant's Work, as required by the Lease

63. Tenant did not pay the rent due on September 1, 2015 in the amount of $525,000.00, nor any payment due thereafter.

64. Thor served on Tenant a notice of default, dated September 9, 2015 ("Default Notice"), in respect of the rent due on September 1, 2015 and a late charge, for a total of $546,000.00.

65. The Default Notice stated that, pursuant to the Lease, "if such default is not cured on or before September 17, 2015, which date is at least five (5) days from the date this notice shall be deemed to have been given, Landlord will seek all applicable remedies available under the Lease, including the right to re-enter the Premises and declare the Lease, and the tenancy thereby created, terminated[.]"

66. Tenant did not cure the default specified in the Default Notice.

67. Thor accordingly served on Tenant a notice of termination, dated December 9, 2015 ("Termination Notice"). The Termination Notice provided that pursuant to the Lease, Thor "hereby terminates the Lease effective 11:59 p.m. on December 23, 2015 ('Termination Date'), which date is more than five (5) days from the date this notice shall be deemed to have been given, on the ground that Tenant has failed to cure the default in the payment of rent and/or other charges due under the Lease, as demanded in [the Default Notice]."

68. Guarantor does not dispute that Thor properly terminated the Lease as of December 23, 2015.

## Thor Relets The Premises

69. On or about July 18, 2016, Thor relet the Premises.

13

70.     In connection with such re-letting, Thor incurred fees and expenses of more than $15,000,000.00, including without limitation the expense of preparing the Premises for a new tenant, a large tenant allowance, brokers' commissions, and other expenses properly chargeable against the Premises and the rental therefrom in connection with such re-letting. Under the Lease, these fees and expenses reduce the rent credit that Tenant would receive for the payment of any rent by the replacement tenant.

71.     The replacement tenant leased more than double the square feet leased to Tenant.

72.     Despite leasing more than twice the space, the replacement tenant's first year fixed rent matched Tenant's – $525,000 per month. Thus, on a square-foot basis, the replacement tenant's rent was significantly lower than Tenant's, reflecting a significant market change from 2013 to 2016.

73.     The replacement tenant was first charged rent on June 29, 2017.

74.     Therefore, from September 1, 2015 through June 29, 2017, Thor did not receive rent in respect of the Premises.

75.     From July 1, 2017 through the present, Thor has received less rent in respect of the Premises, on a square foot basis, than it would have received from Tenant under the Lease.

## COUNT I
### (Breach of Contract – Liability For Tenant's Failure To Build Out The Premises And Surrender The Premises In Proper Condition, Against Guarantor)

76.     Thor realleges the foregoing as if set forth in full.

77.     Tenant's failure to perform Tenant's Work, and to surrender possession of the Premises in its built-out condition in accordance with Madison Avenue Standards, were breaches of Tenant's obligations.

14

78.     Such breaches are the responsibility of Guarantor, because under the Guaranty,

Guarantor is responsible for all of Tenant's obligations under the Lease.

79.     By reason of the foregoing, Thor is entitled to recover an amount to be

determined at trial, together with such additional amounts as may accrue until judgment is

entered, together with reasonable attorneys' fees and costs incurred by Thor in connection with

this action.

## COUNT II
### (Breach of Contract – Liability For Tenant's Damages Due Under The Lease, Against Guarantor)

80.     Thor realleges the foregoing as if set forth in full.

81.     Thor properly terminated the Lease on the basis of Tenant's failure to pay rent.

82.     Under the Lease, if Thor terminated the Lease for default, Tenant is liable

(without limitation) for damages under one of the methodologies set forth in the Lease, as

described in paragraphs 30-32 above.

83.     In turn, Guarantor is responsible for all sums payable by Tenant as damages,

together with reasonable attorneys' fees and costs incurred in this action.

84.     Accordingly, Thor is entitled to recover damages against Guarantor in an amount

to be proven at trial.

## COUNT III

### (Reformation, Against Guarantor)

85.     Thor realleges the foregoing as if set forth in full.

86.     Landlord and Tenant did not agree that Thor's remedy of liquidated damages for

breach of the Lease would be limited to the recovery of "Additional Rent."

87.     Section 19.2 of the Lease contains a typographical error and does not reflect the

parties' intentions.

15

88.     Section 19.2 of the Lease should have stated, in relevant part that "In the event of

a termination of this Lease, Tenant shall pay to Landlord . . . sums equal to aggregate of all *Rent*

that would have been payable by Tenant had this Lease not terminated. . . ." (emphasis added).

The typographical error justifies the reformation of the Lease on the ground of mistake.

89.     The Lease should be reformed and the word "Additional" should be deleted

before the word "Rent" in Section 19.2 of the Lease.

90.     Thor's damages under Section 19.2 of the Lease should be based on the Rent, not

merely the Additional Rent, that would have been payable under the Lease had the Lease not

terminated based on Tenant's default.

## COUNT IV
## (Piercing The Corporate Veil/ Alter Ego, Against The Qatar Foundation)

91.     Thor realleges the foregoing as if set forth in full.

92.     At all relevant times, the Guarantor was wholly owned by the Qatar Foundation

and was undercapitalized.

93.     The Qatar Foundation controlled and financed Tenant and Guarantor to such a

degree as to render them mere agents or instrumentalities of the Qatar Foundation.

94.     The Qatar Foundation exercised its control over Tenant and Guarantor to

orchestrate execution of the Lease, and to induce Thor into the execution thereof, to cause a

default under the Lease and Guarantor, and abused the privilege of doing business in the

corporate form to perpetrate a wrong against Thor.

95.     Article 298 of Law No. (11) of 2015 of Qatar ("Article 298") provides that when

a limited liability company has losses amounting to half or more of its share capital, as a result of

losses from its business, two steps must be complied with and completed no later than 30 days

from the date the losses amounted to half or more of the limited liability company's share

16

capital. First, the manager(s) or any person whose name appears on the Commercial Register as an authorized signatory of the limited liability company must call a Shareholders General Assembly ("Assembly"). Second, in that Assembly, the shareholders must resolve by a 75% majority of shareholders holding 75% of the share capital to either reinstate or refinance the limited liability company's capital, or to dissolve the limited liability company. Both of these steps must be taken within the required time period in order to avoid the shareholder(s) and/or manager(s) becoming jointly and severally liable for the limited liability company's liabilities.

96.     Upon information and belief, Guarantor has losses amounting to half or more of its share capital, as a result of losses from its business.

97.     Upon information and belief, the managers and authorized signatories of Guarantor did not call an Assembly within 30 days from the date that Guarantor's losses amounted to half or more of the limited liability company's share capital.

98.     Upon information and belief, the shareholders of Guarantor did not resolve, within 30 days from the date that Guarantor's losses amounted to half or more of the limited liability company's share capital, by a 75% majority of shareholders holding 75% of the share capital of Guarantor, to either reinstate or refinance Guarantor's capital, or to dissolve Guarantor.

99.     Thus, Guarantor failed to comply with Article 298.

100.    Thor, therefore, is entitled to pierce the corporate veil of Tenant and Guarantor and pursue its claims directly against the Qatar Foundation.

17

**WHEREFORE**, Thor demands judgment against Defendants, jointly and

severally, in an amount to be determined at trial which exceeds $75,000 exclusive of interest and

costs, together with reasonable attorneys' fees and costs incurred by Landlord in connection with

this action, pre-judgment interest and such other and further relief as the Court deems just and

proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury in this action on all issues so triable.

Dated: April ___, 2019
      New York, New York

### M A T A L O N PLLC

By: ___*s/Joseph Lee Matalon*___
    Joseph Lee Matalon
    450 Seventh Avenue, 33rd Floor
    New York, New York 10123
    (212) 244-9000
      *Attorneys for Plaintiff*
      *Thor 680 Madison Ave LLC*