**MATALON PLLC**
**450 Seventh Avenue, 33rd Floor**
**New York, New York 10123**
**Tel: (212) 244-9000**
**Email: nycourts@trial-lawyer.org**
  *Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
                                                            :
**THOR 680 MADISON AVE LLC,**                               :
                                                            :    17-cv-08528 (PGG)(JLC)
          **Plaintiff,**                                    :
                                                            :
     -against-                                              :
                                                            :
**QATAR LUXURY GROUP S.P.C., and**                          :
**QATAR FOUNDATION FOR**                                    :
**EDUCATION, SCIENCE AND**                                  :
**COMMUNITY DEVELOPMENT,**                                  :
                                                            :
          **Defendants**.                                   :
------------------------------------------------------------X

### PLAINTIFF'S LOCAL CIVIL RULE 56.1 STATEMENT OF MATERIAL FACTS

Pursuant to Local Civil Rule 56.1, Plaintiff Thor 680 Madison Ave LLC states that there is no genuine issue to be tried as to the following material facts.

1.  Plaintiff Thor 680 Madison Ave LLC ("Thor" or "Landlord") is the ground lessee of the building at 680 Madison Avenue, New York, New York, occupying the entire length of Madison Avenue between 61st and 62nd Streets ("Building"). (Xenitelis Aff.[1] ¶ 2)

2.  Non-party Qatar Luxury Group Fashion USA Inc. ("Tenant") is a subsidiary of Defendant Qatar Luxury Group S.P.C. ("Guarantor"). (Xenitelis Aff. ¶ 16; Answer[2] (Dkt. 65) ¶

---

[1] "Xenitelis Aff." refers to the Affirmation of Justin A. Xenitelis, dated May 20, 2019.

[2] "Answer" refers to Guarantor's Answer to the Second Amended Complaint (Dkt. 65)).

65))

3. The Qatari Royal Family founded the "QELA" brand to be the first international Middle East luxury goods company designed to compete directly against brand leaders such as Louis Vuitton, Gucci, Prada, Hermes, Christian Dior and Chanel. (Sebag Dep.[3] 21/8-22/6; Exh. Q to the Appendix to this Statement, at Bates No. QLG 2973)

4. On April 30, 2013, Tenant sent Thor a letter of intent to lease space in the Building for a flagship QELA store ("Letter of Intent"). (Xenitelis Aff. ¶ 3)

5. Exhibit A in the Appendix to this Statement is a true and correct copy of the Letter of Intent. (Xenitelis Aff. ¶ 4)

6. Negotiations ensued and Thor and Tenant entered into a lease on December 31, 2013. ("Lease") (Xenitelis Aff. ¶ 3)

7. Exhibit B is a true and correct copy of the Lease. (Xenitelis Aff. ¶ 3; Exh. M (RFA[4]) 1)

8. The term was 15 years with a renewal option. (Lease §§ 1.2, 1.6)

9. The premises, occupying a portion of the ground and second floors in the Building, were to be used for a first-class luxury retail store under the trade name "QELA." (Lease § 5.1)

10. Tenant agreed to pay "Rent," composed of "Fixed Rent" and "Additional Rent." (Lease § 2.1)

---

[3] "Sebag Dep." refers to the transcript of the deposition of Laurent Sebag, Guarantor's corporate representative, taken on January 10, 2019.

[4] "RFA" refers to Guarantor's Responses to Thor's First Request for Admissions, annexed as Exhibit M to the Appendix to this Statement.

11. Fixed Rent was due in monthly installments, initially $525,000 per month ($6.3 million annually), and escalating every three years thereafter. (Lease § 2.1)

12. Additional Rent was defined as all amounts due *other than* Fixed Rent, including reimbursement for increases in real estate taxes. (Lease §§ 2.1, 3.1)

13. The parties agreed that Tenant, at its sole expense, would perform a complete build-out of the premises, referred to as "Tenant's Work." (Lease § 1.3(B))

14. Tenant "covenant[ed] and agree[d] to (i) use diligent efforts to complete Tenant's Work . . . as promptly as reasonably feasible and (ii) open for business to the public fully fixtured, stocked and staffed in accordance with Madison Avenue Standards" by a date certain. (Lease § 1.3(B))

15. The Lease defined "Madison Avenue Standards" as "the operation, maintenance and repair of the Premises (and the business therein) or the Building . . . in a manner commensurate with the standards applicable to first-class luxury mixed-use properties consisting of residential and retail uses located on Madison Avenue between 59th Street and 72nd Street in the Borough of Manhattan, New York, New York." (Lease § 5.1)

16. The Lease had a "Continuous Operations" clause which rendered a "failure to do business" at the Premises, as defined, a lease default (Lease § 5.7)

17. The Lease provided that if Tenant did not pay Rent on time, and did not cure after notice, Thor could terminate the Lease (Lease § 18.1) and regain possession using self-help, including a lockout (Lease § 19.1)

18. There are various damages remedies upon termination for default (Lease, Article 19)

3

19. Under one method, set forth in Section 19.2, damages accrue monthly based on the rent that would have been payable, with a deduction for the rent (net of applicable expenses), actually received from any replacement tenant. (Lease § 19.2)

20. An alternative remedy, contained in Section 19.3, is for liquidated damages payable in a lump sum, measured by the present-value difference between the future income stream to the end of the term, and the fair and reasonable rental value of the Premises for the same period. (Lease § 19.3)

21. The parties agreed that nothing contained in the Lease "shall be construed as limiting or precluding the recovery by Landlord against Tenant of any sums or damages to which, in addition to the damages particularly provided above, Landlord may lawfully be entitled by reason of any default hereunder on the part of Tenant." (Lease §19.4)

22. Guarantor unconditionally and irrevocably guaranteed **all** of Tenant's obligations under the Lease. (Xenitelis Aff. ¶ 8)

23. Exhibit C is a true and correct copy of the Guaranty executed by Guarantor. (Xenitelis Aff. ¶ 8; Exh. M (RFA 1); Exh. N (Schoenfeld Dep.[5] 98/19-25))

24. The business terms of the Lease were negotiated between principals of Landlord and Tenant, with the involvement of a real estate broker. (Xenitelis Aff. ¶ 10)

25. The legal terms of the Lease were agreed to, and the Lease was drafted, between the parties' outside attorneys. (Xenitelis Aff. ¶ 10)

26. Landlord was represented by Pryor Cashman LLP, and Tenant by Eric Schoenfeld

---

[5] "Schoenfeld Dep." refers to the transcript of the deposition of Eric Schoenfeld, taken on February 27, 2019.

4

of the law firm Tannenbaum Helpern Syracuse & Hirschtritt LLP.  (Xenitelis Aff. ¶ 10)

27. Thor's General Counsel, Justin Xenitelis, was also involved in the negotiations and spoke with Pryor Cashman about the issues.  (Xenitelis Aff. ¶ 10)

28. Pryor Cashman circulated the first version of the Lease, based on a template supplied by Thor.  (Xenitelis Aff. ¶ 10; Answer ¶ 51)

29. Exhibit D to the Appendix includes the transmittal email and the first circulated draft of the Lease. (Xenitelis Aff. ¶ 11; Exh. N (Schoenfeld Dep. 26/6-11, 85/22-25))

30. Article XIX in the first draft set forth two alternative remedies upon Thor's termination of the Lease. ((Xenitelis Aff. ¶ 11; Exh. D at p. 47)

31. Section 19.2 in the first draft erroneously had the word "Additional" before "Rent" the first alternative remedy.  (Xenitelis Aff. ¶ 11; Plaintiff's Exh. D at p.47)

32.  The word "Additional" was also erroneously repeated in the next version of the Lease and in each subsequent draft until execution.  (Xenitelis Aff. ¶ 14)

33. Neither the parties nor their counsel ever discussed, much less agreed, to limit Thor's remedy to the recovery of "Additional" Rent. (Xenitelis Aff. ¶ 14; Exh. N (Schoenfeld Dep. 123/23-124/5, 128/2-23)).

34. Tenant's counsel overlooked the typographical error contained in the first and subsequent drafts of the Lease.  (See Schoenfeld Dep. 50/6-17; 51/9-52/23; 78/14-21)

35. In effect, there would be no significant damages recoverable under the first alternative remedy because Additional Rent is a relatively small number, from which all rent of a replacement tenant (net of expenses) is to be deducted. (Xenitelis Aff. ¶ 14)

36. On March 4, 2014, Thor sent Tenant a Notice of Delivery of Possession of the

Premises ("Notice of Delivery").  (Xenitelis Aff. ¶ 16)

37.     Exhibit E is a true and correct copy of the Notice of Delivery. (Xenitelis Aff. ¶ 16)

38.     The Notice of Delivery stated that Landlord's Work is substantially complete, and possession of the premises will be made available to Tenant on March 17, 2014.  (Xenitelis Aff. ¶ 16; Exh. E)

39.     The Notice of Delivery also asked Tenant to contact Geoff Ross (Thor's Director of Development) to "coordinate delivery of the possession of the Premises." (Xenitelis Aff. ¶ 16; Defendant's Exh. E)

40.     Tenant did not contact Geoff Ross (or anyone else at Thor) to coordinate delivery of possession, or to obtain the keys to the premises. (Xenitelis Aff. ¶ 16)

41.     The Lease's Commencement Date was March 28, 2014. ((Xenitelis Aff. ¶ 17; Exh. F).

42.     Since Tenant was based in Qatar and had no United States presence, Landlord did not have an address where it could actually deliver the keys to Tenant. (Xenitelis Aff. ¶ 17; (Exh. O (Sebag Dep. 136/18-137/11))

43.     So Thor held the keys for pickup by Tenant.  (Xenitelis Aff. ¶ 17)

44.     At no time since March 28, 2014 did Tenant ask Thor for the keys. (Xenitelis Aff. ¶ 17)

45.     At no time did Tenant return the keys to the premises to Landlord.  (Exh. O (Sebag Dep. 103/11-24))

46.     On May 12, 2015, representatives of Tenant came to New York and informed

6

Landlord that Tenant would not be opening the QELA store. (Polese Aff.[6] ¶ 8)

47. On May 19, 2015, Tenant stated in an email that "Qatar Luxury Group is restructuring and as such we will not require the space at this time." (Polese Aff. ¶ 8; Plaintiff's Exh. I)

48. Tenant also indicated that it was "going to engage local agents to market the space for potential replacements." (Exh. I)

49. On July 8, 2015, Tenant and Guarantor sent Landlord a notice that Tenant intended to surrender possession in less than two years ("Notice of Intent"). (Xenitelis Aff. ¶ 8)

50. Exhibit J is a true and correct copy of the Notice of Intent. (Xenitelis Aff. ¶ 8; Plaintiff's Exh. J)

51. The Notice of Intent stated that it was being delivered "retroactive to be effective as of [May 19, 2015]." (Xenitelis Aff. ¶ 8; Plaintiff's Exh. J)

52. The Notice of Intent disclosed that "Tenant is currently conducting a search for a subtenant for the Demised Premises for the remainder of the Term." (Exh. J)

53. Landlord rejected the Notice of Intent on the grounds that it provided less than the required two-years' notice. (Polese Aff. ¶ 8; Exh. K)

54. In September 2015, while Tenant was still in possession, it claimed that all of the conditions to cut off liability under the Guaranty had been satisfied. (Polese Aff. ¶ 8; Exh. L)

55. In breach of the Lease, Tenant failed to pay the $525,000 Fixed Rent due on September 1, 2015. (Xenitelis Aff. ¶ 18; Answer ¶ 63)

56. Thor served a default notice and demanded a cure of the rent default. ((Xenitelis

---

[6] "Polese Aff." refers to the Affirmation of Sam Polese, dated May 20, 2019.

7

Aff. ¶ 18;  Answer ¶ ¶  64, 65)

57.     Tenant did not cure, leading to Thor's termination of the Lease as of December 23, 2015.  (Xenitelis Aff. ¶ 18; Defendant's Exh. G; Answer ¶ ¶ 66-68, 81; Exh. M (RFA 4-6))

58.     In December 2015, Thor regained possession of the premises using its contractual self-help rights.  (Lease § 19.1.) (Xenitelis Aff. ¶ 18)

59.     Tenant breached the Lease by not starting, let alone completing Tenant's Work, described in Section 1.3(B) of the Lease.  (Xenitelis Aff. ¶ 19; Answer ¶ ¶ 62, 77, 78; Exh. M (RFA 8, 9))

60.     No physical construction of the planned Qela store at the premises was ever performed by Tenant.  (Exh. M (RFA 9))

61.     Eventually, Thor relet a portion of the Building to Tom Ford Retail LLC ("Tom Ford") pursuant to a lease dated July 18, 2016.  ((Xenitelis Aff. ¶ 20; Answer ¶ 69)

62.     Tom Ford's rent was significantly lower than Tenant's, reflecting a market change from 2013 to 2016: Tom Ford's monthly Fixed Rent was also $525,000, for more than double the space taken by Tenant. (Polese Aff. ¶ 10)

63.     Tom Ford opened for business and started paying rent in June 2017. (Polese Aff. ¶ 10)

64. At oral argument on a discovery motion before Magistrate Judge Cott, defendant's counsel correctly described the Guaranty as containing "conditions" that needed to be "satisfied" before the Guarantor's liability would get "cut off." (Exh. P at p. 16; see also p. 28)

Dated:  May 20, 2019

                                            M A T A L O N PLLC

                                            By: *s/Joseph Lee Matalon*
                                                   Joseph Lee Matalon
                                            450 Seventh Avenue, 33rd Floor
                                            New York, New York 10123
                                            (212) 244- 9000
                                            *Attorneys for Plaintiff*