**MATALON PLLC**
**450 Seventh Avenue, 33rd Floor**
**New York, New York 10123**
**Tel: (212) 244-9000**
**Email: nycourts@trial-lawyer.org**
  *Attorneys for Plaintiff*


**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------x
                                                          :
**THOR 680 MADISON AVE LLC,**                             :
                                                          :   **Case No.:  1:17-cv-08528 (PGG) (JLC)**
                              **Plaintiff,**              :
            **v.**                                        :
                                                          :
**QATAR LUXURY GROUP S.P.C., and**                        :
**QATAR FOUNDATION FOR**                                  :
**EDUCATION, SCIENCE AND**                                :
**COMMUNITY DEVELOPMENT,**                                :
                                                          :
                              **Defendants.**             :
----------------------------------------------------------x

**AFFIRMATION OF JUSTIN XENITELIS IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**JUSTIN A. XENITELIS** affirms as follows:

1.       I am the General Counsel of Thor Equities LLC ("Thor Equities") and have

served in that capacity since February 2011. Thor Equities is a leader in the development, leasing

and management of commercial, residential, retail and mixed-use assets in premier urban

locations.  The real property located at 680 Madison Avenue in New York City is a part of Thor

Equities' real estate investment trust, and Thor Equities also manages the property.  I am also an

adjunct professor at New York Law School, where I teach courses in commercial leasing, and

drafting real estate documents.  I make this affirmation in support of plaintiff's motion for partial

summary judgment.   I am familiar with the facts and circumstances stated below.

2.      Plaintiff Thor 680 Madison Ave LLC ("Thor" or "Landlord") is the ground lessee of the building at 680 Madison Avenue, occupying the entire length of Madison Avenue between 61st and 62nd Streets ("Building"). The Building, in the Upper West Side of Manhattan, neighbors flagship stores and expensive real estate.

**The Lease**

3.      On April 30, 2013, non-party Qatar Luxury Group Fashion USA Inc. ("Tenant") sent Thor a letter of intent to lease space in the Building for a flagship store housing the "QELA" brand.  A copy of the letter of intent is annexed to the Appendix to Plaintiff's Local Civil Rule 56.1 Statement ("Appendix") as Exhibit A.  Negotiations ensued and the parties entered into a lease on December 31, 2013 ("Lease").  A copy of the Lease is annexed to the Appendix as Exhibit B.  The term was 15 years with a renewal option.  (Lease §§ 1.2, 1.6) The premises, occupying a portion of the ground and second floors in the Building, were to be used for a first-class luxury retail store. (Lease § 5.1)

4.      Tenant agreed to pay "Rent," composed of "Fixed Rent" and "Additional Rent." (Lease § 2.1) Fixed Rent was due in monthly installments, initially $525,000 per month ($6.3 million annually), and escalating every three years thereafter.  (Lease § 2.1) Additional Rent was defined as all amounts due other than Fixed Rent, such as reimbursement for increases in real estate taxes.  (Lease §§ 2.1, 3.1)

5.      The parties agreed that Tenant – at its sole expense – would perform a complete build-out of the premises, referred to as "Tenant's Work."  Section 1.3(B) provides, in relevant part, "[a]t *Tenant's sole expense . . . Tenant shall perform* or cause the performance of its initial Alterations (as defined below) in and to the Premises and to promptly prepare the same for the operation of Tenant's business therein ('Tenant's Work')."  (Lease § 1.3(B), emphasis added)

2

Strict, time of the essence, deadlines were imposed by which Tenant had to complete the build-out of the store and open for business.[1]  Specifically, Tenant "*covenant[ed] and agree[d]* to (i) use diligent efforts *to complete Tenant's Work* . . .  as promptly as reasonably feasible and (ii) open for business to the public fully fixtured, stocked and staffed in accordance with Madison Avenue Standards" by a date certain.  (Lease § 1.3(B), emphasis added)  The Lease defined "Madison Avenue Standards" as "the operation, maintenance and repair of the Premises (and the business therein) or the Building . . . in a manner commensurate with the standards applicable to first-class luxury mixed-use properties consisting of residential and retail uses located on Madison Avenue between 59th Street and 72nd Street in the Borough of Manhattan, New York, New York." (Lease § 5.1) Additionally, once open, Tenant was required to continuously operate the store at the premises.  (Lease § 5.7)

6.     The Lease also has remedies for Tenant defaults.  If Tenant did not pay Rent on time, and did not cure after notice, Thor could terminate the Lease (Lease § 18.1)  and regain possession using self-help, including a lockout (Lease § 19.1)  In addition, there are various damages remedies upon termination for default.  Under one method, set forth in Section 19.2, damages accrue monthly based on the rent that would have been payable, with a deduction for the rent (net of applicable expenses) actually received from any replacement tenant.  An alternative remedy, contained in Section 19.3, is for liquidated damages payable in a lump sum, measured by the present-value difference between the future income stream to the end of the term, and the fair and reasonable rental value of the Premises for the same period.

---

[1]  The Lease required Tenant to submit its plans and specifications for Tenant's Work to Landlord for  approval  "no later than the later of (x) one hundred fifty (150) days after the Effective Date and (y) sixty (60) days after the Commencement Date, time being of the essence with respect to (x) and (y)."  (Lease § 1.3(B))

7.     The parties also agreed that nothing contained in the Lease "shall be construed as limiting or precluding the recovery by Landlord against Tenant of any sums or damages to which, in addition to the damages particularly provided above, Landlord may lawfully be entitled by reason of any default hereunder on the part of Tenant."  (Lease § 19.4)

**The Guaranty**

8.     Defendant Qatar Luxury Group S.P.C. ("Guarantor") unconditionally and irrevocably guarantied <u>all</u> of Tenant's obligations under the Lease.  A copy of the Guaranty is annexed to the Appendix as Exhibit C.  The Guaranty first set forth the Guarantor's obligations:

> Guarantor . . . does hereby unconditionally and irrevocably guaranty to Landlord . . . full and timely payment, performance and observance of, and compliance with, *all of Tenant's obligations under the Lease and damages*, costs and expenses arising from the holding over by Tenant . . . including, without limitation, the full and prompt payment of all Fixed Rent, Additional Rent and all other charges and sums due and payable by Tenant under the Lease (including, without limitation, Landlord's reasonable attorney's fees and disbursements) (collectively, the "<u>Obligations</u>"). . .

(Guaranty § 2, emphasis added).  However, if Tenant satisfied certain conditions, it could cut off its liability as of a certain date (termed the "Final Obligation Date"); otherwise its liability remained coextensive with Tenant's. The cut-off conditions included at least two-years' advance notice of Tenant's intent to surrender possession; actual tender of vacant possession, in condition required by the Lease; and return of the keys.[2]

---

[2] Section 2 of the Guaranty provided:

> [Guarantor's Obligations continue] through and including the date that Tenant and its assigns, sublessees and licensees, if any, shall have (i) *tendered vacant possession* of the Demised Premises to Landlord in the condition required pursuant to the terms of the Lease, (ii) *delivered the keys* to the Demised Premises to Landlord and (iii) provided Landlord with not less than *two (2) years' prior written notice,* in the manner provided in this Guaranty, of Tenant's intention to tender vacant possession of the Demised Premises to Landlord (the date on which the last to occur of (i), (ii) and (iii) shall be deemed to be the "<u>Final Obligation Date</u>"). . .

9.      Further, the Guarantor was required to either pay, or cause Tenant to pay, <u>all</u> Rent (inclusive of Fixed Rent) through the "Final Obligation Date."[3]

## The Mutual Mistake In Section 19.2 Excluding Fixed Rent From Damages

10.     The business terms of the Lease were negotiated between principals of Landlord and Tenant, with the involvement of a real estate broker.  The legal terms were agreed to, and the Lease was drafted, between the parties' outside attorneys.  Landlord was represented by Pryor Cashman LLP, and Tenant by Eric Schoenfeld of the law firm Tannenbaum Helpern Syracuse & Hirschtritt LLP.  I was also involved in the negotiations and spoke with Pryor Cashman about the issues.

11.     Pryor Cashman drafted and circulated the first version of the Lease, using a standard form of lease that had been provided to me by other outside counsel for Thor, which I in turn furnished to Pryor Cashman.  A copy of the first version of the Lease, sent by Pryor Cashman to Mr. Schoenfeld, with the transmittal email, is annexed to the Appendix as Exhibit D. That form contained a typographical error in one of the damages remedies, in that it permitted recovery of damages measured only by "Additional Rent" (<u>e.g.</u> a portion of real estate tax increases), thereby excluding Fixed Rent:

> "In the event of a termination of this Lease, Tenant shall pay to Landlord, as damages, at the election of Landlord, sums equal to the aggregate of all *Additional* Rent that would have been payable by Tenant had this Lease not terminated, payable upon the due dates therefor

---

[3] Section 2 of the Guaranty also stated:

On or before the expiration of the Final Obligation Date, Guarantor shall pay, or shall cause Tenant to pay, to Landlord all Fixed Rent, Additional Rent and all other charges and sums due and payable by Tenant under the Lease due and payable up to and including the Final Obligation Date (but specifically excluding any accelerated Fixed Rent, Additional Rent and all other charges and sums due and payable by Tenant under the Lease).

specified herein until the date hereinbefore set forth for the expiration of the Term; provided, however, that if Landlord shall relet all or any part of the Premises . . . Landlord shall credit Tenant with the net rents received from such reletting, when received, net of expenses incurred by Landlord in terminating this Lease and re-entering the Premises and securing possession thereof, as well as the expenses of reletting, including altering and preparing the Premises for new tenants, brokers' commissions, and all other expenses properly chargeable against the Premises and the rental therefrom in connection with such reletting . . ." (Emphasis added.)

12.     The mistaken inclusion of the word "Additional" before "Rent" in the damages formulation of Thor's standard form went unnoticed in the Lease (as well as other leases that Thor and its affiliates had entered into before Thor discovered the error in the Lease). Consistent with standard industry norms, Thor's intention was to measure damages by all Rent that would have been payable had Thor not terminated the leases -- not merely for Additional Rent -- so that Thor would be made whole upon termination. It would have been illogical and nonsensical for Thor to propose -- let alone agree -- to limit its damages to "Additional Rent" and forego any right to recover fixed rent in the event of a lease termination. The standard liquidated-damages formulation in commercial real estate leases includes fixed rent payable under such leases, and is never limited solely to other additional items of rent.

13.     Since Pryor Cashman used the standard form as a template for the first draft without correcting the unnoticed typographical error, the error carried over into the first draft of the Lease sent to Eric Schoenfeld. (Ex. D at p.47) Thus, Article XIX in the first draft set forth the two alternative remedies upon Thor's termination of the Lease, and erroneously used the words "Additional Rent" instead of "Rent" in the first alternative remedy.

14.     Critically, neither the parties nor their counsel ever discussed, much less agreed, to limit Thor's remedy to the recovery of "Additional Rent." In effect, there would be no significant damages recoverable because Additional Rent is a relatively small number, from which all rent of a replacement tenant (net of expenses) is to be deducted. The word

"Additional" was erroneously repeated in the next version of the Lease and in each subsequent draft until execution.  The repetition of the mistake in all subsequent drafts of the Lease is not surprising given the length of the Lease (77 single-spaced pages, not including exhibits), and the propensity of attorneys to review drafts of agreements without reading every single word, but instead anticipating words they expect to read based on the provisions that customarily appear in such documents.

15.     I have negotiated and reviewed hundreds of commercial leases in my career as attorney and law professor.  I have never before encountered a lease which measured damages only by additional rent and excluded fixed monthly rent.  Section 19.2 is plainly an error that was not caught by anyone involved.

**Commencement Of Lease Term And Continuous Availability Of The Keys**

16.     On March 4, 2014, Thor sent Tenant a Notice of Delivery of Possession of the Premises ("Notice of Delivery").  A copy of the Notice of Delivery is annexed to the Appendix as Exhibit E.  The Notice of Delivery stated that Landlord's Work is substantially complete, and possession of the premises will be made available to Tenant on March 17, 2014.  The Notice of Delivery also asked Tenant to contact Geoff Ross (Thor's Director of Development) to "coordinate delivery of the possession of the Premises."  But Tenant did not contact him (or anyone else at Thor) to coordinate delivery of possession, or to obtain the keys to the premises.

17.     The Lease's Commencement Date was March 28, 2014.  See Ex. F.  Since Tenant was based in Qatar and had no United States presence, Landlord did not have an address where it could actually deliver the keys to Tenant, so Thor held the keys for pickup by Tenant.  To my knowledge, at no time since March 28, 2014 did Tenant ask Thor for the keys.

7

**Thor Terminates The Lease For Tenant's Rent Default And Retakes Possession**

18.     In clear breach of the Lease, Tenant failed to pay the $525,000 Fixed Rent due on September 1, 2015.  Thor thus served a default notice and demanded a cure. Tenant did not cure, leading to Thor's termination of the Lease as of December 23, 2015.  See Exhibit G.  Thor then retook possession of the premises using its contractual self-help rights.  (Lease § 19.1.)

19.     Tenant had also breached the Lease by not starting, let alone completing, Tenant's Work.

**Vacancy Of The Premises And The Tom Ford Lease**

20.      For about two years after the Notice of Intent, the Premises remained vacant and Thor did not collect rent, although it periodically drew down on the security deposit (in the form of a letter of credit).  Ultimately, Thor relet a portion of the Building to Tom Ford Retail LLC ("Tom Ford") pursuant to lease dated July 18, 2016.

**The Presence Of The Error In Thor's Other Leases**

21.     The leases that Thor (and its affiliates) entered into for other Madison Avenue retail premises before Thor discovered the error in the Lease contain the same typographical error as the Lease:  these leases were also drafted using the standard form that served as a template for the Lease, and as was the case here, the error was not picked up by landlord or any of the tenants.  See Thor's leases with  (a) Luxury Optical Holdings Co. (dated August 8, 2014, for premises at 680 Madison Avenue), (b) Madison Fur LLC (dated April 30, 2015, for premises at 790 Madison Avenue), (c) Brioni Roman Style USA Corp. (dated June 8, 2015, for premises at 680 Madison Avenue), and (d) Roland Mouret (dated June 29, 2015, for premises at 1006

Madison Avenue).  Copies of the relevant portions of these leases are annexed to the Appendix as Exhibit H.

22.     Thor used a different standard form as a template for its office space leases, which did not contain the mistake at issue. As a result, Thor's lease with Panache Bridal of New York (dated April 29, 2015, for office space at 545 Madison Avenue) does not contain the typographical error that exists in the Lease.  Clearly, Thor did not have a practice or intent to measure damages only by Additional Rent; otherwise the Panache Bridal lease would have contained a similar provision.

23.     By the time Thor entered into the lease with Tom Ford -- and as a result of the careful study of the document engendered by the present dispute -- Thor discovered and corrected the error in its standard form lease.  Thus, the first damages formulation in the Tom Ford lease provides for the recovery of Rent that would have been payable under the lease had the lease not been terminated.

I AFFIRM UNDER PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Dated: May 20, 2019

JUSTIN A. XENITELIS