**MATALON PLLC**
450 Seventh Avenue, 33rd Floor
New York, New York 10123
Tel: (212) 244-9000
Email: nycourts@trial-lawyer.org
   *Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
**THOR 680 MADISON AVE LLC**,                               :
                                                            :   Case No.: 1:17-cv-08528 (PGG) (JLC)
                        Plaintiff,                          :
         v.                                                 :
                                                            :
**QATAR LUXURY GROUP S.P.C.**, and                          :
**QATAR FOUNDATION FOR**                                    :
**EDUCATION, SCIENCE AND**                                  :
**COMMUNITY DEVELOPMENT**,                                  :
                                                            :
                        Defendants.                         :
------------------------------------------------------------x

### AFFIRMATION OF SAM POLESE IN SUPPORT OF
### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**SAM POLESE** duly affirms as follows:

1.      I am the Executive Vice President of Leasing of Thor Equities LLC ("Thor Equities") and have served in that capacity for 16 years. Thor Equities is a leader in the development, leasing and management of commercial, residential, retail and mixed-use assets in premier urban locations.  The real property located at 680 Madison Avenue in New York City is a part of Thor Equities' real estate investment trust, and Thor Equities also manages the property. My responsibilities as Executive Vice President of Leasing are to lease vacant space, negotiate the business terms of leases, and offer guidance to Thor Equities' acquisition team concerning

rents in the marketplace. I make this affidavit in support of plaintiff's motion for partial summary judgment. I am familiar with the facts and circumstances stated below.

**The Lease**

2. On April 30, 2013, Tenant sent Thor a letter of intent to lease space in the Building for a flagship QELA store ("Letter of Intent"). A copy of the Letter of Intent is annexed to the Appendix to Plaintiff's Local Civil Rule 56.1 Statement ("Appendix") as Exhibit A. Negotiations ensued, and eight months later, the parties entered into a lease dated December 31, 2013 ("Lease"). A copy of the Lease is annexed to the Appendix as Exhibit B. I negotiated the business points that led to the Lease.

3. The term was 15 years with a renewal option. (Lease §§ 1.2, 1.6) The premises, occupying a portion of the ground and second floors in the Building, were to be used for a first-class luxury retail store under the trade name "QELA." (Lease § 5.1) Fixed Rent was due in monthly installments, initially $525,000 per month ($6.3 million annually), and escalating every three years thereafter. (Lease § 2.1)

4. Upon delivery to Tenant, the premises were a "cold, dark shell," meaning that it had an unfinished interior and lacked heating, ventilation, and air conditioning (HVAC), and had no lighting, plumbing, ceilings, elevators, or interior walls. The parties agreed that Tenant – at its sole expense – would perform a complete build-out of the premises, referred to as "Tenant's Work." Specifically, Tenant "*covenant[ed] and agree[d]* to (i) use diligent efforts *to complete Tenant's Work . . .* as promptly as reasonably feasible and (ii) open for business to the public fully fixtured, stocked and staffed in accordance with Madison Avenue Standards" by a date certain. (Lease § 1.3(B), emphasis added) The Lease defined "Madison Avenue Standards" as "the operation, maintenance and repair of the Premises (and the business therein) or the Building

2

. . . in a manner commensurate with the standards applicable to first-class luxury mixed-use properties consisting of residential and retail uses located on Madison Avenue between 59th Street and 72nd Street in the Borough of Manhattan, New York, New York." (Lease § 5.1)

5.   Additionally, Landlord bargained for a provision that required Tenant to continuously operate the store at the premises (Lease § 5.7) The continuous-operation clause was important because non-operating space in a building of this nature is harmful, even if the landlord collects rent from the tenant.  A closed store diminishes foot traffic to the building, making both the occupied and available spaces in the building less desirable, ultimately lowering their market value.  An empty store is also unsightly (especially when, as here, part of it was on street level), and may damage landlord's industry reputation, particularly if it continues for an extended period.

**The Guaranty**

6.   Defendant Qatar Luxury Group S.P.C. ("Guarantor") guaranteed all of Tenant's obligations under the Lease.  A copy of the Guaranty is annexed to the Appendix as Exhibit C.  However, upon satisfaction of certain specified conditions, the Guarantor's liability could be cut off as of the last to occur of the conditions.  One of the conditions – the giving of at least two years' advance notice that Tenant would be surrendering possession – was not satisfied, and can no longer be satisfied.  Thus, Guarantor's liability remains the same as the Tenant's.

7.   Specifically, Tenant was required to "provide[] Landlord with not less than two (2) years' prior written notice, in the manner provided in this Guaranty, of Tenant's intention to tender vacant possession of the Demised Premises to Landlord".  It was critical for Landlord to have at least two years' advance notice of the time it would be getting the space back.  Landlord bargained for two years' lead time to market the space, locate a replacement tenant, negotiate

and sign a lease, and have the new tenant transition smoothly into the space with a minimum of down time. This is a time-consuming process that can easily take two years. Madison Avenue rents are extremely expensive (the annual rent here exceeded $6 million), so leasing space in our building is a major corporate decision for any prospective tenant, especially if (as was the case with Tenant and Tom Ford) the tenant needs to build out the space for a flagship store. Moreover, given the undertakings involved, negotiation of the lease can take a long time; the Lease here took 8 months from start to finish, and the Tom Ford lease took a year. Landlord bargained for two years' advance notice so that the new tenant would be ready to start its own work the day after possession was regained, thereby minimizing the period in which there is not an operating store in the building, for the reasons I outlined above.

**Tenant And Guarantor's Notice Of Intent To**
**Tender Vacant Possession Of The Premises To Landlord**

8. Just months into the Lease, on May 12, 2015, representatives of Tenant came to New York and abruptly informed me that Tenant would not be opening the QELA store. A week later, I received an email from a Tenant representative that "Qatar Luxury Group is restructuring and as such we will not require the space at this time." A copy of the May 19, 2015 email is annexed to the Appendix as Exhibit I. Eventually, on July 8, 2015, Tenant and Guarantor sent Landlord a notice that it intended to surrender possession in *less* than two years. (See Ex. J) Moreover, the Notice of Intent stated that it was being delivered "retroactive to be effective as of [May 19, 2015]" -- the date of Tenant's prior email. Landlord rejected that notice on the ground that it was "improper as it attempts to provide less than the required two years' notice." (See Ex. K) Remarkably, on September 14, 2015 – while Tenant was still in possession – Tenant's counsel asserted that "all the conditions of ¶ 2 of the Guaranty have been satisfied, thereby fixing

the Final Obligation Date (as defined in the Guaranty) and cutting off any further obligations of the Guarantor under the Guaranty (to the extent there are any)." (See Ex. L)

9. After Tenant defaulted in the rent as of September 1, 2015, Landlord terminated the Lease and re-entered the Premises in December 2015. Tenant claims that these events constituted a "tender" of possession, which Thor disputes. What is thoroughly indisputable is that Landlord did not have the two years' advance notice that it would be regaining possession – even if the self-help re-entry can be deemed a tender of possession by Tenant. So under any view of the facts, defendant's liability was not truncated.

**Vacancy Of The Premises And The Tom Ford Lease**

10. Tenant never opened the QELA store, and the premises remained empty for about two years after the Notice of Intent. Ultimately, Thor relet a portion of the Building to Tom Ford Retail LLC ("Tom Ford") pursuant to lease dated July 18, 2016. (As noted, the lease negotiations took about one year.) Tom Ford leased more than double the space leased to Tenant. Tom Ford's rent was significantly lower than Tenant's, reflecting a market change from 2013 to 2016: Tom Ford's monthly Fixed Rent was also $525,000, for more than double the space taken by Tenant. Tom Ford opened for business and started paying rent in June 2017.

I AFFIRM UNDER PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

SAM POLESE

Dated: May 20, 2019

5