**MATALON PLLC**
**450 Seventh Avenue, 33rd Floor**
**New York, New York 10123**
**Tel: (212) 244-9000**
**Email: nycourts@trial-lawyer.org**
 *Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
THOR 680 MADISON AVE LLC,                         :
                                                  : Case No.: 1:17-cv-08528 (PGG) (JLC)
            Plaintiff,                            :
      v.                                           : **PLAINTIFF'S RESPONSE**
                                                  : **TO DEFENDANT QATAR**
                                                  : **LUXURY GROUP S.P.C.'S**
QATAR LUXURY GROUP S.P.C., and                    : **UNDISPUTED MATERIAL FACTS**
QATAR FOUNDATION FOR                              : **PURUSANT TO LOCAL CIVIL RULE**
EDUCATION, SCIENCE AND                            : **56.1**
COMMUNITY DEVELOPMENT,                            :
                                                  :
            Defendants.                           :
------------------------------------------------------------x

Plaintiff Thor 680 Madison Ave LLC ("Thor"), through counsel, responds to the Local

Rule 56.1 Statement of Defendant Qatar Luxury Group S.P.C ("QLG") as follows:

**A.    QLG Fashion Enters Into A Lease With Thor 680 Madison Ave LLC.**

1.    On April 30, 2013, QLG Fashion's real estate broker sent Thor a non-binding Letter
of Intent to lease commercial rental space in order to locate a flagship store for the luxury brand
"Qela" on the 61st Street corner of 680 Madison Avenue, a luxury retail space operated by Thor.
(Ex. 1, 4/30/2013 QLG Letter of Intent ("LOI").)

        Response:  Not disputed

2.    That LOI did not mention any damages provisions to be included in the Lease.  (*Id.*)


        Response:  Not disputed

3.    On May 28, 2013, Thor's counsel, Pryor Cashman, prepared a proposed draft of the
Lease and sent it to QLG Fashion's counsel, Tannenbaum Helpern Syracuse & Hirschtritt. (Ex. 2,
5/28/2013 E-Mail Exchange; Ex. 3, 5/28/2013 Thor Initial Lease Draft.)

        Response:  The record does not disclose the date(s) on which Pryor Cashman

"prepared" the draft. Plaintiff does not dispute that the draft was   transmitted to opposing counsel on May 28, 2013 via email.

4.      On June 5, 2013, QLG Fashion's broker contacted Thor's representatives, noting that "the lease draft that was sent had little similarity to the term sheet/LOI." (Ex. 4, 6/5/2013 E-Mail from Richard Hodos to Sam Polese, at 2.)

        Response: Plaintiff does not dispute that the broker made that statement, but does not agree with his characterization.

5.      On July 3, 2013, Thor's counsel sent a revised draft of the Lease to QLG Fashion's counsel. (Ex. 5, 7/3/2013 E-Mail from Pryor Cashman; Ex. 6, 7/3/2013 Thor Lease Draft.)

        Response: Not disputed

6.      On August 6, 2013, QLG Fashion's counsel sent an extensively revised version of the Lease to Thor's counsel. (Ex. 7, 8/6/2013 E-Mail; Ex. 8, 8/6/2013 QLG Fashion Lease Draft.)

        Response: The term "extensively" is subjective, but plaintiff does not otherwise dispute the allegation.

7.      As noted on August 22, 2013, by Thor's General Counsel, Justin Xenitelis, QLG Fashion's August draft of the Lease contained over 2,000 changes made by QLG Fashion's counsel. (Ex. 9, 8/22/2013 Xenitelis E-Mail.)

        Response: The number "2,000" is misleading because it is based on a software count of the repositioning of text and does not actually reflect the number of substantive changes.

8.      Following revisions by Thor's counsel, QLG Fashion's counsel distributed another revised draft of the Lease on November 1, 2013, back to Thor's counsel. (Ex. 10, 11/1/2013 Schoenfeld E-Mail and 11/1/2013 QLG Fashion Lease Draft.)

        Response: Not disputed

9.      Later in November, Thor's counsel sent another revised draft of the Lease to QLG Fashion's counsel. (Ex. 11, 11/6/2013 Pryor Cashman E-Mail; Ex. 12, 11/6/2013 Thor Lease Draft.)

        Response: Not disputed

10.     On December 31, 2013, Thor and QLG Fashion entered into the final Lease for approximately 6,230 square feet of retail space at 680 Madison Avenue (the "Premises"). (SAC ¶ 1; Ex. 13, Final Lease.)

        Response: Plaintiff disputes the number of square feet to the extent defendant is suggesting that is the actual amount of square feet within the Premises. That figure represents "leasable" square feet, a term which includes an allocation of common

area of the building outside the Premises, to the Premises.

**B.     QLG Guarantees The Lease Between QLG Fashion And Thor.**

11.     In connection with the Lease, QLG entered into a Good Guy Guaranty ("the Guaranty") with Thor. (Ex. 14, Good Guy Guaranty.)

Response:  Not disputed

12.     Pursuant to the Guaranty, QLG guaranteed QLG Fashion's performance of its obligations under the Lease:

> Guarantor … does hereby unconditionally and irrevocably guaranty to Landlord and to Landlord's executors, administrators, heirs and successors and assigns, full and timely payment, performance and observance of, and compliance with, all of Tenant's obligations under the Lease and damages, costs and expenses arising from the holding over by Tenant (or any other person or entity claiming by, through or under Tenant), including, without limitation, the full and prompt payment of all Fixed Rent, Additional Rent and all other charges and sums due and payable by Tenant under the Lease (including, without limitation, Landlord's reasonable attorneys' fees and disbursements) (collectively, the "Obligations") ….

(*Id*. § 2.)

Response:  Not disputed

13.     QLG is not responsible for QLG Fashion's obligations under the Lease that arise after the "Final Obligation Date," which is defined as:

> [T]he date that Tenant and its assigns, sublessees and licensees, if any, shall have (i) tendered vacant possession of the Demised Premises to Landlord in the condition required pursuant to the terms of the Lease, (ii) delivered the keys to the Demised Premises to Landlord and (iii) provided Landlord with not less than two (2) years' prior written notice, in the manner provided in this Guaranty, of Tenant's intention to tender vacant possession of the Demised Premises to Landlord (the date on which the last to occur of (i), (ii) and (iii) shall be deemed to be the "<u>Final Obligation Date</u>").

(*Id*. (emphasis in original).)

Response:  There are circumstances where QLG would have obligations after the Final Obligation Date.  See, e.g., Section 10 of the Good Guy Guaranty.  Plaintiff does not dispute that defendant has accurately set forth the definition of Final Obligation Date.

14.     QLG's obligations as Guarantor expressly exclude accelerated rent under § 19.3 of

the Lease:

> On or before the expiration of the Final Obligation Date, Guarantor shall pay, or shall cause Tenant to pay, to Landlord all Fixed Rent, Additional Rent and all other charges and sums due and payable by Tenant under the Lease due and payable up to and including the Final Obligation Date (but specifically excluding any accelerated Fixed Rent, Additional Rent and all other charges and sums due and payable by Tenant under the Lease).

(*Id.*)

> Response:  Disputed.  The exclusion of accelerated fixed rent in the Guaranty applies only if a Final Obligation Date has been properly and effectively fixed. Otherwise, guarantor's obligations are co-extensive with the tenant's, which may include accelerated fixed rent.  In addition, the Guaranty does not reference Section 19.3 of the Lease.

### C.      QLG Fashion Defaults And Does Not Open The Store.

15.      QLG Fashion anticipated opening a retail store at the Premises for its high-end luxury brand, Qela. (SAC ¶ 1; Ex. 13 § 5.1.)

> Response:  Not disputed

16.      QLG Fashion was required to complete its buildout of the Premises on or before the Work Completion Date, defined as "the date in the fifteenth (15th) month after the Commencement Date that is the same numerical date as the Commencement Date[.]" (Ex. 13 § 1.3(B).)

> Response:  Not disputed

17.      The  Commencement  Date  was  March  28,  2014.  (Ex.  15,  3/28/2014 Commencement Date Letter.)

> Response:  Not disputed

18.      The Work Completion Date was June 28, 2015. (Ex. 13 § 1.3(B).)

> Response:  Not disputed

19.      QLG Fashion did not complete the anticipated buildout of the Qela store by the Work Completion Date. (SAC ¶ 47; Answer to SAC ¶ 47.)

> Response:  Not disputed

20.      During this time, QLG Fashion did not perform any physical construction in the Premises. (Ex. 16, Laurent Sebag Depo. at 20:21-25.)

> Response:  Not disputed

21.     By March 11, 2015, Thor was aware that QLG Fashion would not complete the anticipated buildout by the Work Completion Date, and Albert Dayan, Thor's Director of Leasing, stated that he would "love to get more rent out of them in exchange for another 12 month period to open for business." (Ex. 17, 3/11/2015 Albert Dayan E-Mail.)

> Response:  This allegation is not relevant, but is not disputed.

22.     On March 17, 2017, Sam Polese, Executive Vice President of Thor Equities, informed QLG Fashion's broker that it would take a rent increase of $600,000 per year for QLG Fashion to stay in the space and obtain a later opening date. (Ex. 18, 3/17/2015 Polese E-Mail; Ex. 19, 3/20/2015 Polese E-Mail.)

> Response:  This allegation is not relevant, but is not disputed.

23.     On May 19, 2015, Mohamed Dobashi of QLG contacted Mr. Polese to request permission to sublease the premises in light of QLG Fashion's intent not to open a store. (Ex. 20, May 2015 Dobashi/Polese E-Mail Exchange.)

> Response:  Disputed.  The May 19, 2015 email from Mohamad Dobashi did not request permission to sublease the premises, but stated that QLG was "going to engage local agents to market the space for potential replacements."  (Thor Ex. I)]

24.     Section 10.1 prohibited QLG Fashion from finding a subtenant without Thor's prior written consent. (Ex. 13 § 10.1(A).)

> Response:  Disputed.  Section 10.1 of the Lease prohibited QLG Fashion from subletting the Premises without Thor's prior written consent.

25.     On May 27, 2015, Mr. Polese responded that Thor would permit QLG to seek out a subtenant. (Ex. 20.)

> Response:  Disputed.  Mr. Polese responded that Thor has "no objection to [QLG] engaging agents to locate a suitable subtenant."  (Ex. 20.)

26.     On July 8, 2015, QLG Fashion delivered a notice of intent to tender vacant possession of the Premises. (Ex. 21, QLG Fashion Notice of Intent to Tender Vacant Possession.)

> Response:  Disputed.  The referenced letter was sent on behalf of both QLG and QLG Fashion.  Plaintiff also disputes that the letter was a proper or effective notice of intention under the Guaranty.

27.     QLG Fashion's notice of intent to tender vacant possession attempted to backdate its effective date to Mr. Dobashi's May 19, 2015 e-mail to Mr. Polese, but otherwise complied with all requirements for such a notice under the Guaranty. The notice also informed Thor of its intent to sublet the Premises, following Mr. Polese's prior grant of permission to do so. (*Id.*; Ex. 14 § 13.)

Response:  Disputed.  The notice was improper not only because it attempted to backdate the effective date, but also stated an intention to deliver vacant possession in less than two years, while the Guaranty required at least two years' Plaintiff also disputes that "the notice also informed Thor of its intent to sublet the Premises, following Mr. Polese's prior grant of permission to do so."  The notice stated that "Tenant is currently conducting a search for a subtenant for the Demised Premises for the remainder of the Term."  (Thor Ex. J)

28.    On August 4, 2015, Mr. Polese contacted Mr. Dobashi, telling Mr. Dobashi that Thor was "in a position to start a dialogue about terminating the Qela lease."  (Ex. 22, August 2015 Polese/Dobashi E-Mail Exchange, at 2.)

Response:  Not disputed

29.    On August 17, 2015, Mr. Polese relayed Thor's position that it "anticipate[d] that the damages recoverable under Section 19.2 of the lease are almost $38mm."  (*Id*. at 1.)

Response:  Not disputed

30.    On August 31, 2015, counsel for QLG Fashion sent Thor a notice of QLG Fashion's intent to find a subtenant. (Ex. 23, 8/31/2015 QLG Fashion Notice of Intent to Sublease.)

Response:  Disputed.  The referenced letter indicated Tenant's intention to advertise and/or publicize the availability of the Premises.

31.    On September 3, 2015, counsel for Thor notified QLG Fashion that Thor would not consent to QLG Fashion finding a subtenant, both because it was in breach of the Lease for failure to build out and because Thor "finds it difficult to believe that such a short-term sublease would be attractive to any suitable candidate for the premises."  (Ex. 24, 9/3/2015 Thor Response to QLG Fashion Notice of Intent to Sublease.)

Response:  Disputed in part.  On September 3, 2015, counsel for Thor notified QLG Fashion:

"The Lease provides that Tenant may only enter into a sublease or assignment 'provided that Tenant is not in default of any of Tenant's obligations under this Lease[']" among other conditions (Section 10.1(B)(4)).  Tenant, however, is indisputably in default of the Lease, for failure to complete Tenant's Work (Section 1.3(B)).  Accordingly, Landlord will not be required to approve any proposed assignment or sublease, and at this juncture, Landlord does not intend to do so.  Therefore, Landlord insists that Tenant refrain from advertising the space."

Counsel for  Thor also stated  on September 3, 2015: "Moreover, assuming the notice is valid, Landlord finds it difficult to believe that such a short term sublease would be attractive to any

suitable candidate for the premises."
(Thor Ex. K)

32.     On September 9, 2015, Thor sent a Notice of Default stating that QLG Fashion was in default "due to Tenant's failure to pay rent and/or other charges due under the Lease." (Ex. 25, 9/9/2015 Notice of Default.)

Response:  Not disputed

33.     On December 9, 2015, Thor sent QLG Fashion a Notice of Termination stating that Thor was terminating the Lease "on the ground that Tenant has failed to cure the default in the payment of rent and/or other charges due under the Lease, as demanded in Landlord's Notice of Default, dated September 9, 2015 …." (Ex. 26, 12/9/2015 Notice of Termination.)

Response:  Not disputed

34.     Neither the Notice of Default nor the Notice of Termination mentions the fact that QLG Fashion did not build out the anticipated Qela store. (*See* Exs. 25, 26.)

Response:  Plaintiff disputes the implication that the referenced notices needed to mention to build out default to recover damages for such breach.  The allegation is not otherwise disputed.

35.     The Notice of Termination became effective at 11:59 P.M. on December 23, 2015. (Ex. 26.)

Response:  Not disputed

36.     Thor received vacant possession of the Premises as of 11:59 P.M. on December 23, 2015.  (*Id.*)

Response:  Disputed.  Thor did not "receive" vacant possession from the Tenant at any time, but exercised its right of re-entry.  That occurred some time after the termination became effective.

37.     The keys to the Premises were in Thor's possession at all times between commencement and termination of the lease, and QLG Fashion never received them. (Ex. 16 at 103:21-24; Ex. 27, Justin Xenitelis Depo. at 124:20 – 125:12.)

Response:  Disputed in part.  Thor disputes the characterization that QLG never "received" the keys given the fact that Tenant did not contact Geoff Ross to coordinate delivery of possession of the Premises, as directed by Thor.  (Xenitelis Aff.  ¶ 16, Thor Ex. E)

38.     QLG Fashion had never been notified that the keys to the Premises were available, and was told by Mr. Polese following the Notice of Default that it was not allowed to pick up the keys. (Ex. 28, 10/3/2015 Dobashi E-Mail.)

Response: Disputed. There is no evidence of any statement by Mr. Polese to Mr. Dobashi that QLG Fashion was not allowed to pick up the keys. The record evidence is to the contrary. On March 4, 2014, Thor sent Tenant a Notice of Delivery of Possession of the Premises asking Tenant to contact Geoff Ross (Thor's Director of Development) to "coordinate delivery of possession of the Premises." Tenant did not contact Geoff Ross (or anyone else at Thor) to coordinate delivery of possession or to obtain the keys to the premises. (Xenitelis Aff. ¶ 16, Thor Ex. E) Guarantor's corporate representative testified at deposition that the keys "have always been available." (Ex. O (Sebag dep.) 136/18-137/11)

39.     At termination, the Premises were in the same condition as when Landlord's Work was completed, including being vacant and broom clean, and free of debris and Tenant's Moveable Property. (Ex. 27 at 124:7-19; 133:5 – 134:1.)

Response: Not disputed.

40.     At his deposition, Mr. Xenitelis professed his belief that, despite the Lease requiring Thor to deliver the Premises in "good, structurally sound condition," the Premises may not have been in good condition at the time it was delivered to QLG Fashion, which would have been a breach of the Lease on Thor's part. (*Id.* at 134:12 – 137:2.)

Response: Disputed. Thor disputes the characterization of Mr. Xenitelis' testimony and the Lease. Mr. Xenitelis testified that the premises were to be delivered "as is" except for Thor's obligation to perform "Landlord's Work." The Lease provides that Landlord shall not be required to perform any work to prepare the Premises for Tenant's occupancy, except for Landlord's Work. In addition, Mr. Xenitelis' testimony was that it was possible that the Premises may not have been in good order, condition and state of repair at the time the Premises was delivered to QLG Fashion, to the extent that some areas within the Premises, mechanicals or the like were not included as part of "Landlord's Work." (Ex. 27 at 134:2 – 137:2; Ex. B (Lease) §1.3(A))

41.     On July 18, 2016, Thor relet the Premises to Tom Ford, another high-end luxury retailer. (SAC ¶ 69; Ex. 29, Tom Ford Lease.)

Response: Not disputed.

**D.     Provisions Addressing The Condition Of The Premises**

42.     Under § 1.3(A) of the Lease, Thor was to perform certain initial improvements (called "Landlord's Work") at its own expense. (Ex. 13 § 1.3.)

Response: Not disputed.

43.     That work included, for example, installing partitions to separate the leased Premises from the rest of the building, a concrete floor slab, a "stick-built" storefront, and an

elevator between the first and second floors, and providing access for QLG Fashion to connect to utilities. (*Id.* Ex. B.)

        Response:  Not disputed, but that is not a complete statement of Landlord's Work.

44.    Following the completion of Landlord's Work, Thor was to deliver the Premises in:

> [V]acant and broom clean condition, free of tenancies and rights of
> occupancy, with all of Landlord's Work substantially completed in a good
> and workmanlike manner and in accordance with all applicable Laws,
> subject only to minor punch list items which shall be completed by Landlord
> within thirty (30) days following such delivery date, and to Landlord's
> actual knowledge, water-tight, free of Hazardous Substances or Waste, and
> in a good, structurally sound condition (and Tenant has received a certificate
> signed by a licensed architect certifying to Tenant that Landlord's Work is
> so substantially complete).

(*Id.* § 1.4(A).)

        Response:  Not disputed.

45.    QLG Fashion would then build out the anticipated Qela store at its own expense (called "Tenant's Work"). (*Id.* § 1.3(B).)

        Response:  Not disputed.

46.    The Qela store was required to conform to "Madison Avenue Standards"—which essentially meant a standard commensurate with other "first class" retail stores on Madison Avenue between 59th Street and 72nd Street—for the course of its active operation. (*Id.* § 5.1.)

        Response:  Not disputed.

47.    QLG Fashion had approximately 15 months to complete the buildout and open its store for business (the "Work Completion Date").  (*Id.*)

        Response:  Not disputed.

48.    Section 6.1 addresses the parties' respective ownership of improvements to the property. QLG Fashion is deemed to own all "Moveable Property," which is defined as:

> [A]ll moveable furniture, equipment and any other items that are the
> property of Tenant and are not affixed to the Premises, excluding shelving,
> and any of Tenant's trade fixtures and equipment that is affixed to the
> Premises so long as any damage to the Premises incurred by reason of such

affixed Moveable Property or the removal thereof is repaired by Tenant at
the end of the Term in the manner herein required pursuant to Article 21.5.

(*Id*. § 6.1.)

    Response:  Not disputed.

49.    Thor, on the other hand, is deemed to own all other "fixtures, equipment,
improvements and installations attached to, or built into, the Premises at the commencement of or
during the Term." (*Id*.)

    Response:  Not disputed.

50.    Two provisions address the condition in which QLG Fashion was required to return
the Premises to Thor following the expiration or termination of the Lease. The first requires QLG
Fashion to return the property "broom-clean and in good condition." (*Id*. § 8.1(J)(12).)

    Response:  Thor disputes that there are only two provisions in the Lease that
address the condition in which QLG Fashion was required to return the Premises to
Thor following the expiration or termination of the Lease.  The Lease also requires
Tenant to surrender the Premises with Tenant's Work performed.  (Ex. B (Lease)
§1.3(B))

51.    The second provision is similar:

    Tenant shall deliver up and surrender to Landlord possession of the
Premises upon the expiration or earlier termination of the Lease Term,
broom clean, free of debris and Tenant's Moveable Property, in good order,
condition and state of repair (excepting ordinary wear and tear, damage by
casualty or condemnation, and any repairs that are Landlord's obligation
hereunder) and shall deliver the keys at the office of Landlord[.]

(*Id*. § 21.5.)

    Response:  Thor disputes that there are only two provisions in the Lease that
address the condition in which QLG Fashion was required to return the Premises to
Thor following the expiration or termination of the Lease.  The Lease also requires
Tenant to surrender the Premises with Tenant's Work performed.  (Ex. B (Lease)
§1.3(B))

52.    Neither provision references "Madison Avenue Standards" in relation to QLG
Fashion's surrender of the Premises. (*Id*. §§ 8.1(J)(12), 21.5.)

    Response:  Thor does not dispute that the two provisions quoted by defendant do
not reference the Madison Avenue Standards, but does dispute that those are the
only provisions in the Lease addressing the required condition of the Premises
upon termination.  The Lease also requires Tenant to surrender the Premises with

Tenant's Work performed.  (Ex. B (Lease) §1.3(B))

**E.     Provisions Addressing Payment of Rent, Default, And Damages**

53.     Under the Lease, QLG Fashion was responsible for paying monthly "Fixed Rent" (*Id*. § 2.1(A)) as well as "Additional Rent"—defined as "all sums of money, other than Fixed Rent as shall become due and payable from Tenant to Landlord under or pursuant to this Lease." (*Id*. § 2.1(B).)

> Response:  Not disputed.

54.     Together, "Fixed Rent" and "Additional Rent" were termed "Rent." (*Id*.)

> Response:  Not disputed.

55.     In the event QLG Fashion failed to timely complete the buildout, Thor could treat that failure as a default, which it did not do:

> If after the Work Completion Date Tenant has still failed to complete Tenant's Work and open the Premises to the public for business fully fixtured, stocked and staffed in accordance with Madison Avenue Standards, then Landlord shall have the right, but not the obligation, to treat such failure as a default hereunder, giving rise to all of Landlord's rights and remedies hereunder, at law and in equity.

(*Id*. § 1.7.)

> Response:  Disputed in part.  Thor could treat QLG's failure to timely complete the buildout as a default and/or breach of the Lease.  Thor has treated such failure as a default and/or breach of the Lease.  (Ex. B (Lease) §§ 1.7, 19.4; Ex. K (September 3, 2015 letter from Thor's counsel to QLG Fashion stating "Tenant . . . is indisputably in default of the Lease, for failure to complete Tenant's Work."); Second Amended Complaint ¶¶ 76-79)).

56.     QLG Fashion ceased paying all amounts due under the Lease as of September 2015. (Ex. 25.)

> Response:  Disputed to the extent defendant suggests that Rent for September 2015 was paid.  The last month of paid rent was August 2015.

57.     Thor treated QLG Fashion's failure to pay amounts due under the Lease as a default.  (*Id*.)

> Response:  Not disputed.

58.     Under Section 18.1 of the Lease, Thor was required to provide notice specifying the default; QLG Fashion would then have 30 days to cure the default, and if it remained uncured Thor could then sent a notice of its intention to terminate the Lease. (Ex. 13 § 18.1.)

Response:  Disputed. Thor was not "required" to send a notice of default at all. However, if it wished to terminate the Lease based on a default, it was required under Section 18.1 to send a notice and provide an opportunity to cure

59.    Section 19 sets forth Thor's remedies in the event of a default, including two alternative damages provisions. Section 19.2 permits Thor to recover unpaid "Additional Rent," subject to certain credits and offsets in the event Thor re-lets the Premises:

> In the event of a termination of this Lease, Tenant shall pay to Landlord, as damages, at the election of Landlord, sums equal to the aggregate of all Additional Rent that would have been payable by Tenant had this Lease not terminated, payable upon the due dates therefor specified herein until the date hereinbefore set forth for the expiration of the Term; provided, however, that if Landlord shall relet all or any part of the Premises for all or any part of the period commencing on the day following the date of such termination and ending on the date hereinbefore set forth for the expiration of the Term, Landlord shall credit Tenant with the net rents received by Landlord from such reletting, when received, net of expenses incurred or paid by Landlord in terminating this Lease and re-entering the Premises and securing possession thereof, as well as the expenses of reletting, including altering and preparing the Premises for new tenants, brokers' commissions, and all other expenses properly chargeable against the Premises and the rental therefrom in connection with such reletting …

(*Id.* § 19.2.)

> Response:  Disputed.  Section 19 does not purport to set forth all of Thor's remedies for default.  See Section 19.4.  In addition, Section 19.2 contains a typographical error of which neither party was aware when the Lease was signed and should be reformed.  The word "Additional" was not intended by any party. (Xenitelis Aff. ¶ 11-15; Ex. N (Schoenfeld Dep.) 50/6-51/2, 80/9-18, 83/10-21)

60.    Section 19.3 provides an alternative liquidated damages remedy that allows Thor to recover accelerated "Rent" according to a specified formula:

> As an alternative to the remedy set forth in Section 19.2, Landlord may recover from Tenant, as liquidated damages, in addition to any unpaid Rent accrued to the date of such termination, an amount equal to the difference, for the unexpired portion of the term hereof, between: (1) the aggregate of all Rent reserved hereunder; and (2) the then fair and reasonable rental value of the Premises as proven by Tenant, both discounted to present worth at the rate of four (4%) percent per annum over the prime commercial lending rate at the time announced by Citigroup to be in effect at its principal office in New York City….

(*Id.* § 19.3.)

Response:  Not disputed.

61.     The first draft of the Lease limited Thor's available remedies under § 19.2 to "Additional Rent," net of specified offsets. (Ex. 3 § 19.2; Ex. 27 at 56:5-9.)

Response:  Disputed in part.  The word "Additional" in Section 19.2 was a typographical error not intended by either party.

62.     This provision was a part of Thor's standard form lease. (SAC ¶ 51.)

Response:  Not disputed that for a period of time, Thor's standard for New York City retail leases contained a typographical error.

63.     This provision was a part of the form lease "at the onset" of negotiations between Thor and QLG Fashion. (Ex. 27 at 56:5-9.)

Response:  Not disputed.

64.     This provision was drafted and offered by Thor, not QLG Fashion or QLG. (SAC ¶¶ 51-53.)

Response:  Disputed.  Section 21.16 provides that the submission and negotiation of the Lease was not to be deemed an offer by Landlord.  Section 21.19 provides that the Lease was to be deemed jointly drafted.

65.     This provision was not the result of any fraudulent act by QLG Fashion or QLG. (Ex. 27 at 52:15 – 53:9.)

Response:  Not disputed.

66.     Thor contends that the inclusion of the word "Additional" before "Rent" in § 19.2 was "a mistake that resulted from Pryor Cashman's reliance on the incorrect standard form of lease provided by Thor." (SAC ¶¶ 54; Ex. 27 at 45:12-22; 48:10-14.)

Response:  Disputed in part.  Thor also contends that the inclusion of the word "Additional" before "Rent" in Section 19.2 also resulted from both parties' failure to pick up the mistake in the drafting process.  (Xenitelis Aff. ¶ 11-15; Ex. N (Schoenfeld Dep.) 50/6-51/2, 80/9-18, 83/10-21)

67.     The parties had no communication, oral or written, regarding any alleged mistake with respect to the remedy provided by § 19.2 until after this lawsuit was filed. (Ex. 27 at 49:16 – 50:17.)

Response:  Not disputed.

68.     The parties had no communication, oral or written, stating that the remedy provided

under Section 19.2 was to include anything other than "Additional Rent," net of specified offsets. (Ex. 30, Eric Schoenfeld Depo., at 49:25 – 50:5.)

> Response:  Not disputed, but this is an incomplete statement.  The parties had no communication, oral or written, expressing an intention to limit the damages under Section 19.2 to Additional Rent either.

69.     The limitation of Thor's recovery under § 19.2 to "Additional Rent" is favorable to QLG Fashion, and "would be beneficial to the tenant." (Ex. 27 at 47:7 – 48:9.)

> Response:  Not disputed.

70.     One of Mr. Schoenfeld's objectives in negotiating the Lease on QLG Fashion's behalf was to secure the most favorable terms possible for QLG Fashion. (Ex. 30 at 113:4-10.)

> Response:  Not disputed.

71.     Mr. Schoenfeld, when asked for his ***hypothetical response in 2019 to § 19.2 as drafted in 2013***, stated as follows:

> Q.  Okay.  So  I'm asking your understanding of whether, under 19.2, the fixed rent and additional rent that the landlord received from a successor tenant, would be deducted from the additional rent that was payable under the [lease]?
>
> [Objections omitted]
>
> A.     Again, I don't recall what my reaction was in 2013 if that's what you're asking.
>
> Q.     Okay. Suppose you're reading—suppose we're in 2013 now and you read it, what is your reaction?
>
> [Objection omitted]
>
> A.     What—what do you—I don't understand the question.
>
> Q. Does it make any logical sense to deduct the full rent including base rent by a successor tenant and deduct that from the additional rent that would have been payable under this lease in determining the damages that were due to the landlord?
>
> A.     It's—it's—it's some illogicalness to it.
>
> Q.     Some illogicalness to it, correct?
>
> A.     Some. In my opinion.

(*Id*. at 82:9 – 83:21.)

Response:  Not disputed that defendant has accurately set forth the testimony.

72.      The August 2013 draft of the Lease, revised by QLG Fashion, contained several revisions to § 19.2, none of which involved the "Additional Rent" provision. (Ex. 8 § 19.2.)

Response:  Not disputed.

73.      By November 2013, Thor had reviewed and rejected QLG Fashion's changes to § 19.2. (Ex. 11 § 19.2; Ex. 12 § 19.2.)

Response:  Not disputed.

**F.      Thor's Other High-End Retail Leases Contained Identical Damages Provisions**

74.      On August 8, 2014, Thor entered into a lease with Luxury Optical Holdings Co. for premises located at 680 Madison Avenue, New York, NY. (Ex. 31, Luxury Optical Lease.)

Response:  Not disputed.

75.      The Luxury Optical Lease was negotiated on behalf of Thor by Pryor Cashman, the outside sophisticated counsel used to negotiate the QLG Fashion Lease. (*Id.* § 20.1.)

Response:  Disputed to the extent that defendant is suggesting that "sophisticated counsel" is equivalent to infallible counsel.

76.      The Luxury Optical Lease limits Thor's recoverable damages under § 19.2 to "Additional Rent." (*Id.* § 19.2.)

Response:  Disputed in part.  Section 19.2 contains the same typographical error as the Lease:  The Luxury Optical Lease was also drafted using the standard form that served as a template for the Lease, and the error was not picked up by landlord or tenant.  (Xenitelis Aff. ¶ 21)

77.      The Luxury Optical Lease defines "Additional Rent" as "all sums of money, other than Fixed Rent, as shall become due and payable from Tenant to Landlord under or pursuant to this Lease." (*Id.* Article of Definitions.)

Response:  Not disputed.

78.      The Luxury Optical Lease defines "Fixed Rent" in the same manner as the QLG Fashion Lease. (*Id.* § 2.1(A).)

Response:  Not disputed.

79.      In April 2015, Thor entered into a lease with Brioni Roman Style USA Corp for

premises located at 680 Madison Avenue, New York, NY. (Ex. 32, Brioni Lease.)

>    Response:  Not disputed.

80.    The Brioni Lease was negotiated on behalf of Thor by Wachtel Missry LLP. (*Id*. § 20.1.)

>    Response:  Not disputed.

81.    The Brioni Lease limits Thor's recoverable damages under § 19.2 to "Additional Rent." (*Id*. § 19.2.)

>    Response:  Disputed in part.  Section 19.2 contains the same typographical error as the Lease:  The Brioni Lease was also drafted using the standard form that served as a template for the Lease, and the error was not picked up by landlord or tenant. (Xenitelis Aff. ¶ 21)

82.    The Brioni Lease defines "Additional Rent" as "all sums of money, other than Fixed Rent, as shall become due and payable from Tenant to Landlord under or pursuant to this Lease." (*Id*. Article of Definitions.)

>    Response:  Not disputed.

83.    The Brioni Lease defines "Fixed Rent" in the same manner as the QLG Fashion Lease. (*Id*. § 2.1(A).)

>    Response:  Not disputed.

84.    On April 30, 2015, Thor entered into a lease with Madison Fur LLC, d/b/a Yves Salomon for premises located at 790 Madison Avenue, New York, NY. (Ex. 33, Madison Fur Lease.)

>    Response:  Not disputed.

85.    The Madison Fur Lease was negotiated on behalf of Thor by Wachtel Missry LLP. (*Id*. § 20.1.)

>    Response:  Not disputed.

86.    The Madison Fur Lease limits Thor's recoverable damages under § 19.2 to "Additional Rent." (*Id*. § 19.2.)

>    Response:  Disputed in part.  Section 19.2 contains the same typographical error as the Lease:  The Madison Fur Lease was also drafted using the standard form that served as a template for the Lease, and the error was not picked up by landlord or tenant.  (Xenitelis Aff. ¶ 21)

87.     The Madison Fur Lease defines "Additional Rent" as "all sums of money, other than Fixed Rent, as shall become due and payable from Tenant to Landlord under or pursuant to this Lease." (*Id*. § 1.3(B).)

        Response:  Not disputed.

88.     The Madison Fur Lease defines "Fixed Rent" in the same manner as the QLG Fashion Lease. (*Id*. § 2.1(A).)

        Response:  Not disputed.

89.     On June 29, 2015, Thor entered into a lease with 19RM Inc. d/b/a Roland Mouret for premises located at 1006 Madison Avenue, New York, NY. (Ex. 34, Roland Mouret Lease.)

        Response:  Not disputed.

90.     Like the QLG Fashion Lease, the Roland Mouret Lease was negotiated on behalf of Thor by Pryor Cashman. (*Id*. § 20.1.)

        Response:  Not disputed.

91.     The Roland Mouret Lease limits Thor's recoverable damages under § 19.2 to "Additional Rent." (*Id*. § 19.2.)

        Response:  Disputed in part.  Section 19.2 contains the same typographical error as the Lease:  The Roland Mouret Lease was also drafted using the standard form that served as a template for the Lease, and the error was not picked up by landlord or tenant.  (Xenitelis Aff. ¶ 21)

92.     The Roland Mouret Lease defines "Additional Rent" as "all sums of money, other than Fixed Rent, as shall become due and payable from Tenant to Landlord under or pursuant to this Lease." (*Id*. § 1.3(C).)

        Response:  Not disputed.

93.     The Roland Mouret Lease defines "Fixed Rent" in the same manner as the QLG Fashion Lease. (*Id*. § 2.1(A).)

        Response:  Not disputed.

G.      **Thor's Post-Termination Recovery of Damages**

94.     QLG Fashion was required to provide a $12 million Letter of Credit ("LOC") to the Landlord in case of any default:

95.

        Tenant shall have deposited with Landlord simultaneously with the execution of this Lease, the sum of Twelve Million ($12,000,000.00) and

00/100 Dollars (the "Security Deposit"), by Letter of Credit (as hereinafter defined) in substantially the form of Exhibit D, attached hereto and made a part hereof, or such other form as Landlord shall reasonably approve, as security for the faithful performance, observance and compliance with all of the terms, covenants and conditions of this Lease on Tenant's part to perform, observe or comply with. Tenant agrees that, in the event that Tenant defaults under any of the terms, covenants or conditions in this Lease on Tenant's part to observe, perform or comply with (including, without limitation, the payment of any installment of Fixed Rent or any amount of Additional Rent), which default continues after any notice and applicable grace periods required under this Lease and the expiration of any applicable cure period, Landlord may notify the Issuing Bank (as hereinafter defined) and thereupon receive all of the monies represented by the said Letter of Credit and use, apply, or retain the whole or any part of such proceeds, or both, as the case may be, to the extent required for the payment of any Fixed Rent, Additional Rent, or any other sums as to which Tenant is in default, or for any sum that Landlord may expend or may be required to expend by reason of any such default (including any damages or deficiency accrued before or after summary proceedings or other re-entry by Landlord).

(Ex. 13 § 28.1.)

Response:  Disputed.  QLG was required to provide the LOC upon commencement of the Lease, and not only in the case there was a default.

96.     QLG applied for, obtained, and provided the LOC on QLG Fashion's behalf.  (Ex. 35, Letter of Credit Issuance.)

Response:  Thor does not dispute that the LOC identifies QLG as the entity that applied for, obtained and provided the LOC on QLG Fashion's behalf.  Thor disputes any implication that such identification of QLG changes the fact that the LOC is a contract between Thor and the issuing bank, and that QLG is not a party to that contract.

97.     Thor began drawing on the LOC on January 28, 2016. (Ex. 36, Thor Letter of Credit Draws.)

Response:  Not disputed.

Through July 2017, Thor made withdrawals from the LOC on the following dates and in the following amounts:

| Withdrawal Date | Amount |
| --- | --- |
| January 28, 2016 | $881,092.00 |
| February 25, 2016 | $878,105.00 |
| March 31, 2016 | $1,261,014.00 |
| April 26, 2016 | $1,277,097.00 |
| May 23, 2016 | $553,897.00 |
| June 22, 2016 | $525,065.00 |
| July 12, 2016 | $525,025.00 |
| August 10, 2016 | $524,920.00 |
| September 8, 2016 | $525,025.00 |
| September 23, 2016 | $525,050.00 |
| October 28, 2016 | $525,025.00 |
| November 25, 2016 | $525,025.00 |
| December 22, 2016 | $525,025.00 |
| January 23, 2017 | $579,891.18 |
| February 23, 2017 | $552,495.59 |
| March 23, 2017 | $552,470.59 |
| May 1, 2017 | $552,470.59 |
| May 23, 2017 | $552,470.59 |
| July 6, 2017 | $158, 836.46 |
| **TOTAL** | $12,000,000 |

(*Id.*)

98.     Each of these withdrawals was credited to QLG Fashion's account as it was received.  (Ex. 37, Thor Internal Letter of Credit Ledger for QLG Fashion; Ex. 27 at 70:23 – 72:2.)

   Response:  Not disputed.

99.     From January 28, 2016 to April 26, 2016, Thor withdrew amounts sufficient to cover unpaid pre-termination Fixed Rent accrued between September 2015 and December 2015, as well as post-termination Fixed Rent, Additional Rent, and penalties Thor believed it was entitled to during that time period. (Ex. 27 at 69:2 – 76:18; Ex. 37.)

   Response:  Disputed.  Thor's corporate representative testified that he did not know how the amounts of the withdrawals were calculated.  Thor  disputes any implication that the draws on the LOC constituted an election of the damages formulation in Section 19.2 of the Lease that bars it from recovering damages pursuant to the alternative damages formulation in Section 19.3.  (Ex. 27 (Xenitelis dep.) 72/23-74/14, 75/11-76/6)

100.    Thor limited its withdrawals between January 28, 2016 and April 26, 2016, so as not to prejudice itself with respect to its mortgage lender. (Ex. 27 at 69:8 – 70:16.)

   Response:  Not disputed.

101.    Thor's withdrawals occurred on a near-monthly basis, as Fixed and Additional Rent would have become due under the Lease had it not been terminated. (Exs. 36, 37.)

   Response:  Not disputed.  However, Thor disputes any implication that the draws on the LOC constituted an election of the damages formulation in Section 19.2 of the Lease that would bars Thor from recovering damages pursuant to the alternative damages formulation in Section 19.3.

102.    After April 2016, and through May 23, 2017, Thor's withdrawals matched amounts of Fixed Rent and Additional Rent that would have been due under the Lease had Thor not terminated the Lease. (*Id.*; *id.*)

   Response:  Disputed.  Under the Lease, Additional Rent would include late fees, interest on unpaid Fixed Rent, and starting in January 2017, reimbursement for real estate tax increases.  The withdrawals did not take into account that Additional Rent.  Thor also disputes any implication that draws on the LOC (even the amounts of such draws "matched" the amounts of Fixed Rent and Additional Rent that would have been due under the Lease) could have constituted an election or an irrevocable election of the damages formulation in Section 19.2 of the Lease that would bar Thor from recovering damages pursuant to the alternative damages formulation in Section 19.3.

103.    Thor's withdrawals from the LOC constituted a recovery of damages under the Lease. (Ex. 13 § 28.1.)

Response:  Not disputed.  Thor disputes any implication that draws on the LOC (even the amounts of such draws "matched" the amounts of Fixed Rent and Additional Rent that would have been due under the Lease) could have constituted an election or an irrevocable election) of the damages formulation in Section 19.2 of the Lease that would bar Thor from recovering damages pursuant to the alternative damages formulation in Section 19.3.


MATALON PLLC

By:  /s/ Joseph Lee Matalon____
          Joseph Lee Matalon
450 Seventh Avenue, 33rd Floor
New York, New York 10123
(212)244-9000
nycourts@trial-lawyer.org
   *Attorneys for Plaintiff*

Of Counsel:
   Barbara R. Shweky