**MATALON PLLC**
**450 Seventh Avenue, 33rd Floor**
**New York, New York 10123**
**Tel: (212) 244-9000**
**Email: nycourts@trial-lawyer.org**
  *Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
THOR 680 MADISON AVE LLC,                    :
                                             : Case No.: 1:17-cv-08528 (PGG) (JLC)
                Plaintiff,                   :
        v.                                   : **PLAINTIFF'S RESPONSE**
                                             : **TO DEFENDANT QATAR**
                                             : **LUXURY GROUP S.P.C.'S**
                                             :**ADDITIONAL UNDISPUTED**
QATAR LUXURY GROUP S.P.C., and               : **MATERIAL FACTS PURSUANT**
QATAR FOUNDATION FOR                         : **TO LOCAL CIVIL RULE 56.1**
EDUCATION, SCIENCE AND                       :
COMMUNITY DEVELOPMENT,                       :
                                             :
                Defendants.                  :
------------------------------------------------------------x

        Plaintiff Thor 680 Madison Ave LLC ("Thor"), through counsel, responds to the

Statement of Additional Material Facts of Defendant Qatar Luxury Group S.P.C ("QLG"),

contained in QLG's Response to Plaintiff Thor 680 Madison LLC's Statement of Material Facts,

as follows:

**I.      The Guaranty**

        65.    The Guaranty contained three conditions that QLG Fashion was required to

satisfy in order to terminate its liability, which were set forth in §2 of the Guaranty. QLG Fashion

was required to have: "(i) tendered vacant possession of the Demised Premises to Landlord in the

condition required pursuant to the terms of the Lease, (ii) delivered the keys to the Demised

Premises to Landlord and (iii) provided Landlord with not less than two (2) years' prior written

notice, in the manner provided in this Guaranty, of Tenant's intention to tender vacant possession

of the Demised Premises to Landlord." (Thor Ex. C §2.)

> **RESPONSE:** The conditions in the Guaranty needed to be strictly satisfied in order to terminate the liability of Guarantor, not QLG Fashion. There are circumstances where QLG would have obligations after the Final Obligation Date. See e.g., Section 10 of the Guaranty. Plaintiff does not dispute that defendant has accurately set forth the conditions stated in the Guaranty for the Final Obligation Date.

66.    The date on which the last of these three conditions occurred was "deemed

to be the 'Final Obligation Date'." (*Id.*)

> **RESPONSE:** Not disputed.

67.    The Guaranty further stated that "[o]n or before the expiration of the Final

Obligation Date, Guarantor shall pay, or shall cause Tenant to pay, to Landlord all Fixed Rent,

Additional Rent and all other charges and sums due and payable by Tenant under the Lease due

and payable up to and including the Final Obligation Date (but specifically excluding any

accelerated Fixed Rent, Additional Rent and all other charges and sums due and payable by Tenant

under the Lease)." (*Id.*)

> **RESPONSE:** Not disputed.

68.    Section 6 of the Guaranty stated that "[e]xcept as provided in Section 2

hereof, this Guaranty shall be a continuing guaranty, and shall survive the expiration or earlier

termination of the Lease." (*Id.* § 6.)

> **RESPONSE:** Not disputed.

## II.    Relevant Lease Provisions

69.    Under § 1.3(A) of the Lease, Thor was to perform certain initial

improvements (called "Landlord's Work") at its own expense. (Thor Ex. C § 1.3.)

> **RESPONSE:** Not disputed.

70.    That work included, for example, installing partitions to separate the leased Premises from the rest of the building, a concrete floor slab, a "stick-built" storefront, and an elevator between the first and second floors, and providing access for QLG Fashion to connect to utilities. (Ex. B to *id.*)

> **RESPONSE:**  Disputed that Exhibit B demonstrates that Landlord's work included providing access for QLG Fashion to connect to utilities.  (Ex. B, B(1)-(6))

71.    Following the completion of Landlord's Work, Thor was to deliver the Premises in:

> [V]acant and broom clean condition, free of tenancies and rights of occupancy, with all of Landlord's Work substantially completed in a good and workmanlike manner and in accordance with all applicable Laws, subject only to minor punch list items which shall be completed by Landlord within thirty (30) days following such delivery date, and to Landlord's actual knowledge, water-tight, free of Hazardous Substances or Waste, and in a good, structurally sound condition (and Tenant has received a certificate signed by a licensed architect certifying to Tenant that Landlord's Work is so substantially complete).

(*Id.* § 1.4(A).)

> **RESPONSE:** Not disputed.

72.    Section 6.1 addresses the parties' respective ownership of improvements to the property. QLG Fashion is deemed to own all "Moveable Property," which is defined as:

> [A]ll moveable furniture, equipment and any other items that are the property of Tenant and are not affixed to the Premises, excluding shelving, and any of Tenant's trade fixtures and equipment that is affixed to the Premises so long as any damage to the Premises incurred by reason of such affixed Moveable Property or the removal thereof is repaired by Tenant at the end of the Term in the manner herein required pursuant to Article 21.5.

(*Id.* § 6.1.)

**RESPONSE:** Disputed.  Section 6.1 requires Tenant to remove all Moveable Property from the Premises prior to the expiration or earlier termination of the Lease.

73.    Thor, on the other hand, is deemed to own all other "fixtures, equipment, improvements and installations attached to, or built into, the Premises at the commencement of or during the Term." (*Id*.)

**RESPONSE:** Disputed.  Section 1.6 provides that except as provided therein, all other "fixtures, equipment, improvements and installations attached to, or built into, the Premises at the commencement of or during the Term" shall be and remain part of the Premises and be deemed the property of Landlord.

74.    Two provisions address the condition in which QLG Fashion was required to return the Premises to Thor following the expiration or termination of the Lease. The first requires QLG Fashion to return the property "broom-clean and in good condition." (*Id*. § 8.1(J)(12).)

**RESPONSE:** Disputed.  Section 1.3(B) also governs the condition in which QLG was required to return the Premises to Thor following the expiration or termination of the Lease.

75.    The second provision is similar:

Tenant shall deliver up and surrender to Landlord possession of the Premises upon the expiration or earlier termination of the Lease Term, broom clean, free of debris and Tenant's Moveable Property, in good order, condition and state of repair (excepting ordinary wear and tear, damage by casualty or condemnation, and any repairs that are Landlord's obligation hereunder) and shall deliver the keys at the office of Landlord[.]

(*Id*. § 21.5.)

**RESPONSE:** Disputed.  Section 1.3(B) also governs the condition in which QLG was required to return the Premises to Thor following the expiration or termination of the Lease.

76.    Neither provision references "Madison Avenue Standards" in relation to QLG Fashion's surrender of the Premises. (*Id*. §§ 8.1(J)(12), 21.5.)

**RESPONSE:** Admitted. Section 1.3(B), which references "Madison Avenue Standards" also governs the condition in which QLG was required to return the Premises to Thor following the expiration or termination of the Lease.

77. In the event QLG Fashion failed to timely complete the buildout, Thor could treat that failure as a default, which it did not do:

> If after the Work Completion Date Tenant has still failed to complete Tenant's Work and open the Premises to the public for business fully fixtured, stocked and staffed in accordance with Madison Avenue Standards, then Landlord shall have the right, but not the obligation, to treat such failure as a default hereunder, giving rise to all of Landlord's rights and remedies hereunder, at law and in equity.

(*Id*. § 1.7.)

**RESPONSE:** Thor disputes that it did not treat Tenant's failure to complete Tenant's Work and open the Premises to the public for business fully fixtured, stocked and staffed in accordance with Madison Avenue Standards as a default. (Ex. K)  Thor also contends that it was not required to treat such failure as a default in order to recover damages.

78. Section 19 sets forth Thor's rights of re-entry on termination of the Lease:

> If this Lease shall terminate in accordance with the provisions set forth in Section 18.1, Landlord or Landlord's agents and servants may immediately or at any time thereafter re-enter into or upon the Premises and dispossess Tenant therefrom, or any part thereof, either by summary dispossess proceedings, by any lawful action or proceeding at law, or by the use of peaceful self-help (including, without limitation by locking Tenant out of the Premises).

(Thor Ex. B § 19.1.) This provision does not permit forcible re-entry.

**RESPONSE:** Not disputed. Thor did not make a forcible, non-peaceful re-entry.

79. Section 19 also sets forth Thor's remedies in the event of a default, including two alternative damages provisions. Section 19.2 permits Thor to recover unpaid "Additional Rent," subject to certain credits and offsets in the event Thor re-lets the Premises:

> In the event of a termination of this Lease, Tenant shall pay to Landlord, as damages, at the election of Landlord, sums equal to the aggregate of all Additional Rent that would have been payable by Tenant had this

- 5 -

Lease not terminated, payable upon the due dates therefor specified herein until the date hereinbefore set forth for the expiration of the Term; provided, however, that if Landlord shall relet all or any part of the Premises for all or any part of the period commencing on the day following the date of such termination and ending on the date hereinbefore set forth for the expiration of the Term, Landlord shall credit Tenant with the net rents received by Landlord from such reletting, when received, net of expenses incurred or

paid by Landlord in terminating this Lease and re-entering the Premises and securing possession thereof, as well as the expenses of reletting, including altering and preparing the Premises for new tenants, brokers' commissions, and all other expenses properly chargeable against the Premises and the rental therefrom in connection with such reletting….

(*Id.* § 19.2.)

> **RESPONSE:** Thor disputes that Section 19.2 limits its recovery to Additional Rent that would have been payable.

80.    Section 19.3 provides an alternative liquidated damages remedy that allows Thor to recover accelerated "Rent" according to a specified formula:

As an alternative to the remedy set forth in Section 19.2, Landlord may recover from Tenant, as liquidated damages, in addition to any unpaid Rent accrued to the date of such termination, an amount equal to the difference, for the unexpired portion of the term hereof, between: (1) the aggregate of all Rent reserved hereunder; and (2) the then fair and reasonable rental value of the Premises as proven by Tenant, both discounted to present worth at the rate of four (4%) percent per annum over the prime commercial lending rate at the time announced by Citigroup to be in effect at its principal office in New York City….

(*Id.* § 19.3.)

> **RESPONSE:** Not disputed.

81.    Section 19.4 of the Lease defines Thor's "Other Remedies" as follows:

Nothing herein contained shall be construed as limiting or precluding the recovery by Landlord against Tenant of any sums or damages to which, in addition to the damages particularly provided above, Landlord may lawfully be entitled by reason of any default hereunder on the part of Tenant.

(*Id*. § 19.4.)

> **RESPONSE:** Not disputed that this is an accurate quotation of Section 19.4. Denied that Section 19.4 contains any limitation on the damages Thor is entitled to recover for breach of the Lease.

82.    QLG Fashion was required to provide a $12 million Letter of Credit

("LOC") to the Landlord in case of any default, which Thor could elect to recover from:

> Tenant shall have deposited with Landlord simultaneously with the execution of this Lease, the sum of Twelve Million ($12,000,000.00) and 00/100 Dollars (the "Security Deposit"), by Letter of Credit (as hereinafter defined) in substantially the form of Exhibit D, attached hereto and made a part hereof, or such other form as Landlord shall reasonably approve, as security for the faithful performance, observance and compliance with all of the terms, covenants and conditions of this Lease on Tenant's part to perform, observe or comply with. Tenant agrees that, in the event that Tenant defaults under any of the terms, covenants or conditions in this Lease on Tenant's part to observe, perform or comply with (including, without limitation, the payment of any installment of Fixed Rent or any amount of Additional Rent), which default continues after any notice and applicable grace periods required under this Lease and the expiration of any applicable cure period, Landlord may notify the Issuing Bank (as hereinafter defined) and thereupon receive all of the monies represented by the said Letter of Credit and use, apply, or retain the whole or any part of such proceeds, or both, as the case may be, to the extent required for the payment of any Fixed Rent, Additional Rent, or any other sums as to which Tenant is in default, or for any sum that Landlord may expend or may be required to expend by reason of any such default (including any damages or deficiency accrued before or after summary proceedings or other re-entry by Landlord).

(*Id*. § 28.1.)

> **RESPONSE:** Not disputed.

## III.    Negotiation Of The Lease

83.    The first draft of the Lease limited Thor's available remedies under § 19.2

to "Additional Rent," net of specified offsets. (Thor Ex. D § 19.2; QLG Ex. A at 56:5-9.)

> **RESPONSE:** Not disputed.  Thor disputes that the limitation of Thor's available remedies under § 19.2 to "Additional Rent," net of specified offsets in the first draft of the Lease was intended by Thor.  (Xenitelis Aff. ¶ 11)

84.     This provision was a part of Thor's standard form lease. (SAC ¶ 51.)

**RESPONSE:** Not disputed.

85.     This provision was a part of the form lease "at the onset" of negotiations between Thor and QLG Fashion. (QLG Ex. A at 56:5-9.)

**RESPONSE:** Not disputed.

86.     This provision was drafted and offered by Thor, not QLG Fashion or QLG. (SAC ¶¶ 51-53.)

**RESPONSE:** Disputed that the provision was "offered" by Thor.

87.     This provision was not the result of any fraudulent act by QLG Fashion or QLG. (QLG Ex. A at 52:15 – 53:9.)

**RESPONSE:** Not disputed.

88.     The parties had no communication, oral or written, regarding any alleged mistake with respect to the remedy provided by § 19.2 until after this lawsuit was filed. (QLG Ex. A at 49:16 – 50:17.)

> **RESPONSE:** Not disputed that the parties had no communications between them regarding any alleged mistake with respect to the remedy provided by § 19.2 until after this lawsuit was filed.

89.     The parties had no communication, oral or written, stating that the remedy provided under Section 19.2 was to include anything other than "Additional Rent," net of specified offsets. (QLG Ex. B, Eric Schoenfeld Depo., at 49:25 – 50:5.)

> **RESPONSE:** Disputed. The quoted testimony does not support this statement. There is no evidence that the parties had any communications before the Lease was signed regarding what the remedy provided in Section 19.2 was to include.

90.     The limitation of Thor's recovery under § 19.2 to "Additional Rent" is favorable to QLG Fashion, and "would be beneficial to the tenant." (QLG Ex. A at 47:7 – 48:9.)

**RESPONSE:** Not disputed.  Thor denies that this fact has any bearing here.

91.    One of Mr. Schoenfeld's objectives in negotiating the Lease on QLG

Fashion's behalf was to secure the most favorable terms possible for QLG Fashion. (QLG Ex. B

at 113:4- 10.)

**RESPONSE:** Not disputed.  Thor denies that this fact has any bearing here.

92.    Mr. Schoenfeld, when asked for his ***hypothetical response in 2019 to §***

***19.2 as drafted in 2013***, stated as follows:

> Q.  Okay.  So I'm asking your understanding of whether, under 19.2, the fixed rent and additional rent that the landlord received from a successor tenant, would be deducted from the additional rent that was payable under the [lease]?
>
> [Objections omitted]
>
> A.      Again, I don't recall what my reaction was in 2013 if that's what you're asking.
>
> Q.      Okay. Suppose you're reading—suppose we're in 2013 now and you read it, what is your reaction?
>
> [Objection omitted]
>
> A.      What—what do you—I don't understand the question.
>
> Q.    Does it make any logical sense to deduct the full rent including base rent by a successor tenant and deduct that from the additional rent that would have been payable under this lease in determining the damages that were due to the landlord?
>
> A.      It's—it's—it's some illogicalness to it.
>
> Q.      Some illogicalness to it, correct?
>
> A.      Some. In my

opinion. (*Id*. at 82:9 – 83:21.)

**RESPONSE:** Thor disputes the characterization of the question posed to Mr. Schoenfeld.

**IV.    Possession And Delivery Of The Keys To The Premises At Termination**

93.    The keys to the Premises were in Thor's possession at all times between commencement and termination of the lease, and QLG Fashion never received them. (QLG Ex. C, Laurent Sebag Depo. at 103:21-24; QLG Ex. A at 124:20 – 125:12.)

> **RESPONSE:** Not disputed. Tenant's failure to receive the keys was the result of its own omissions. Thor asked Tenant to coordinate delivery of possession of the Premises (which included picking up the keys) in its Notice of Delivery and made the keys available at all times.  (Xenitelis Aff. 16; Ex. E)  Guarantor's corporate representative admitted that the keys have always been available for Tenant to pick up. (Ex. O (Sebag Dep.) 136/18-137/11)

94.    QLG Fashion had never been notified that the keys to the Premises were available, and was told by Mr. Polese following the Notice of Default that it was not allowed to pick up the keys. (QLG Ex. D.)

> **RESPONSE:** Disputed.  Thor asked Tenant to coordinate delivery of possession of the Premises (which included picking up the keys) in its Notice of Delivery and made the keys available at all times.  (Xenitelis Aff. 16; Ex. E)  Guarantor's corporate representative admitted that the keys have always been available for Tenant to pick up. (Ex. O (Sebag Dep.) 136/18-137/11)

## V.    Surrender Of The Premises

95.    At termination, the Premises were in the same condition as when Landlord's Work was completed, including being vacant and broom clean, and free of debris and Tenant's Moveable Property. (QLG Ex. A at 124:7-19; 133:5 – 134:1.)

> **RESPONSE:** Not disputed.

96.    At his deposition, Mr. Xenitelis professed his belief that, despite the Lease requiring Thor to deliver the Premises in "good, structurally sound condition," the Premises may not have been in good condition at the time it was delivered to QLG Fashion, which would have been a breach of the Lease on Thor's part. (*Id.* at 134:12 – 137:2.)

> **RESPONSE:** Disputed. Mr. Xenitelis testified that Landlord performed Landlord's Work before it delivered the Premises to Tenant.

## VI.     Termination Of The Lease

97.    Thor's December 9, 2015 notice of termination stated that "upon the Termination Date, the Lease and the term and estate thereby granted shall terminate with the same effect as if December 23, 2015 were the date originally fixed for the expiration of the Lease, but Tenant shall remain liable for damages as provided in the Lease or pursuant to law and the consequences for surrendering possession in its then condition." (Thor Ex. G.)

**RESPONSE:** Not disputed.

## VI.     Reletting To Tom Ford

98.    Thor provided Tom Ford with up to a $12 million tenant allowance for use in constructing its store in the Premises. (QLG Ex. E, Tom Ford Lease at § 1.3(C)(1).)

**RESPONSE:** Not disputed.

99.    Tom Ford used at least $11,979,891.61 of the $12 million tenant allowance to construct its store in the Premises. (QLG Ex. F, Tom Ford Tenant Construction Allowance Requisitions and Releases at 17.)

> **RESPONSE:** Not disputed that Thor disbursed $11,979,891.61 of the $12 million tenant allowance to Tom Ford. (QLG Ex. F, Tom Ford Tenant Construction Allowance Requisitions and Releases at 17)

100.    Under § 19.2 of the Lease, as of February 2019, Thor had received no net rent from Tom Ford (defined as Tom Ford's monthly Fixed Rent, net of allowable reletting expenses required to alter and prepare the Premises for Tom Ford) sufficient to offset Additional Rent recoverable from QLG Fashion. (QLG Ex. G, Thor's March 11, 2019 Second Supplemental Response to QLG's First Set of Interrogatories at 4.)

**RESPONSE:** Disputed.  The Second Supplemental Response to QLG's First Set of Interrogatories states that as of February 2019, Thor had received no net rent from Tom Ford that would be a deduction from the amount owed by Guarantor.


Respectfully submitted,
MATALON PLLC


By: /s/ Joseph Lee Matalon

*Attorneys for Plaintiff*
*Thor 680 Madison Ave LLC*