UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THOR 680 MADISON AVE. LLC,

             Plaintiff,

       - against -

QATAR LUXURY GROUP S.P.C. and QATAR
FOUNDATION FOR EDUCATION, SCIENCE
AND COMMUNITY DEVELOPMENT,

             Defendants.

**MEMORANDUM
OPINION & ORDER**

17 Civ. 8528 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Thor 680 Madison Ave. LLC ("Thor") brings this breach of contract

action against Defendant Qatar Luxury Group S.P.C. ("Qatar Group") – a "segregated portfolio

company" organized under the laws of Qatar.  (Second Amended Complaint ("SAC") (Dkt. No.

63) ¶¶ 5-6)[1]  The parties have cross-moved for summary judgment.  (Dkt. Nos. 72, 74)  For the

reasons stated below, Plaintiff's motion will be granted in part and denied in part, and

Defendant's motion will be denied.

---

[1]  The SAC also names as a defendant Qatar Foundation for Education, Science and Community
Development ("Qatar Foundation") – a private, non-profit organization in Qatar.  (SAC (Dkt.
No. 63) ¶¶ 7, 16-17)  Defendant Qatar Group asserts that Defendant Qatar Foundation "has never
been served" (Def. Sum. J. Br. (Dkt. No. 75) at 7 n.1), even though this action has been pending
since November 3, 2017.  (Cmplt. (Dkt. No. 1)  The docket does not reflect service on Qatar
Foundation, and Plaintiff does not address this issue in its briefs.  "If a defendant is not served
within 90 days after the complaint is filed, the court – on motion or on its own after notice to the
plaintiff – must dismiss the action without prejudice against that defendant or order that service
be made within a specified time."  Fed. R. Civ. P. 4(m).  "Although Rule 4(m) creates an
exception for 'service in a foreign country pursuant to subdivision (f),' . . . this exception does
not apply if, as here, the plaintiff did not attempt to serve the defendant in the foreign country."
USHA (India), Ltd. v. Honeywell Int'l, Inc., 421 F.3d 129, 133-34 (2d Cir. 2005); see also In re
Veon Ltd. Sec. Litig., No. 15-CV-08672 (ALC), 2018 WL 4168958, at *8-9 (S.D.N.Y. Aug. 30,
2018) (finding that "the foreign country exception is inapplicable" where an electronic summons
was issued but plaintiffs did not timely effect service).  Accordingly, all claims against Qatar
Foundation will be dismissed without prejudice.

## BACKGROUND

I.   **FACTS**[2]

  Plaintiff is the ground lessee of 680 Madison Avenue in Manhattan.  (Pltf. R. 56.1 Stmt. (Dkt. No. 76) ¶ 1)  On December 31, 2013, Plaintiff entered into a lease (the "Lease") with Qatar Luxury Group Fashion USA Inc. ("Qatar Fashion").  Qatar Fashion intended to use the leased space to house a store selling luxury goods bearing its "QELA" brand.  (Id. ¶¶ 2, 4, 6; see also Pltf. Appx., Ex. B (Lease) (Dkt. No. 79))

  The Lease has a 15-year term with a renewal option, and provides for monthly "Fixed Rent" of $525,000, which escalates at three-years intervals.  (Pltf. Appx., Ex. B (Lease) (Dkt. No. 79) §§ 1.2, 1.6, 2.1)  Pursuant to the Lease, Qatar Fashion is also obligated to pay "Additional Rent," which is "defined as all amounts due other than Fixed Rent, including reimbursement for increases in real estate taxes."  (Id. § 2.1)  And Qatar Fashion is required, "at [its] sole expense[,] [to] perform . . . its initial Alterations . . . in and to the Premises" and to "open for business to the public fully fixtured, stocked and staffed in accordance with Madison Avenue Standards," which are defined as "standards applicable to first-class luxury mixed-use properties . . . on Madison Avenue from 59th to 72nd Street."  (Id. §§ 1.3(B), 5.1)

---

[2]  To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)).  Where a non-movant disputes the movant's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the non-movant's characterization of the evidence.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).  Unless otherwise indicated, the facts cited by the Court are undisputed.

Defendant Qatar Group executed a guaranty concerning Qatar Fashion's obligations under the Lease.  (Pltf. Appx., Ex. C (Guaranty) (Dkt. No. 79-1))  The Guaranty provides for a "Final Obligation Date," which is defined as

> the date that Tenant and its assigns, sublessees and licensees, if any, shall have (i) tendered vacant possession of the Demised Premises to Landlord in the condition required pursuant to the terms of the Lease, (ii) delivered the keys to the Demised Premises to Landlord and (iii) provided Landlord with not less than two (2) years' prior written notice, in the manner provided in this Guaranty, of Tenant's intention to tender vacant possession of the Demised Premises to Landlord (the date on which the last to occur of (i), (ii) and (iii) shall be deemed to be the "Final Obligation Date").

(Id. § 2)

The Guaranty further states that

> [o]n or before the expiration of the Final Obligation Date, Guarantor shall pay, or shall cause Tenant to pay, to Landlord all Fixed Rent, Additional Rent and all other charges and sums due and payable by Tenant under the Lease due and payable up to and including the Final Obligation Date (but specifically excluding any accelerated Fixed Rent, Additional Rent and all other charges and sums due and payable by Tenant under the Lease).

(Id.)

The Lease requires Qatar Fashion to complete the build-out work by June 28, 2015.  (Pltf. Appx., Ex. B (Lease) (Dkt. No. 79) § 1.3(B))  Qatar Fashion never built out the premises or performed any physical construction, however (see Def. R. 56.1 Stmt. (Dkt. No. 85) ¶¶ 18-20), and in a May 12, 2015 meeting, Qatar Fashion informed Plaintiff that it would not be opening the planned store.  (Pltf. R. 56.1 Stmt. (Dkt. No. 76) ¶ 46)

In a May 19, 2015 email, Qatar Fashion informed Plaintiff that it was "restructuring and as such will not require the space at this time.  We are going to engage local

agents to market the space for potential replacements."  (Pltf. Appx., Ex. I (Pltf. May 19, 2015

Email) (Dkt. No. 79-2) at 2)[3]

On July 8, 2015, Qatar Fashion sent Plaintiff a notice stating that it intended to

surrender the premises:

> Tenant and Guarantor hereby notify Landlord, as required pursuant to Section 2 of the
> Guaranty, of Tenant's intention to tender vacant possession of the Demised Premises to
> Landlord on or before the second anniversary of the Initial Notice Date (as defined
> below).  As previously communicated to Landlord by Tenant via email on May 19, 2015
> (the "Initial Notice Date"), which Tenant email was acknowledged via email by Landlord
> on May 28, 2015, Tenant has determined not to open for business in the Premises.
> Tenant and Guarantor are delivering this notice retroactively to be effective as of the
> Initial Notice Date.
>
> While it is Tenant's intention to vacate the Demised Premises as described above, Tenant
> is currently conducting a search for a subtenant for the Demised Premises for the
> remainder of the Term.

(Pltf. Appx., Ex. J (Def. July 8, 2015 Ltr.) (Dkt. No. 79-2) at 4)

Qatar Fashion did not pay the $525,000 Fixed Rent due on September 1, 2015, in

breach of the Lease.  (Pltf. R. 56.1 Stmt. (Dkt. No. 76) ¶ 55)

In a September 3, 2015 letter, Plaintiff informed Qatar Fashion that it could "only

enter into a sublease or assignment 'provided that [Qatar Fashion] is not in default of any of [its]

obligations under this Lease' . . . . [Qatar Fashion], however, is indisputably in default of the

Lease."  (Pltf. Appx., Ex. K (Pltf. Sept. 3, 2015 Ltr.) (Dkt. No. 79-2) at 7)

On September 9, 2015, Plaintiff sent a Notice of Default to Qatar Fashion, citing

its "failure to pay rent and/or other charges due under the Lease."  (Def. Appx., Ex. 25 (Sept. 9,

2015 Not.) (Dkt. No. 85-29) at 2)

---

[3]  All references to page numbers in this Order are as reflected in this District's Electronic Case
Files ("ECF") system.

On December 9, 2015, Plaintiff sent a Notice of Termination to Qatar Fashion, citing its "fail[ure] to cure the default in the payment of rent and/or other charges due under the Lease. . . ."  (Def. Appx., Ex. 26 (Dec. 9, 2015 Not.) (Dkt. No. 85-30) at 2)  The Notice of Termination provides that it is effective as of 11:59 p.m. on December 23, 2015.  (Id.)

On July 18, 2016, Plaintiff re-let the premises to Tom Ford, a retail store.  Tom Ford agreed to pay the same rent as Qatar Fashion, but obtained rights to double the space in 680 Madison Avenue.  The Tom Ford store opened for business and began paying rent to Plaintiff in June 2017.  (Pltf. R. 56.1 Stmt. (Dkt. No. 76) ¶¶ 61-63)

The Lease provides Plaintiff Thor with a number of remedies in the event of a breach by Qatar Fashion, the "Tenant."  For example, Section 19.2 of the Lease states:

> In the event of a termination of this Lease, Tenant shall pay to Landlord, as damages, at the election of Landlord, sums equal to the aggregate of all Additional Rent that would have been payable by Tenant had this Lease not terminated, payable upon the due dates therefor specified herein until the date hereinbefore set forth for the expiration of the Term; provided, however, that if Landlord shall relet all or any part of the Premises for all or any part of the period commencing on the day following the date of such termination and ending on the date hereinbefore set forth for the expiration of the Term, Landlord shall credit Tenant with the net rents received by Landlord from such reletting, when received, net of expenses incurred or paid by Landlord in terminating this Lease and re-entering the Premises and securing possession thereof, as well as the expenses of reletting, including altering and preparing the Premises for new tenants, brokers' commissions, and all other expenses properly chargeable against the Premises and the rental therefrom in connection with such reletting . . . ."

(Pltf. Appx., Ex. B (Lease) (Dkt. No. 79) § 19.2)

Section 19.3 of the Lease states:

> As an alternative to the remedy set forth in Section 19.2, Landlord may recover from Tenant, as liquidated damages, in addition to any unpaid Rent accrued to the date of such termination, an amount equal to the difference, for the unexpired portion of the term hereof, between: (1) the aggregate of all Rent reserved hereunder; and (2) the then fair and reasonable rental value of the Premises as proven by Tenant, both discounted to present worth at the rate of four (4%) percent per annum over the prime commercial lending rate at the time announced by Citigroup to be in effect at its principal office in New York City . . . ."

(Id. § 19.3)

        Section 19.4 of the Lease provides for still "Other Remedies":

Nothing herein contained shall be construed as limiting or precluding the recovery
by Landlord against Tenant of any sums or damages to which, in addition to the
damages particularly provided above, Landlord may lawfully be entitled by
reason of any default hereunder on the part of Tenant.

(Id. § 19.4)

## II.   PROCEDURAL HISTORY

        The Complaint was filed on November 3, 2017.  (Cmplt. (Dkt. No. 1)  On April

29, 2019, Plaintiff filed the Second Amended Complaint.  (SAC (Dkt. No. 63))  The SAC pleads

(1) a breach of contract claim against Qatar Group, in its capacity as guarantor, premised on

Qatar Fashion's failure to build out the premises (id. ¶¶ 76-79); (2) a breach of contract claim

against Qatar Group, in its capacity as guarantor, premised on Qatar Fashion's failure to pay rent

(id. ¶¶ 76-79); and (3) a claim for reformation of Section 19.2 of the Lease, in which Plaintiff

seeks to delete the word "Additional" from the phrase "Additional Rent" (id. ¶¶ 85-90).[4]

        The parties have filed cross-motions for summary judgment.  (Dkt. Nos. 72, 74)

Plaintiff Thor seeks summary judgment as to (1) Qatar Group's "continuing liability" post-July

8, 2017 for Qatar Fashion's failure to pay rent; (2) its right to damages on the SAC's First Cause

of Action for breach of contract arising out of Qatar Fashion's failure to build out the premises;

and (3) its claim for reformation.  (Pltf. Sum. J. Br. (Dkt. No. 73) at 24-25, 29)  Defendant Qatar

Group seeks summary judgment on (1) Plaintiff's breach claims to the extent that Plaintiff seeks

damages for Qatar Fashion's failure to pay rent post-July 8, 2017; (2) Plaintiff's breach claim

regarding Qatar Fashion's failure to build out the premises; (3) Plaintiff's claim for reformation;

---

[4]  The SAC also pleads an alter ego claim against Qatar Foundation.  (Id. ¶¶ 91-100)  As
discussed above, however, Qatar Foundation has never been served, and accordingly this claim
will be dismissed.

and (4) Plaintiff's claim for damages under the SAC's Second Cause of Action for breach of contract arising out of Qatar Fashion's failure to pay rent, to the extent that Plaintiff seeks damages that go beyond those provided in Section 19.2 of the Lease.  (Def. Sum. J. Br. (Dkt. No. 75) at 7)

## DISCUSSION

## I.      LEGAL STANDARDS

### A.      Summary Judgment Standard

Summary judgment is warranted where a moving party shows that "there is no genuine dispute as to any material fact" and that that party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).  "'[W]here the non[-]moving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the non[-]moving party's claim.'"  Lesavoy v. Lane, No. 02 Civ. 10162, 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create

a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alteration in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)). "'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'" Eviner v. Eng, No. 13 Civ. 6940 (ERK), 2015 WL 4600541, at *6 (E.D.N.Y. July 29, 2015) (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)).

"The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment . . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (internal citations omitted).

### B.      General Principles of New York Contract Law

"Under New York law, there are four elements to a breach of contract claim: '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'"[5] Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)).

---

[5]  Because both sides cite to New York law (see Pltf. Sum. J. Br. (Dkt. No. 73) at 19; Def. Sum. J. Br. (Dkt. No. 75) at 11), the parties have implicitly agreed to the application of New York law. See Golden Pac. Bancorp v. F.D.I.C., 273 F.3d 509, 514 n.4 (2d Cir. 2001) ("The parties' briefs assume that New York substantive law governs the issues of contract interpretation and statute of limitations presented here, and such implied consent is, of course, sufficient to establish the applicable choice of law."); Corbett v. Firstline Sec., Inc., 687 F. Supp. 2d 124, 128 (E.D.N.Y. 2009) (applying New York law where "both parties cite exclusively to New York contract law in their arguments").

"Under New York law, the initial interpretation of a contract 'is a matter of law for the court to decide.'" K. Bell & Assocs. v. Lloyd' s Underwriters, 97 F.3d 632, 637 (2d Cir. 1996) (quoting Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 299 (2d Cir. 1996)); see also Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000) ("Construing an unambiguous contract provision is a function of the court, rather than a jury, and matters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument.") (citing Teitelbaum Holdings, Ltd. v. Gold, 48 N.Y.2d 51, 56 (1979)). However, "[w]here there are alternative, reasonable constructions of a contract, i.e., the contract is ambiguous, the issue 'should be submitted to the trier of fact.'" K. Bell & Assocs., 97 F.3d at 637 (quoting Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993)). "[T]he question of whether [a contract] is ambiguous is a matter of law to be determined by the Court." Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252 F.3d 608, 616 (2d Cir. 2001) (internal quotation marks and citations omitted).

Under New York law, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." W.W.W. Assocs. v. Giancontieri, 77 N.Y.2d 157, 162 (1990). "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." Id.; see also Schron v. Troutman Sanders LLP, 20 N.Y.3d 430, 436 (2013) ("[E]vidence is inadmissible to alter or add a provision to a written agreement.").

"Extrinsic evidence of the parties' intent may be considered . . . if the agreement is ambiguous," however. Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002); see also Kasowitz, Benson, Torres & Friedman, LLP v. Duane Reade, 98 A.D.3d 403, 406 (1st Dep't 2012) ("'[E]xtrinsic evidence may not be considered unless the document itself is ambiguous.'")

(quoting South Rd. Assoc., LLC v. Int'l Bus. Machs. Corp., 4 N.Y.3d 272, 278 (2005)).  "An ambiguity exists where the terms of [a contract] could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'"  Morgan Stanley Group Inc. v. New England Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000) (quoting Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997)).  No ambiguity exists, however, when contract language has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion."  Breed v. Ins. Co. of N. Am., 46 N.Y.2d 351, 355 (1978) (citations omitted).

　　　　　"In accordance with cardinal doctrines of contract interpretation, courts must endeavor to read a contractual document in a manner that gives effect to all of its provisions and that causes them to be consistent with one another."  DaPuzzo v. Globalvest Mgmt. Co., L.P., 263 F. Supp. 2d 714, 729 (S.D.N.Y. 2003) (citing Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63 (1995)).  "'[A] court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect.'"  JA Apparel Corp. v. Abboud, 568 F.3d 390, 405 (2d Cir. 2009) (quoting Corhill Corp. v. S.D. Plants, Inc., 9 N.Y.2d 595, 599 (1961)); see also Verzani v. Costco Wholesale Corp., 641 F. Supp. 2d 291, 299 (S.D.N.Y. 2009) ("[T]he court may not read [an] agreement to make any of its terms meaningless, or construe its language to render particular provisions 'mere surplusage.'" (citations omitted)), aff'd, 387 F. App'x 50 (2d Cir. 2010); Del Glob. Techs. Corp. v. Park, 3 Civ. 8867 (PGG), 2008 WL 5329963, at *3 (S.D.N.Y. Dec. 15, 2008) ("It is a 'cardinal rule of contract interpretation that a court shall not interpret an agreement in a way which leaves a part meaningless or ineffectual.'")

(quoting Hauser v. W. Group Nurseries, Inc., 767 F. Supp. 475, 488 (S.D.N.Y. 1991)).

Moreover, "a contract should not be interpreted to produce a result that is absurd, commercially

unreasonable or contrary to the reasonable expectations of the parties."  Greenwich Capital Fin.

Prods., Inc. v. Negrin, 74 A.D.3d 413, 415 (1st Dep't 2010) (internal citations omitted).

   Here, the Lease contains an integration clause, which states that "[t]his Lease

contains all of the agreements and understandings relating to the leasing of the Premises and the

obligations of [Plaintiff] and [Qatar Fashion] in connection therewith . . . ."  (Pltf. Appx., Ex. B

(Lease) (Dkt. No. 79) § 21.2)  An integration clause establishes "the parties' intent that the

[a]greement [in question] is to be considered a completely integrated writing," Primex Int'l Corp.

v. Wal-Mart Stores, 89 N.Y.2d 594, 600 (1997), and "[a] completely integrated contract

precludes extrinsic proof to add to or vary its terms."  Id.  Because the Lease is "'complete on its

face,'" see Manolis v. Brecher, 11 Civ. 2750 (RMB), 2014 WL 642849 (S.D.N.Y. Feb. 14, 2014)

(quoting Battery Steamship Corp. v. Refineria Panama, S.A., 513 F.2d 735, 738 n.3 (2d Cir.

1975)), and contains an integration clause, "extrinsic proof to add to or vary [its] terms" may not

be considered.  Primex, 89 N.Y.2d at 600.[6]

## II. CROSS-MOTIONS CONCERNING QATAR GROUP'S CONTINUING LIABILITY

   Plaintiff Thor seeks summary judgment on the issue of Qatar Group's "continuing

liability" – post-July 8, 2017 – for Qatar Fashion's failure to pay rent.  According to Plaintiff,

Qatar Fashion never satisfied the three conditions in the Guaranty for the setting of a "Final

---

[6]  Although the Lease and the Guaranty are separate documents, the Guaranty is incorporated by reference in the Lease (Pltf. Appx., Ex. B (Lease) (Dkt. No. 79) § 33.1), and thus is to be read together with the Lease.  See U S W. Fin. Servs., Inc. v. Marine Midland Realty Credit Corp., 810 F. Supp. 1393, 1396 (S.D.N.Y. 1993) ("The [first agreement] is incorporated by reference into the [second] [a]greement . . . and [so] those documents should be read together.") (citing Carvel Corp. v. Diversified Management Group, Inc., 930 F.2d 228, 233 (2d Cir. 1991) ("Under New York law, instruments executed at the same time, by the same parties, for the same purpose and in the course of the same transaction will be read and interpreted together.")).

Obligation Date," and accordingly, under the Guaranty, Qatar Group remains liable for the full

fifteen-year term of the Lease.  (Pltf. Sum. J. Br. (Dkt. No. 73) at 21, 24)

Defendant Qatar Group cross-moves for summary judgment on the same issue,

arguing that its liability for Qatar Fashion's breach of the Lease continued "only through the

'Final Obligation Date,' which was . . . July 8, 2017, two years after [Qatar Fashion] provided

[Plaintiff] with valid prior written notice" of its intention to surrender the premises.  (Def. Sum.

J. Br. (Dkt. No. 75) at 9-10)  According to Qatar Group, its "liability under the Guaranty ended

on July 8, 2017, and <u>all</u> of [Plaintiff's] claims for damages subsequent to that date are cut off."

(<u>Id.</u> (emphasis in original))

### 1. Whether Qatar Fashion Satisfied the Three Conditions for the Setting of a "Final Obligation Date"

As discussed above, the Guaranty defines the "Final Obligation Date" as the date

on which

> that Tenant and its assigns, sublessees and licensees, if any, shall have (i) tendered vacant possession of the Demised Premises to Landlord in the condition required pursuant to the terms of the Lease, (ii) delivered the keys to the Demised Premises to Landlord and (iii) provided Landlord with not less than two (2) years' prior written notice, in the manner provided in this Guaranty, of Tenant's intention to tender vacant possession of the Demised Premises to Landlord (the date on which the last to occur of (i), (ii) and (iii) shall be deemed to be the "Final Obligation Date").

(Pltf. Appx., Ex. C (Guaranty) (Dkt. No. 79-1) § 2)

### a. Tender of Vacant Possession

The Lease's first condition for the setting of a "Final Obligation Date" is that

Qatar Fashion has "tendered vacant possession of the Demised Premises to Landlord in the

condition required pursuant to the terms of the Lease . . . ."  (<u>Id.</u>)  The Court concludes that there

are material issues of fact as to whether Qatar Fashion satisfied this condition.

Plaintiff argues that Qatar Fashion neither "tendered" the premises, nor did so "in the condition required pursuant to the terms of the Lease." (Pltf. Sum. J. Br. (Dkt. No. 73) at 22) As to the first point, Plaintiff claims that it had to "forcibly re-enter[] the premises after it terminated the Lease for nonpayment of rent." (Id.) As to the second point, Plaintiff argues that "the words 'in the condition required pursuant to the terms of the Lease' are meant to incorporate all of the Lease terms concerning the 'condition' of the premises, including Section 1.3(B), which required the premises to be built-out in accordance with Madison Avenue Standards." (Pltf. Opp. Br. (Dkt. No. 80) at 12) It is undisputed that Qatar Fashion never performed the build-out work. (Def. R. 56.1 Stmt. (Dkt. No. 85) ¶¶ 18-20)

As to whether Qatar Fashion "tendered possession," Qatar Fashion sent a notice to Plaintiff on July 8, 2015 stating the following:

> Tenant and Guarantor hereby notify Landlord, as required pursuant to Section 2 of the Guaranty, of Tenant's intention to tender vacant possession of the Demised Premises to Landlord on or before the second anniversary of the Initial Notice Date (as defined below). As previously communicated to Landlord by Tenant via email on May 19, 2015 (the "Initial Notice Date"), which Tenant email was acknowledged via email by Landlord on May 28, 2015, Tenant has determined not to open for business in the Premises. Tenant and Guarantor are delivering this notice retroactively to be effective as of the Initial Notice Date.
>
> While it is Tenant's intention to vacate the Demised Premises as described above, Tenant is currently conducting a search for a subtenant for the Demised Premises for the remainder of the Term.

(Pltf. Appx., Ex. J (Def. July 8, 2015 Ltr.) (Dkt. No. 79-2) at 4) In sum, in the July 8, 2015 letter, Qatar Fashion gives notice that it intends to vacate the Premises, but also states that it is "conducting a search for a subtenant for the Demised Premises" – a statement that is inconsistent with the notion of surrendering the Premises. Qatar Fashion argues, however, that it tendered vacant possession on December 23, 2015, the date when the Notice of Termination became effective. (Def. Sum. J. Br. (Dkt. No. 75) at 10; see also Def. R. 56.1 Stmt. (Dkt. No. 85) ¶ 35)

Plaintiff does not contest that the Notice of Termination became effective on December 23, 2015, and Plaintiff admits to having "exercised its right of re-entry . . . some time after the termination became effective."[7]  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 81) ¶¶ 35-36)  While Plaintiff complains that it had to "forcibly re-enter[] the premises after it terminated the Lease for nonpayment of rent" (Pltf. Sum. J. Br. (Dkt. No. 73) at 22), the "forcible reentry" point appears preposterous given the fact that Plaintiff never surrendered custody of the keys to the Premises. Qatar Fashion never took possession of the keys to the Premises, and never occupied, altered, or exercised control over the Premises.  (Def. R. 56.1 Stmt. (Dkt. No. 85) ¶¶ 37, 39)  Moreover, Qatar Fashion's failure to pay rent post-September 1, 2015 and failure to cure this default after Plaintiff gave notice – combined with its July 8, 2015 letter giving notice of its intent to tender the Premises – arguably communicated that it did not intend to occupy the Premises in the future, or to sub-let the space.

In sum, by December 23, 2015, both sides had taken acts inconsistent with an ongoing landlord-tenant relationship, which under New York law is sufficient to surrender a lease by operation of law.  See 14th Street Owner LLC v. Westside Donut 6th Ave. Ventures LLC, No. 650473/2017, 2019 WL 1044195, at *5 (N.Y. Cty. Sup. Ct. Mar. 01, 2019) ("Under New York law, as distinguished from an express surrender, a lease is surrendered by operation of law 'when the parties to a lease both do some act so inconsistent with the landlord-tenant relationship that it indicates their intent to deem the lease terminated . . . [and can be] inferred from the conduct of the parties.'" (quoting Riverside Research Inst. v KMGA, Inc., 68 N.Y.2d 689, 691-92 (1986))).

---

[7]  Indeed, Plaintiff re-let the Premises to Tom Ford on July 18, 2016.  (Pltf. R. 56.1 Stmt. (Dkt. No. 76) ¶¶ 61-63)

The fact remains, however, that the Guaranty requires – as a condition to the setting of a "Final Obligation Date" – that Qatar Fashion "tender[] vacant possession of the Demised Premises to Landlord."  (Pltf. Appx., Ex. C (Guaranty) (Dkt. No. 79-1) § 2)  Given that Qatar Fashion never took possession of the keys to the Premises; never occupied the Premises; gave notice of an intent to vacate the Premises; and stopped paying rent, a reasonable jury could find that it "tendered vacant possession" within the meaning of the Guaranty.  A reasonable jury could also find, however, that Qatar Fashion's July 8, 2015 letter is equivocal on the question of vacating possession; that the mere act of stopping rental payments is not the equivalent of "tender[ing] vacant possession" within the meaning of the Guaranty; and that Qatar Group cannot demonstrate satisfaction of this condition by pointing to Plaintiff's Notice of Termination. Accordingly, neither side is entitled to summary judgment on this point.

Plaintiff also argues that Qatar Fashion was required – in order to satisfy the first condition – to have performed the build-out work specified in Section 1.3(B) of the Lease.  The Court concludes that this issue likewise cannot be resolved as a matter of law.

Section 8.1(J)(12) and Section 21.5 of the Lease (the "surrender provisions") address Qatar Fashion's surrender of the Premises.  Section 8.1(J)(12) of the Lease states:

> At the expiration or any earlier termination of this Lease, Tenant shall terminate its occupancy of, and quit and surrender to Landlord, the Premises broom-clean and in good condition except for [] ordinary wear and tear. . . ."

(Pltf. Appx., Ex. B (Lease) (Dkt. No. 79) § 8.1(J)(12))  Section 21.5 of the Lease – entitled "Surrender and Holding Over" – states that

> Tenant shall deliver up and surrender to Landlord possession of the Premises upon the expiration or earlier termination of the Lease Term, broom clean, free of debris and Tenant's Moveable Property, in good order, condition and state of repair (excepting ordinary wear and tear . . . .

(Id. § 21.5 (emphasis in original))

Section 1.3(B) of the Lease – which sets forth Qatar Fashion's obligation to perform the build-out work – states in part:

> At Tenant's sole expense, following the Commencement Date[,] Tenant shall perform or cause the performance of its initial Alterations (as defined below) in and to the Premises and to promptly prepare the same for the operation of Tenant's business therein ("Tenant's Work") . . . . Tenant shall submit plans and specifications for Tenant's Work to Landlord for Landlord's approval . . . Tenant covenants and agrees to (i) use diligent efforts to complete Tenant's Work substantially in accordance with such approved plans and specifications as promptly as reasonably feasible and (ii) open for business to the public fully fixtured, stocked and staffed in accordance with Madison Avenue Standards (as hereinafter defined) for at least one (1) day on or prior to the date in the fifteenth (15th) month after the Commencement Date that is the same numerical date as the Commencement Date (the "Work Completion Date") . . . .

(Id. § 1.3(B))

Although Section 1.3(B) does not address or reference surrender of the Premises, it does impose requirements on Qatar Fashion regarding the "condition" of the Premises.  (Id.) Accordingly, a reasonable jury could find that – in mandating that Qatar Fashion tender the Premises "in the condition required pursuant to the terms of the Lease" (Pltf. Appx., Ex. C (Guaranty) (Dkt. No. 79-1) § 2) – the Guaranty requires that Qatar Fashion have performed the build-out work specified in Section 1.3(B).

Conversely, a reasonable jury could find that "in the condition required pursuant to the terms of the Lease" refers to the surrender provisions discussed above, and not to the build-out provision.  Plaintiff does not dispute that Qatar Fashion satisfied the surrender provisions, as "the Premises were in the same condition as when Landlord's Work was completed, including being vacant and broom clean, and free of debris and [Qatar Fashion's] Moveable Property."  (Def. R. 56.1 Stmt. (Dkt. No. 85) ¶ 39)

This Court cannot resolve this ambiguity in the Guaranty.

Accordingly, neither side is entitled to summary judgment as to whether Qatar Fashion satisfied the first condition for the setting of a "Final Obligation Date."

### b.   Delivery of Keys

The second condition for the setting of a "Final Obligation Date" is that Qatar Fashion has "delivered the keys to the Demised Premises to [Plaintiff]."  (Pltf. Appx., Ex. C (Guaranty) (Dkt. No. 79-1) § 2)

Defendant Qatar Group argues that Plaintiff "always had the keys to the Premises in its possession, rendering the delivery provision irrelevant."  (Def. Sum. J. Br. (Dkt. No. 75) at 12)

Plaintiff does not dispute that "[t]he keys to the Premises were in [Plaintiff's] possession at all times between commencement and termination of the [L]ease."  (Def. R. 56.1 Stmt. (Dkt. No. 85) ¶ 37)  However, Plaintiff argues that somehow this condition was not satisfied, because Qatar Fashion "did not contact [Thor's Director of Development Geoff Ross] (or anyone else at Thor) to coordinate delivery of possession, or to obtain the keys."  (Pltf. Opp. Br. (Dkt. No. 80) at 13)  Plaintiff further argues that "the key-return condition must be strictly satisfied" because it "has legal consequences as the 'symbolic act of relinquishing possession,' and would have had a real practical effect here, resolving the disputed issue of whether (and when) [Qatar Fashion] tendered vacant possession."  (Id. at 14-15 (citing People v. Richards, 152 Misc. 2d 775, 779 (Kings Cty. Sup. Ct. 1991)))

Plaintiff's argument on this point is nonsense.  Given that Plaintiff never provided Qatar Fashion with the keys to the Premises, there was no need for Qatar Fashion to deliver the keys to Plaintiff.  And while Plaintiff complains that Qatar Fashion should have made

arrangements to pick up the keys, neither the Lease nor the Guaranty imposes that obligation on Qatar Fashion.

To require that Qatar Fashion somehow return keys that never left Plaintiff's possession would be absurd, and "a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." Greenwich Capital, 74 A.D.3d at 415.[8]

Plaintiff's motion for summary judgment is denied on this point, and Qatar Group's motion for summary judgment is granted as to this point.

### c.      Prior Written Notice

The third condition for the setting of the "Final Obligation Date" is that Qatar Fashion "provide[] [Plaintiff] with not less than two (2) years' prior written notice, in the manner provided in this Guaranty, of [Qatar Fashion's] intention to tender vacant possession of the Demised Premises to [Plaintiff]."  (Pltf. Appx., Ex. C (Guaranty) (Dkt. No. 79-1) § 2)

As discussed above, in a May 19, 2015 email, Qatar Fashion informed Plaintiff that it was "restructuring and as such will not require the space at this time.  We are going to

---

[8]  The cases Plaintiff cites on this point (see Pltf. Sum. J. Br. (Dkt. No. 73) at 19) are not to the contrary.  In MHR Capital Partners LP v. Presstek, Inc., the party failing to perform the condition had not "agree[d] to all of the terms contained in the consent form, as required by the escrow agreement," including substantive requirements "to refrain from declaring a default and increase its lending commitment . . . ."  12 N.Y.3d 640, 646 (2009).  And in Ellan Corp., Inc. v. Dongkwang Intl. Co., Ltd., the court addressed a condition precedent to formation, and concluded that because one of the parties had not obtained necessary approvals, the "[a]greement was never effective."  2011 WL 4343844, at *2-*3 (S.D.N.Y. Aug. 15, 2011).  In 300 Park Avenue, Inc. v. Café 49, Inc., the trial court rejected the tenant's argument that it had tendered possession of the premises, finding that the tenant had occupied the premises, been evicted, and never returned the keys.  No. 113795/09, 2010 WL 3617141 (N.Y. Cty. Sup. Ct. Sep. 7, 2010).  The First Department affirmed, rejecting the tenant's substantial compliance argument and finding that the condition of "deliver[ing] possession 'together with all keys thereto . . .' was never satisfied."  300 Park Avenue, Inc. v. Café 49, Inc., 89 A.D.3d 634, 634-35 (1st Dep't 2011).

engage local agents to market the space for potential replacements."  (Pltf. Appx., Ex. I (May 19,

2015 email) (Dkt. No. 79-2) at 2)  Accordingly, while Qatar Fashion notifies Plaintiff on May

19, 2015, that it will not be opening a store on the Premises, it also tells Plaintiff that it intends to

sublet the space it had leased.

           In a July 8, 2015 letter to Plaintiff, Qatar Fashion confirms that it will not be

opening a store on the Premises, but reiterates its interest in subletting the space:

> Tenant and Guarantor hereby notify Landlord, as required pursuant to Section 2 of the
> Guaranty, of Tenant's intention to tender vacant possession of the Demised Premises to
> Landlord on or before the second anniversary of the Initial Notice Date (as defined
> below).  As previously communicated to Landlord by Tenant via email on May 19, 2015
> (the "Initial Notice Date"), which Tenant email was acknowledged via email by Landlord
> on May 28, 2015, Tenant has determined not to open for business in the Premises.
> Tenant and Guarantor are delivering this notice retroactively to be effective as of the
> Initial Notice Date.
>
> While it is Tenant's intention to vacate the Demised Premises as described above, Tenant
> is currently conducting a search for a subtenant for the Demised Premises for the
> remainder of the Term.

(Pltf. Appx., Ex. J (July 8, 2015 Ltr.) (Dkt. No. 79-2) at 4)

           Defendant Qatar Group argues that Qatar Fashion's July 8, 2015 letter satisfies

the notice condition, and that its "attempt to backdate the notice is irrelevant to the notice's

effectiveness," because "[a]s of July 8, 2017, [Plaintiff] had received vacant possession of the

Premises."  (Def. Sum. J. Br. (Dkt. No. 75) at 13, 15)  Plaintiff argues, however, that Qatar

Fashion's notice is insufficient, because it sets "an outside date for surrender less than two years

after notice."  (Pltf. Sum. J. Br. (Dkt. No. 73) at 20 (emphasis in original))

           In support of its argument that its notice was effective, Qatar Group cites New

York cases holding that "'a termination notice which erroneously identifies the termination date

is nevertheless sufficient to effect a termination as of the first proper termination date . . . .'"

(Def. Sum. J. Br. (Dkt. No. 75) at 13 (quoting G. B. Kent & Sons, Ltd. v. Helena Rubinstein,

Inc., 47 N.Y.2d 561, 563 (1979)))  Plaintiff argues, however, that the cases Defendant cites are irrelevant, because "the erroneous date rule applies only to termination notices," and the notice provision at issue here is a condition that must be "literally performed."  (Pltf. Opp. Br. (Dkt. No. 80) at 9-10)

As discussed above, this Court cannot resolve as a matter of law whether Qatar Fashion – in simultaneously informing Plaintiff (1) of its intention to "tender vacant possession," and (2) that it was "currently conducting a search for a subtenant for the Demised Premises for the remainder of the Term" – unequivocally gave notice of its intention to vacate the Premises. An intention to sublet the Premises for the remainder of the fifteen-year term is not consistent with "tender[ing] vacant possession" within the meaning of Section 2 of the Guaranty.[9]  And the fact that Plaintiff asserted control over the Premises in December 2015 does not establish that Qatar Fashion gave the required notice in July 2015.  On the other hand, Qatar Fashion clearly states in its July 8, 2015 letter that it is notifying Plaintiff of its "intention to tender vacant possession of the Demised Premises."  Because a reasonable jury applying the language of Section 2 of the Guaranty could reach contrary results, the issue must be presented to a jury.

If a jury were to conclude that Qatar Fashion's July 8, 2015 letter is effective notice under Section 2 of the Guaranty, Qatar Fashion's attempt to backdate the notice would appear to have little relevance.

---

[9]  The fact that Plaintiff told Qatar Group during a May 27, 2015 meeting that Plaintiff had "no objection to [Qatar Group] engaging agents to locate a suitable subtenant" (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 81) ¶ 25) does not change the analysis.  Qatar Fashion had a right under the Lease to enter into a sublease or assignment provided that it was not in default and certain other conditions were met.  (Pltf. Appx., Ex. B (Lease) (Dkt. No. 79) § 10.1(B)(4))  But Qatar Fashion could not both "tender vacant possession of the Demised Premises" and sublet the Premises to another tenant.  These concepts are mutually exclusive.

Strict compliance with a contract's notice provision is generally not required where the adverse party received actual notice and suffered no prejudice. Dellicarri v. Hirschfeld, 210 A.D.2d 584, 585 (3d Dep't 1994) ("Strict compliance with the contract's notice provisions was not required, for defendants do not claim that they did not receive actual notice or that they were in any way prejudiced as a result of this minimal deviation."); see also Baygold Assocs., Inc. v. Congregation Yetev Lev of Monsey, Inc., 81 A.D.3d 763, 764 (2d Dep't 2011) ("[S]trict compliance with contractual notice provisions need not be enforced where the adversary party does not claim the absence of actual notice or prejudice by the deviation. . . .") (internal quotation marks and citations omitted). Indeed, premature termination notices are commonly found sufficient where the adverse party has suffered no prejudice. See, e.g., Yarmy v. Conte, 128 A.D.2d 611, 611 (2d Dep't 1987) (notice of termination "served to terminate the contract after the lapse of the full amount of time provided for in the contract" even though it "was premature and failed to meet the technical requirements of the contract"); Ives v. Mars Metal Corp., 23 Misc. 2d 1015, 1017 (Sup. Ct. N.Y. Cty. 1959) (notice of termination "accomplished a termination of the agreement as of a date three months subsequent" even though the notice had an earlier date).

Here, Plaintiff argues that it was prejudiced by the backdated notice because it "lost the lead time to find a replacement tenant, negotiate and sign a lease, and have the new tenant transition smoothly into the space with a minimum of down time." (Pltf. Opp. Br. (Dkt. No. 80) at 11) However, if a jury concludes that the July 8, 2015 notice was effective, and if the notice date is changed to July 8, 2017, Plaintiff received the two years of notice for which it bargained.

*    *    *    *

21

The parties' cross-motions for summary judgment on the issue of Qatar Group's post-July 8, 2017 liability will be denied.

## III.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT CONCERNING PLAINTIFF'S DAMAGE REMEDY UNDER THE SECOND CAUSE OF ACTION

Defendant Qatar Group has moved for summary judgment as to Plaintiff's claim for damages arising from Qatar Fashion's failure to pay rent (see SAC (Dkt. No. 63) Second Cause of Action), to the extent that Plaintiff seeks damages that go beyond those set forth in Section 19.2 of the Lease.  (Def. Sum. J. Br. (Dkt. No. 75) at 20, 30)

Qatar Group contends that "Sections 19.2 and 19.3 of the Lease are inconsistent remedies"; that Plaintiff drew down on a letter of credit that Qatar Group provided as security for Qatar Fashion's obligations under the Lease, and thereby elected to recover damages under Section 19.2; and that, having done so, Plaintiff may not seek damages under Section 19.3 of the Lease.  (Id. at 7, 20-22)

Plaintiff argues that (1) nothing in the Lease suggests that Plaintiff's drawing down on the letter of credit constitutes an election of remedies between Section 19.2 and Section 19.3; (2) its drawing down on the letter of credit does not constitute an election of remedies; and (3) in any event, Plaintiff is "free to change its damage remedy, there being no prejudice to Tenant [Qatar Fashion] or Guarantor [Qatar Group] from the manner of letter of credit drawdowns."  (Pltf. Opp. Br. (Dkt. No. 80) at 20-21)

### 1.   Applicable Law

Under New York law, "[t]he election of remedies rule bars the pursuit of alternative relief after a party has 'chosen one of two or more co-existing inconsistent remedies, and in reliance upon that election, that party must also have gained an advantage, or the opposing party must have suffered some detriment.'"  Sofi Classic S.A. de C.V. v. Hurowitz, 444 F. Supp.

2d 231, 238 (S.D.N.Y. 2006) (quoting <u>331 East 14th St. LLC v. 331 East Corp.</u>, 293 A.D.2d 361, 361 (1st Dep't 2002)); <u>see</u> <u>also</u> <u>Luitpold Pharmaceuticals, Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie</u>, 784 F.3d 78, 96 (2d Cir. 2015) ("The doctrine of election of remedies generally prevents a party that has chosen to assert one of two inconsistent rights from later seeking to vindicate the alternative right.").  "The election of remedies [doctrine] is largely a rule of policy to prevent vexatious litigation," <u>Clark v. Kirby</u>, 243 N.Y. 295, 303 (1926), and is "designed to prevent a party from obtaining duplicate relief for a single wrong and from gaining an unfair advantage over the opposing party which has acted in reliance upon the election." <u>Omega Executive Services, Inc. v. Grant</u>, No. 78 Civ. 4616(RWS), 1980 WL 1432, at *1 (S.D.N.Y. Aug. 22, 1980) (citing <u>Prudential Oil Corp. v. Phillips Petroleum Co.</u>, 418 F.Supp. 254, 277 (S.D.N.Y. 1975) ("The doctrine of election of remedies 'represents a harsh and arbitrary principle designed only to prevent vexatious litigation' and 'should be applied only where there has clearly been an irrevocable election.' . . . Accordingly, it has been the policy of the New York courts to apply 'a liberal doctrine . . . rather than a narrow and harsh one' in regard to the election of remedies.") (citations omitted)).  "Under New York law, election of remedies is an affirmative defense."  <u>MBIA Ins. Corp. v. Patriarch Partners VIII, LLC</u>, 842 F. Supp. 2d 682, 709 (S.D.N.Y. 2012).

### 2.   **Analysis**

As discussed above, Section 19.2 of the Lease provides:

> In the event of a termination of this Lease, Tenant shall pay to Landlord, as damages, at the election of Landlord, sums equal to the aggregate of all Additional Rent that would have been payable by Tenant had this Lease not terminated, payable upon the due dates therefor specified herein until the date hereinbefore set forth for the expiration of the Term; provided, however, that if Landlord shall relet all or any part of the Premises for all or any part of the period commencing on the day following the date of such termination and ending on the date hereinbefore set forth for the expiration of the Term, Landlord shall credit

> Tenant with the net rents received by Landlord from such reletting, when
> received, net of expenses incurred or paid by Landlord in terminating this Lease
> and re-entering the Premises and securing possession thereof, as well as the
> expenses of reletting, including altering and preparing the Premises for new
> tenants, brokers' commissions, and all other expenses properly chargeable against
> the Premises and the rental therefrom in connection with such reletting . . . ."

(Pltf. App., Ex. B (Lease) (Dkt. No. 79) § 19.2)

According to Defendant Qatar Group, "Section 19.2 limits [Plaintiff's]
recoverable damages to Additional Rent, net of rent received from reletting, offset by
[Plaintiff's] expenses in reletting the Premises.  Under this Section, [Plaintiff] may only recover
as damages Additional Rent as it becomes due under the Lease."  (Def. Sum. J. Br. (Dkt. No. 75)
at 21)

Section 19.3 of the Lease states:

> As an alternative to the remedy set forth in Section 19.2, Landlord may recover
> from Tenant, as liquidated damages, in addition to any unpaid Rent accrued to the
> date of such termination, an amount equal to the difference, for the unexpired
> portion of the term hereof, between: (1) the aggregate of all Rent reserved
> hereunder; and (2) the then fair and reasonable rental value of the Premises as
> proven by Tenant, both discounted to present worth at the rate of four (4%)
> percent per annum over the prime commercial lending rate at the time announced
> by Citigroup to be in effect at its principal office in New York City . . . ."

(Pltf. App., Ex. B (Lease) (Dkt. No. 79) § 19.3)

According to Defendant Qatar Group, "Section 19.3 would entitle
[Plaintiff] to recover *all prospective unpaid Rent*, reduced to present value, offset by the
fair and reasonable rental value of the Premises as proven by [Qatar Fashion]."  (Def.
Sum. J. Br. (Dkt. No. 75) at 21 (emphasis in original))

As is also discussed above, Section 19.4 of the Lease provides Plaintiff with still
"Other Remedies" in the event of a breach by Qatar Fashion:

> Nothing herein contained shall be construed as limiting or precluding the recovery
> by Landlord against Tenant of any sums or damages to which, in addition to the

damages particularly provided above, Landlord may lawfully be entitled by reason of any default hereunder on the part of Tenant.

(Pltf. App., Ex. B (Lease) (Dkt. No. 79) § 19.4)

It is undisputed here that Qatar Group provided a letter of credit to Plaintiff to secure Qatar Fashion's performance under the Lease, and that between January 28, 2016 and July 6, 2017, Plaintiff drew down on the letter of credit, on a near-monthly basis, as Fixed and Additional Rent would have become due under the Lease, had it not been terminated in December 2015. Plaintiff's withdrawals on the letter of credit total $12 million, and Plaintiff does not dispute that its withdrawals on the letter of credit constitute a recovery of damages under the Lease. (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 81) ¶¶ 96-98, 101, 103)

Defendant Qatar Group contends that – in recovering $12 million from the letter of credit "provided as security under the Lease . . . for what it believed were Fixed Rent and Additional Rent payments owed under the Lease" – Plaintiff elected to pursue its remedies under Section 19.2, and may not recover pursuant to the alternative remedy provided in Section 19.3. (Def. Sum. J. Br. (Dkt. No. 75) at 21-22)

Qatar Group's argument ignores the fact that the Lease does not address in any fashion the letter of credit. Because the Lease does not address the letter of credit, this Court cannot find, as a matter of law, that Plaintiff's drawing down on the letter of credit somehow triggered an election of remedies by which Plaintiff elected to pursue its remedies under Section 19.2 rather than under Section 19.3. Such a result would be particularly incongruous here given that (1) as set forth in Section 19.4 of the Lease, the remedies set forth in Sections 19.2 and 19.3 are not exclusive or exhaustive (Pltf. App., Ex. B (Lease) (Dkt. No. 79) § 19.4); and (2) under

New York law, the election of remedies doctrine is designed for "vexatious litigation" and is to be applied in a "liberal" fashion.  Prudential Oil, 418 F.Supp. at 277.

Accordingly, to the extent that Plaintiff ultimately may recover under the Second Cause of Action for Qatar Fashion's failure to pay rent, the election of remedies doctrine will not bar its recovery of damages under Section 19.3.

Qatar Group further contends that, regardless of election of remedies, "the Guaranty expressly bars [Plaintiff] from recovering accelerated rent under [Section] 19.3 from [Qatar Group]."  (Def. Sum. J. Br. (Dkt. No. 75) at 23)  Defendant relies on Section 2 of the Guaranty, which reads, in pertinent part, as follows:

> On or before the expiration of the Final Obligation Date, Guarantor shall pay, or shall cause Tenant to pay, to Landlord all Fixed Rent, Additional Rent and all other charges and sums due and payable by Tenant under the Lease due and payable up to and including the Final Obligation Date (but specifically excluding any accelerated Fixed Rent, Additional Rent and all other charges and sums due and payable by Tenant under the Lease).

(Pltf. Appx., Ex. C (Guaranty) (Dkt. No. 79-1) § 2)

Plaintiff argues that if "no Final Obligation Date arose, then [Qatar Group's] obligations remain identical to that of [Qatar Fashion], including liability for damages under Section 19.3."  (Pltf. Opp. Br. (Dkt. No. 80) at 22)  Plaintiff acknowledges, however, that "if [Qatar Fashion] satisfied the cut-off conditions, and a Final Obligation Date was thereby fixed, [Qatar Group]'s obligations did not include any accelerated rent for which [Qatar Fashion] might be liable in the interim."  (Id.)

This issue thus turns on whether Qatar Fashion satisfied the conditions in the Guaranty for the setting of a "Final Obligation Date."  This Court has ruled that this issue cannot be resolved as a matter of law.

Accordingly, Defendant Qatar Group's motion for summary judgment as to Plaintiff's remedy for the Second Cause of Action will be denied.

## IV.   CROSS-MOTIONS REGARDING BUILDOUT COSTS

Plaintiff seeks summary judgment on its claim, set forth in the First Cause of Action, that it is "entitled to recover damages for [Qatar Fashion's] failure to build out the premises."  (Pltf. Sum. J. Br. (Dkt. No. 73) at 29)  Defendant Qatar Group has cross-moved for summary judgment on this issue, arguing that Plaintiff "has no claim to recover buildout costs under the Lease."  (Def. Sum. J. Br. (Dkt. No. 75) at 16)

### A.   Legal Standards

"Damages for breach of contract 'are intended to return the parties to the point at which the breach arose and to place the nonbreaching party in as good a position as it would have been had the contract been performed.'"  Milltex Grp. Inc. v. Gossard & Berlei Ltd., No. 15 Civ. 10002 (RA), 2018 WL 6624275, at *3 (S.D.N.Y. Sept. 20, 2018) (citing Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs., P.C., 91 N.Y.2d 256, 261 (1998)).  However, "courts must honor contractual provisions that limit liability or damages because those provisions represent the parties' agreement on the allocation of the risk of economic loss in certain eventualities. . . . Contract terms providing for a 'sole remedy' are sufficiently clear to establish that no other remedy was contemplated by the parties at the time the contract was formed, for purposes of that portion of the transaction . . . ."  Nomura Home Equity Loan, Inc., Series 2006-FM2, by HSBC Bank USA, Nat'l Ass'n v. Nomura Credit & Capital, Inc., 30 N.Y.3d 572, 581-82 (2017) (citations omitted).

B.    **Analysis**

The parties agree that Qatar Fashion's failure to perform build-out work at the Premises constitutes a breach of Section 1.3(B) of the Lease.[10]  (Pltf. R. 56.1 Stmt. (Dkt. No. 76) ¶ 59)  Section 1.7 of the Lease states that Plaintiff "shall have the right, but not the obligation, to treat [Qatar Fashion's failure to perform the build-out work] as a default hereunder, giving rise to all of Landlord's rights and remedies hereunder, at law and in equity."  (Pltf. Appx., Ex. B (Lease) (Dkt. No. 79) § 1.7)  Plaintiff argues that the Lease thereby "specifically entitles [Plaintiff] to recover for [Qatar Fashion's] undisputed breach of the [L]ease."  (Pltf. Sum. J. Br. (Dkt. No. 73) at 29)  Plaintiff further notes that Section 19.4 of the Lease provides that

> [n]othing herein contained shall be construed as limiting or precluding the recovery by [Plaintiff] against [Qatar Fashion] of any sums or damages to which, in addition to the damages particularly provided above, [Plaintiff] may lawfully be entitled by reason of any default hereunder on the part of [Qatar Fashion].

(Pltf. Appx., Ex. B (Lease) (Dkt. No. 79) § 19.4)

Defendant Qatar Group contends, however, that its "obligations to [Plaintiff] under the Guaranty are limited to Rent and 'other charges and sums due and payable by [Qatar Fashion] under the Lease due and payable up to and including the Final Obligation Date . . . .'" (Def. Sum. J. Br. (Dkt. No. 75) at 16 (citing Def. R. 56.1 Stmt. (Dkt. No. 85) ¶ 12) (emphasis omitted)); see also Pltf. Appx., Ex. C (Guaranty) (Dkt. No. 79-1) § 2), and that accordingly Plaintiff's "remedies [under the Lease] in the event of a default [by Qatar Fashion] . . . do not

---

[10]  As discussed above, Section 1.3(B) of the Lease, in pertinent part, provides:  "At [Qatar Fashion's] sole expense, following the Commencement Date [Qatar Fashion] shall perform or cause the performance of its initial Alterations . . . in and to the Premises and to promptly prepare the same for the operation of [Qatar Fashion's] business therein . . . [Qatar Fashion] agrees to (i) use diligent efforts to complete [Qatar Fashion's] Work substantially in accordance with such approved plans and specifications as promptly as reasonably feasible and (ii) open for business to the public fully fixtured, stocked and staffed in accordance with Madison Avenue Standards . . . ."  (Pltf. Appx., Ex. B (Lease) (Dkt. No. 79) § 1.3(B))

include recovering the cost of the anticipated Qela buildout."  (Def. Sum. J. Br. (Dkt. No. 75) at 16)

As discussed above, however, the Lease explicitly provides that the remedies referenced in Sections 19.2 and 19.3 are not exclusive or exhaustive.  Section 19.4 states that "[n]othing herein contained shall be construed as limiting or precluding the recovery by [Plaintiff] against [Qatar Fashion] of any sums or damages to which, in addition to the damages particularly provided [in Sections 19.2 and 19.3], [Plainitff] may lawfully be entitled [to] by reason of any default hereunder on the part of [Qatar Fashion]."  (Pltf. Appx., Ex. B (Lease) (Dkt. No. 79) § 19.4)  A build-out of the Premises is part of what Plaintiff bargained for in the Lease, and accordingly Plaintiff is entitled to damages that place it "in as good a position as it would have been" had Qatar Fashion performed the build-out that the Lease requires.  Milltex Grp. Inc., 2018 WL 6624275, at *3.

Qatar Group's argument to the contrary relies on Granfeld II, LLC v. Kohl's Dep't Stores, Inc., 48 Misc. 3d 1210(A) (N.Y. Cty. Sup. Ct. 2015), an unreported decision.  See Def. Sum. J. Br. (Dkt. No. 75) at 16-18.  In Granfeld, the lease at issue set forth a list of remedies in the event of the tenant's default, which included the "cost of recovering the Premises," "accrued and unpaid rentals," the "discounted net present value of the balance of the annual fixed rent for the remainder of the Term minus the then fair market rental value of the Premises for the remainder of the Term," and "any other sum of money and damages owed by Tenant to Landlord."  Granfeld, 48 Misc. 3d 1210(A) at *2.  The tenant defaulted and the landlord sued, seeking – in addition to the above specifically identified remedies – the value of a fully constructed retail store that the tenant was obligated to construct on the property.  The Granfeld court found that the provision referencing "any other sum of money and damages owed by the

Tenant to Landlord" "does not refer to the cost of construction of the building and other improvements," and that "[h]ad the parties intended to allow the plaintiff to recover those costs, . . . it would have been a simple matter to include them [in the damages provision]." Id. at *9.

Granfeld is not controlling here, nor is it persuasive to this Court. Qatar Fashion agreed to build out the Premises; Qatar Group guaranteed that performance; and Qatar Fashion concededly did not perform that obligation and thereby breached the Lease. Under well settled New York law, Plaintiff is entitled to a damages award that will put it in the same position it would have been in if Qatar Fashion had performed as agreed.

Finally, Defendant Qatar Group argues that Section 19.2 already provides for damages related to build-out costs, because Section 19.2 provides that Plaintiff may "offset the costs of 'altering and preparing the Premises for new tenants'" in the event of a breach. (Def. Sum. J. Br. (Dkt. No. 75) at 19 (citing Pltf. Appx., Ex. B (Lease) (Dkt. No. 79) § 19.2)) The cost of a build-out from scratch may be larger than the cost of "altering and preparing the Premises for new tenants" subsequent to a build-out, however, and Section 19.2 does not foreclose a broader recovery under Section 19.4.[11]

Plaintiff's motion for summary judgment as to Defendant Qatar Group's liability for damages on the SAC's First Cause of Action will be granted, and Defendant Qatar Group's cross-motion as to the First Cause of Action will be denied.

---

[11] Qatar Group's arguments concerning fixtures and improvements (see Def. Sum. J. Br. (Dkt. No. 75) at 19) go to the amount of damages Plaintiff is entitled to, and not whether Plaintiff is entitled to a damages award premised on Qatar Fashion's failure to perform the build-out work. A jury will determine the amount of damages that Plaintiff is entitled to as a result of Qatar Fashion's failure to perform the build-out work, but Qatar Group's liability for Qatar Fashion's breach is clear.

## V.        CROSS-MOTIONS REGARDING REFORMATION

The parties have cross-moved for summary judgment on the SAC's Third Cause of Action, which seeks reformation of the Lease.  Plaintiff contends that it is entitled to reformation, because "Additional Rent," as used in Section 19.2 of the Lease, was the product of a mutual mistake.  Plaintiff argues that "it is undisputed that [Plaintiff] and [Qatar Fashion] never negotiated, intended or agreed to limit [Plaintiff's] damages to the recovery of 'Additional Rent'" under Section 19.2.  (Pltf. Sum. J. Br. (Dkt. No. 73) at 27 (emphasis in original)) According to Plaintiff, both sides intended that the word "Rent" be used, rather than "Additional Rent."  Plaintiff therefore contends that it is entitled to summary judgment on its reformation claim, and that the word "Additional" should be struck from the term "Additional Rent" as used in Section 19.2 of the Lease.  (Pltf. Sum. J. Br. (Dkt. No. 73) at 25)

Defendant Qatar Group argues that use of the term "Additional Rent" was Plaintiff's "unilateral mistake" rather than "a mutual mistake."  (Def. Sum. J. Br. (Dkt. No. 75) at 24)  According to Defendant, the reference to "Additional Rent" "was the result of [Plaintiff's lawyer's] reliance on an incorrect form that [Plaintiff] provided to it, prior to and absent any discussion or alternative agreement between the parties."  (Id. at 25)

### A.        Legal Standards

"Under New York law, reformation is appropriate where there is a mutual mistake as to the contract."  Global Intellicom, Inc. v. Thomson Kernaghan & Co., No. 99 Civ. 342(DLC), 1999 WL 544708, at * 18 (S.D.N.Y., July 27, 1999) (citing Healy v. Rich Products Corp., 981 F.2d 68, 73 (2d Cir. 1992)).  "In a case of mutual mistake, the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement."  Chimart Assocs. v. Paul, 66 N.Y.2d 570, 573 (1986) (citations omitted).  "A 'mutual mistake' occurs when both [] parties to a bilateral transaction share the same erroneous belief and their

acts do not in fact accomplish their mutual intent." Healy, 981 F.2d at 73 (internal quotation marks and citation omitted).

"[A] contract can be reformed on the basis of mutual mistake if the writing does not accurately reflect the mutual intention of the parties . . . ." Investors Ins. Co. of America v. Dorinco Reins. Co., 917 F.2d 100, 105 (2d Cir. 1990). "'Reformation of contract [] is not a matter of resolving an ambiguity in a contract but rather of supplying what the parties clearly intended to include but inadvertently omitted.'" Citibank, N.A. v. Morgan Stanley & Co. Intern., PLC, 797 F.Supp.2d 254, 264 (S.D.N.Y. 2011) (quoting Robinson v. Metro N. Commuter R.R. Co., 325 F.Supp.2d 411, 412 (S.D.N.Y. 2004)).

"'A party seeking reformation of a contract by reason of a mistake must establish, with clear and convincing evidence, that the contract was executed under mutual mistake . . . .'" Moshe v. Town of Ramapo, 54 A.D.3d 1030, 1031 (2d Dep't 2008) (quoting Yu Han Young v. Chiu, 49 A.D.3d 535, 536 (2d Dep't 2008)); see also Migliore v. Manzo, 28 A.D.3d 620, 622 (2d Dep't 2006) ("A party seeking to invoke equity to reform a written agreement based upon a purported mistake bears the burden of showing a mutual mistake by clear and convincing evidence.") (citing Ross v. Food Specialties, 6 N.Y.2d 336 (1959)). The party seeking reformation must show that both sides were under the same belief as to the facts, and "not only that [a] mistake [in the contract] exists, but exactly what was really agreed upon between the parties." George Backer Mgmt. Corp. v. Acme Quilting Co., 46 N.Y.2d 211, 219 (1978).

The sophistication of the parties to the contract – including whether they were represented by counsel – is considered in determining whether mutual mistake has been established. Migliore, 28 A.D.3d at 622 ("'[w]here a written agreement between sophisticated, counseled businessmen is unambiguous on its face, one party cannot defeat summary judgment

by a conclusory assertion that, owing to mutual mistake or fraud, the writing did not express his own understanding of the oral agreement reached during negotiations'") (quoting <u>Chimart</u>, 66 N.Y.2d at 571.  "Because the remedy of reformation presents the danger 'that a party, having agreed to a written contract that turns out to be disadvantageous, will falsely claim the existence of a different, oral contract,' the New York courts have sharply limited the remedy of reformation both procedurally and substantively."  <u>Collins v. Harrison-Bode</u>, 303 F.3d 429, 435 (2d Cir. 2002) (quoting <u>Chimart</u>, 66 N.Y.2d at 573).

## B.   <u>Analysis</u>

The parties agree that the origin of the word "Additional" – as used in Section 19.2 of the Lease – was Plaintiff's standard form for New York retail leases.  (Def. R. 56.1 Stmt. (Dkt. No. 85) ¶¶ 61-62)  The word "Additional" appeared in the first draft of the Lease, which Plaintiff's counsel sent to Qatar Fashion's counsel.  (Pltf. R. 56.1 Stmt. (Dkt. No. 76) ¶¶ 28, 30-32)  There is conflicting evidence as to whether the parties discussed this provision, and what their intent was as to this provision.  (<u>Compare</u> <u>id.</u> ¶¶ 33-34 <u>with</u> Def. R. 56.1 Cntrstmt. (Dkt. No. 88) ¶¶ 33-34)

Plaintiff was represented during the Lease negotiations by Justin Xenitelis, its general counsel, and by Pryor Cashman LLP, its outside counsel.  Xenitelis has submitted an affidavit stating the following:

> Consistent with standard industry norms, [Plaintiff]'s intention was to measure damages by all Rent that would have been payable had [Plaintiff] not terminated the leases – not merely for Additional Rent – so that [Plaintiff] would be made whole upon termination.  It would have been illogical and nonsensical for [Plaintiff] to propose – let alone agree – to limit its damages to "Additional Rent" and forego any right to recover fixed rent in the event of a lease termination.  The standard liquidated-damages formulation in commercial real estate leases includes fixed rent payable under such leases, and is never limited solely to other additional items of rent.
>
> . . . .

> Critically, neither the parties nor their counsel ever discussed, much less agreed, to limit [Plaintiff's] remedy to the recovery of "Additional Rent."
>
> . . . .
>
> I have negotiated and reviewed hundreds of commercial leases in my career as attorney and law professor.  I have never before encountered a lease which measured damages only by additional rent and excluded fixed monthly rent. Section 19.2 is plainly an error that was not caught by anyone involved.

(Xenitelis Aff. (Dkt. No. 77) ¶¶ 10-15)

At deposition, Eric Schoenfeld, Qatar Fashion's lawyer, testified as follows

concerning the drafting of Section 19.2:

> Q:  Do you recall any negotiations with any representative of the landlord in connection with [Section 19.2]?
>
> A:  No.
>
> Q:  Do you recall that the damages set forth in the lease provided that the landlord would recover from the tenant the aggregate of all additional rent that would have been payable by tenant?
>
> A:  No.
>
> . . . .
>
> Q:  Do you have any recollection of having read that provision at the time that you received the draft of the lease?
>
> A:  Not specifically.
>
> Q:  Have you ever seen a provision where the landlord's damages would be measured solely by the additional rent that it received?
>
> . . . .
>
> A:  I don't recall seeing it.
>
> Q:  Okay.  In your experience would it be unusual if a landlord's measure of damages was not by all of the rent but only by the additional rent?
>
> . . . .
>
> A:  Yes.

(Schoenfeld Dep. (Dkt. No. 85-34) at 49:25-51:8)[12]

Later in his deposition, Schoenfeld testified as follows:

Q:  Does it make any logical sense to deduct the full rent including base rent by a successor tenant and deduct that from the additional rent that would have been payable under this lease in determining the damages that were due to the landlord?

A:  It [has] some illogicalness to it.

(Id. at 83:10-18)

When asked again whether he recalled specific negotiations regarding Section 19.2 of the Lease, Schoenfeld testified as follows:

Q:  Did you have any specific negotiations over how, in [Section] 19.2, landlord's damages would be measured?

A:  No. . . . Well, I have to say I don't recall to be very clear.

. . . .

Q:  [C]an you name any logical basis for [the drafting of Section 19.2]?

. . . .

A:  I cannot name a logical basis for limit[ing] damages to additional rent.  I wouldn't advise my landlord client to do that in general, but I can understand logically no matter what the calculation of rent, additional rent, fixed represented rent, why a tenant, no matter what . . . would want netted out what the landlord actually gets.

Q:  Okay. Was it your specific intent in this transaction to have that occur, that calculation?

. . . .

A:  I have no memory of what my intent was on that particular subject.

(Id. at 123:23-128:23)

Based on the above evidence, Plaintiff argues that "it is undisputed that [Plaintiff] and [Qatar Fashion] never negotiated, intended or agreed to limit [Plaintiff]'s damages to the

---

[12]  Citations to this deposition reflect the pagination of the transcript rather than ECF numbering.

recovery of 'Additional Rent,'" and accordingly, it is entitled to summary judgment on its reformation claim.  (Pltf. Sum. J. Br. (Dkt. No. 73) at 27 (emphasis in original))

Defendant Qatar Group argues, however, that the record "clearly establish[es] that [Plaintiff] committed a unilateral mistake" (Def. Sum. J. Br. (Dkt. No. 75) at 26), noting that it was Plaintiff's "practice" during this time "to limit its contractual remedy under [Section] 19.2 to Additional Rent with respect to its high-end tenants."  (Id. at 25)

Plaintiff has not demonstrated that it is entitled to summary judgment on its reformation claim.  The fact that Schoenfeld does not recall reviewing drafts of Section 19.2, or negotiations regarding the term "Additional Rent," does not demonstrate that the parties agreed that Plaintiff would be entitled to "Rent" in the event of Qatar Fashion's breach.

Plaintiff's arguments regarding "what is standard in [the] industry" (Pltf. Sum. J. Br. (Dkt. No. 73) at 26) are also not persuasive.  As an initial matter, Plaintiff's standard form for retail leases at that time included the "Additional Rent" language.  (Def. R. 56.1 Stmt. (Dkt. No. 85) ¶¶ 61-62)  The only other evidence on this point is Schoenfeld's admission that the provision as written is "unusual" (Schoenfeld Dep. Tr. (Dkt. No. 85-34) at 51:3-8), and Xenitelis' claim that, in reviewing hundreds of leases, he has "never before encountered a lease" with such a provision.  (Xenitelis Aff. (Dkt. No. 77) ¶ 15)  But the issue here is not "what is standard in [the] industry," but rather whether Plaintiff has shown by "clear and convincing evidence," Moshe, 54 A.D.3d at 1031, that there is a mistake in the Lease, and that the parties "really agreed upon [something else]."  George Backer Mgmt., 46 N.Y.2d at 219.  The evidence cited by Plaintiff does not begin to meet this standard.

Defendant Qatar Group's motion likewise fails.  There is no evidence that the parties negotiated the "Additional Rent" language set forth in Section 19.2, or that they reached

an agreement to limit Plaintiff's damages to the recovery of "Additional Rent."  Indeed,

Defendant does not even argue that it bargained for and intended that the "Additional Rent" term

be used in Section 19.2.  Moreover, Schoenfeld's testimony and Xenitelis' affidavit suggest that

the presence of such a term in a lease of this sort would be both "unusual" and "illogical," and

perhaps unprecedented.  There is also evidence that acceptance of Defendant's argument would

lead to an absurd result.  For all these reasons, a reasonable jury could find that neither Plaintiff's

counsel nor Qatar Fashion's counsel understood or intended that Plaintiff's remedy be limited to

"Additional Rent."

       Accordingly, Plaintiff's and Defendant's motions for summary judgment on the

Third Cause of Action will be denied.

*     *     *     *

       To summarize, the parties' cross-motions for summary judgment on the issue of

Qatar Group's "continuing liability" post-July 8, 2017 are denied.  Plaintiff's motion for

summary judgment is granted as to its right to damages on the First Cause of Action for breach

of contract arising out of Qatar Fashion's failure to perform build-out work on the Premises.  The

parties' cross-motions for summary judgment on the SAC's Third Cause of Action for

reformation are denied.  Defendant Qatar Group's motion for summary judgment is denied in its

entirety.[13]

## CONCLUSION

       Plaintiff's motion for summary judgment is granted in part and denied in part as

set forth above.  Defendant Qatar Group's motion for summary judgment is denied.  Plaintiff's

---

[13]  Plaintiff's motion for summary judgment is, as to an award of attorney's fees and costs, denied without prejudice.  An attorney's fee award will be determined after the jury renders its verdict.

claim against Qatar Foundation is dismissed without prejudice.  The Clerk of Court is directed to terminate the motions (Dkt. Nos. 72, 74).

This matter will proceed to trial on **October 5, 2020**.  The joint pretrial order, motions in limine, requested voir dire, and requests to charge are due on **September 7, 2020**. Responsive papers are due **September 14, 2020**.  The parties are directed to consult this Court's Individual Rules as to the contents of these materials.

Dated:  New York, New York
         May 27, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge