UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THOR 680 MADISON AVE. LLC,

Plaintiff,

- against -

QATAR LUXURY GROUP S.P.C.,

Defendant.

**ORDER**

17 Civ. 8528 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff Thor 680 Madison Ave. LLC ("Thor") brings this breach of contract action against Defendant Qatar Luxury Group S.P.C. ("Qatar Group").  (Second Amended Complaint ("SAC") (Dkt. No. 63) ¶¶ 5-6)  Thor has moved to strike or dismiss Qatar Group's counterclaims.  (Dkt. No. 110)

For the reasons stated below, Plaintiff's motion to strike will be denied, and its motion to dismiss will be granted.

**BACKGROUND**

I.    **FACTS**

On December 31, 2013, Thor entered into a fifteen-year commercial lease (the "Lease") with Qatar Luxury Group Fashion USA Inc. ("Qatar Fashion") for space in a building located at 680 Madison Avenue in Manhattan.  (SAC (Dkt. No. 63) ¶¶ 1, 25-26)  Qatar Fashion planned to use the leased space to house a store selling luxury goods bearing its "QELA" brand.  (Id. ¶¶ 1, 14-16)  Pursuant to the Lease, Qatar Fashion agreed to pay "Fixed Rent" and "Additional Rent."  (Id. ¶ 28)  "Fixed Rent" is a monthly payment of $525,000, which escalates at three-year intervals.  "Additional Rent" "mean[s] all sums of money, other than Fixed Rent, as

shall become due and payable from Tenant to Landlord under or pursuant to this Lease," such as reimbursement for increases in real estate taxes.  (Id.; Lease (Dkt. No. 12-1) § 2.1(B))

The Lease requires Qatar Fashion to build out the premises in accordance with "the standards applicable to first-class luxury mixed-use properties" on Madison Avenue.  (SAC (Dkt. No. 63) ¶¶ 34-37)  Section 28.1 of the Lease requires Qatar Fashion to make a $12 million security deposit through a letter of credit:

> Tenant shall have deposited with Landlord simultaneously with the execution of this Lease, the sum of Twelve Million . . . Dollars (the "Security Deposit"), by Letter of Credit . . . or such other form as Landlord shall reasonably approve, as security for the faithful performance, observance and compliance with all of the terms, covenants and conditions of this Lease on Tenant's part to perform, observe or comply with.  Tenant agrees that, in the event that Tenant defaults under any of the terms, covenants or conditions in this Lease on Tenant's part to observe, perform or comply with (including, without limitation, the payment of any installment of Fixed Rent or any amount of Additional Rent), which default continues after any notice and applicable grace periods required under this Lease and the expiration of any applicable cure period, Landlord may notify the Issuing Bank . . . and thereupon receive all of the monies represented by the said Letter of Credit and use, apply, or retain the whole or any part of such proceeds, or both, as the case may be, to the extent required for the payment of any Fixed Rent, Additional Rent, or any other sums as to which Tenant is in default, or for any sum that Landlord may expend or may be required to expend by reason of any such default (including any damages or deficiency accrued before or after summary proceedings or other re-entry by Landlord).

(Lease (Dkt. No. 12-1) § 28.1)

To satisfy the security deposit requirement, Defendant Qatar Group provided a $12 million letter of credit on behalf of Qatar Fashion.  (Counterclaims (Dkt. No. 65) ¶ 5)  Qatar Group also executed a guaranty on behalf of Qatar Fashion with respect to the latter's obligations under the Lease.  (SAC (Dkt. No. 63) ¶¶ 42-44; Guaranty (Dkt. No. 12-2))

Qatar Fashion never built out the premises, and it did not pay the Fixed Rent due on September 1, 2015 or in any subsequent month.  (Third Answer (Dkt. No. 65) ¶¶ 63, 77)  On September 9, 2015, Thor sent a Notice of Default to Qatar Fashion, citing its "failure to pay rent

and/or other charges due under the Lease." (Sept. 9, 2015 Not. (Dkt. No. 12-3) at 2)[1]  On

December 9, 2015, Thor sent a Notice of Termination to Qatar Fashion, citing its "fail[ure] to

cure the default in the payment of rent and/or other charges due under the Lease." (Dec. 9, 2015

Not. (Dkt. No. 12-4) at 2)

On July 28, 2016, Thor re-let the premises to a replacement tenant.  The new

tenant agreed to pay the same rent as Qatar Fashion, but obtained rights to double the space at

680 Madison Avenue.  (SAC (Dkt. No. 63) ¶¶ 69-71)  Moreover, the new tenant's obligation to

pay rent began on June 29, 2017, and Thor did not receive any rent for the premises between

September 1, 2015 and June 29, 2017.  (Id. ¶¶ 73-74)

The Lease provides Thor with a number of remedies in the event of a breach by

Qatar Fashion.  For example, Section 19.2 of the Lease states:

> In the event of a termination of this Lease, Tenant shall pay to Landlord, as
> damages, at the election of Landlord, sums equal to the aggregate of all
> Additional Rent that would have been payable by Tenant had this Lease not
> terminated, payable upon the due dates therefor specified herein until the date
> hereinbefore set forth for the expiration of the Term; provided, however, that if
> Landlord shall relet all or any part of the Premises for all or any part of the period
> commencing on the day following the date of such termination and ending on the
> date hereinbefore set forth for the expiration of the Term, Landlord shall credit
> Tenant with the net rents received by Landlord from such reletting, when
> received, net of expenses incurred or paid by Landlord in terminating this Lease
> and re-entering the Premises and securing possession thereof, as well as the
> expenses of reletting, including altering and preparing the Premises for new
> tenants, brokers' commissions, and all other expenses properly chargeable against
> the Premises and the rental therefrom in connection with such reletting . . . .

(Lease (Dkt. No. 12-1) § 19.2)

Section 19.3 of the Lease states:

> As an alternative to the remedy set forth in Section 19.2, Landlord may recover
> from Tenant, as liquidated damages, in addition to any unpaid Rent accrued to the
> date of such termination, an amount equal to the difference, for the unexpired

---

[1]  All references to page numbers in this Order are as reflected in this District's Electronic Case
Files ("ECF") system.

portion of the term hereof, between: (1) the aggregate of all Rent reserved
hereunder; and (2) the then fair and reasonable rental value of the Premises as
proven by Tenant, both discounted to present worth at the rate of four (4%)
percent per annum over the prime commercial lending rate at the time announced
by Citigroup to be in effect at its principal office in New York City.

(Id. § 19.3)

As discussed above, Section 28.1 of the Lease provides that, "in the event that

[Qatar Fashion] defaults under any of the terms, covenants or conditions in this Lease . . .

(including, without limitation, the payment of any installment of Fixed Rent or any amount of

Additional Rent) . . . [Thor] may notify the Issuing Bank . . . and thereupon receive all of the

monies represented by the said Letter of Credit and use, apply, or retain the whole or any part of

such proceeds, or both, as the case may be, to the extent required for the payment of any Fixed

Rent, Additional Rent, or any other sums as to which Tenant is in default . . . ."  (Id. § 28.1)

Finally, Section 19.4 of the Lease – entitled "Other Remedies" – provides that

[n]othing herein contained shall be construed as limiting or precluding the
recovery by Landlord against Tenant of any sums or damages to which, in
addition to the damages particularly provided above, Landlord may lawfully be
entitled by reason of any default hereunder on the part of Tenant.

(Id. § 19.4)

As discussed above, Qatar Fashion did not make the Fixed Rent payment due on

September 1, 2015, and did not make any Fixed Rent payments thereafter.  (Third Answer (Dkt.

No. 65) ¶ 63)  Accordingly, on December 9, 2015, Thor terminated the Lease, by sending Qatar

Fashion a Notice of Termination.  (Dec. 9, 2015 Not. (Dkt. No. 12-4) at 2)  Between January

2016 and July 2017, Thor drew down on the letter of credit, on a near monthly basis, as Fixed

and Additional Rent would have become due under the Lease, had it not been terminated.

Plaintiff's withdrawals on the letter of credit total $12 million.  (Xenitelis Decl. (Dkt. No. 111-1)

¶¶ 3-4; see id., Ex. B (Dkt. No. 111-3); Counterclaims (Dkt. No. 65) ¶¶ 15-16)

4

## II.    PROCEDURAL HISTORY

The Complaint was filed on November 3, 2017, and pleads (1) a breach of contract claim against Qatar Group, in its capacity as guarantor, premised on Qatar Fashion's failure to build out the premises (Cmplt. (Dkt. No. 1) ¶¶ 51-54); (2) a breach of contract claim against Qatar Group, in its capacity as guarantor, premised on Qatar Fashion's failure to pay rent (id. ¶¶ 55-59); and (3) an alter ego claim against Defendant Qatar Foundation for Education, Science and Community Development – the alleged parent of Qatar Group.[2]  (Id. ¶¶ 60-64)

On April 19, 2018, this Court entered a scheduling order which provides that "[a] party may not amend its pleadings except with leave of the Court.  Except for good cause shown, any motion to amend pleadings must be filed within 30 days from the date of this Order."  (Apr. 19, 2018 order (Dkt. No. 22) ¶ 4)

On May 29, 2018 – pursuant to a stipulation between the parties (Dkt. No. 23) – Thor filed the First Amended Complaint ("FAC").  (Dkt. No. 24)  The FAC is substantially similar to the Complaint, but pleads additional facts regarding Qatar Fashion's obligations under the Lease.  (See id. ¶¶ 28-31, 54-59, 64-67, 70)  Thor also increased its damage claim from $25 million to $28 million.  (Id. ¶ 3)

Fact discovery closed on March 25, 2019.  (Dkt. No. 50)

In an April 18, 2019 letter, the parties proposed a briefing schedule for cross-motions for summary judgment.  (Dkt. No. 59)  On April 30, 2019, the Court adopted the parties' proposed briefing schedule, which made the parties' cross-motions due on May 20, 2019.  (Dkt. No. 64)

---

[2] On May 27, 2020, this Court dismissed all claims against Defendant Qatar Foundation for Education, Science and Community Development without prejudice for failure to effect service under Rule 4(m).  (May 27, 2020 Memorandum Opinion & Order (Dkt. No. 90) at 1 n.1)

A.    <u>The Second Amended Complaint</u>

On April 29, 2019 – pursuant to a stipulation between the parties (Dkt. No. 61) –

Thor filed the Second Amended Complaint.  (SAC (Dkt. No. 63))  The SAC adds a claim for

reformation of Section 19.2 of the Lease, in which Thor seeks to delete the word "Additional"

from the phrase "Additional Rent."  (<u>Id.</u> ¶¶ 85-90)  Thor also pleads facts regarding the

negotiation and drafting of the Lease in support of its theory that the parties "mistakenly used the

words 'Additional Rent' instead of 'Rent' in [Section 19.2]."  (<u>Id.</u> ¶ 53)  For example, the SAC

alleges that the use of "Additional Rent" in Section 19.2 was a "typographical error" in "Thor's

standard form [lease]" "that went unnoticed" by both parties' counsel.  (<u>Id.</u> ¶ 52)  Thor further

alleges that it "did not intend to limit its damages recovery to Additional Rent and forego any

right to recover [F]ixed [R]ent in the event of a lease termination."  (<u>Id.</u> ¶ 54)

The SAC also pleads other remedies – beyond those set forth in Section 19.2 –

available to Thor under the Lease in the event of Qatar Fashion's breach.  For example, the SAC

cites Thor's alternative remedy under Section 19.3 of the Lease.  Pursuant to that provision, Thor

alleges that it can recover

> an amount equal to the difference, for the unexpired portion of the term, between
> (a) the aggregate of all rent that would have been payable by Tenant had Thor not
> terminated the Lease, and (b) the then fair and reasonable rental value of the
> Premises (as proven by Tenant) . . . . Tenant, moreover, agreed that if the
> Premises are re-let within a reasonable time after Thor's termination, then the rent
> realized by such re-letting is deemed <u>prima</u> <u>facie</u> to be the reasonable rental value.
> Thor may also prove and obtain as liquidated damages an amount equal to the
> maximum allowed by law, whether such amount is greater, equal to, or less than
> the difference described above.

(<u>Id.</u> ¶ 32; <u>see</u> Lease (Dkt. No. 12-1) § 19.3)  The SAC also cites the "Other Remedies" provision

set forth in Section 19.4 of the Lease, and asserts that "nothing contained in the Lease would

limit or preclude Thor from recovering any additional sums or damages to which Thor may

lawfully be entitled by reason of any default by Tenant under the Lease."  (SAC (Dkt. No. 63) ¶ 33; see Lease (Dkt. No. 12-1) § 19.4)

Finally, Thor drops its claim for $28 million in damages in favor of a general, unspecified amount of damages.  (See SAC (Dkt. No. 63) ¶ 84 ("Thor is entitled to recover damages against Guarantor in an amount to be proven at trial."))

### B.    Qatar Group's Answer and Counterclaims

On May 9, 2019, Qatar Group filed its answer to the SAC.  (Dkt. No. 65)  The Answer asserts two counterclaims related to draws Thor made on the $12 million letter of credit posted by Qatar Group as security for the Lease.  Qatar Group's two counterclaims are for breach of contract and unjust enrichment.  (Counterclaims (Dkt. No. 65) ¶¶ 5, 7, 15, 38-48)

In its breach of contract counterclaim, Qatar Group contends that Thor breached the Lease by drawing down on the letter of credit.  According to Qatar Group, although Thor was entitled to draw on the letter of credit for Additional Rent, it had "no contractual right to withdraw Fixed Rent following termination of the Lease."  (Id. ¶ 40)  Similarly, in its unjust enrichment claim, Qatar Group contends that "Thor lacked any contractual or equitable right to withdraw post-termination Fixed Rent from the Letter of Credit," and that "[e]quity and good conscience require that Thor return all wrongfully withdrawn amounts to [Qatar Group]."  (Id. ¶¶ 45, 47)

In a May 14, 2019 letter, Thor sought permission to move to dismiss the counterclaims.  (Dkt. No. 66)  At a May 23, 2019 conference, this Court stated that it would rule on Thor's application after resolving the parties' cross-motions for summary judgment.  (May 23, 2019 Conf. Tr. (Dkt. No. 93) at 20)

7

C.      **Cross-Motions for Summary Judgment**

On July 2, 2019, the parties filed cross-motions for summary judgment.  (Dkt. Nos. 72, 74)  Thor sought summary judgment as to (1) Qatar Group's "continuing liability" post-July 8, 2017 for Qatar Fashion's failure to pay rent; (2) Thor's right to damages on its breach of contract claim arising out of Qatar Fashion's failure to build out the premises; and (3) Thor's claim for reformation.  (Pltf. Sum. J. Br. (Dkt. No. 73) at 18-19, 24, 29)

Defendant Qatar Group sought summary judgment on (1) Thor's breach claim to the extent that it seeks damages from Qatar Group for Qatar Fashion's failure to pay Fixed Rent or Additional Rent post-July 8, 2017, arguing that – in drawing down on the $12 million letter of credit – Thor had elected that remedy, and could seek no other; (2) Thor's breach claim regarding Qatar Fashion's failure to build out the premises; (3) Thor's claim for reformation; and (4) Thor's claim for damages based on Qatar Fashion's failure to pay rent, to the extent that Thor seeks damages that go beyond those provided in Section 19.2 of the Lease.  (Def. Sum. J. Br. (Dkt. No. 75) at 8-10, 16, 20, 23-24, 30)

In a May 27, 2020 decision, this Court denied Qatar Group's motion in its entirety.  Thor was granted summary judgment as to its right to damages for Qatar Fashion's failure to perform build-out work at 680 Madison Avenue.  Thor's motion was otherwise denied. (May 27, 2020 Memorandum Opinion & Order (Dkt. No. 90) at 37)

As noted above, in moving for summary judgment on Thor's breach claim for rent, Qatar Group argued that – in recovering $12 million from the letter of credit "provided as security under the Lease . . . for what it believed were Fixed Rent and Additional Rent payments owed under the Lease" – Thor elected to pursue its remedies under Section 19.2 of the Lease,

and thus was "not permitted to elect [Section] 19.3 as a method of recovery from [Qatar Group]."

(Def. Sum. J. Br. (Dkt. No. 75) at 21-22)

This Court rejected Qatar Group's election of remedies argument:

Qatar Group's argument ignores the fact that [Sections 19.2 and 19.3 of] the Lease do[] not address in any fashion the letter of credit.  Because [these provisions] of the Lease do[] not address the letter of credit, this Court cannot find, as a matter of law, that Plaintiff's drawing down on the letter of credit somehow triggered an election of remedies by which Plaintiff elected to pursue its remedies under Section 19.2 rather than under Section 19.3.  Such a result would be particularly incongruous here given that (1) as set forth in Section 19.4 of the Lease, the remedies set forth in Sections 19.2 and 19.3 are not exclusive or exhaustive (Pltf. App., Ex. B (Lease) (Dkt. No. 79) § 19.4); and (2) under New York law, the election of remedies doctrine is designed for "vexatious litigation" and is to be applied in a "liberal" fashion.  Prudential Oil Corp. v. Phillips Petroleum Co., 418 F.Supp. 254, 277 (S.D.N.Y. 1975).

(May 27, 2020 Memorandum Opinion & Order (Dkt. No. 90) at 25-26)

In a September 15, 2020 letter, Thor renewed its request for permission to move to dismiss Qatar Group's counterclaims.  (Sept. 15, 2020 Jt. Ltr. (Dkt. No. 95) at 2-3)  In a September 16, 2020 order setting a briefing schedule for Thor's motion, this Court directed the parties "to brief both whether the counterclaim[s] w[ere] properly filed and the Rule 15 factors applicable to a motion to amend."  (Dkt. No. 97)

On November 23, 2020, Thor moved to strike or, in the alternative, to dismiss the counterclaims.  (Dkt. No. 110)  In its motion to strike, Thor argues that the counterclaims violate Fed. R. Civ. P. 15 and 16 because Qatar Group did not seek leave of court and did not obtain Plaintiff's consent before filing the counterclaims, and has not made a showing of good cause. In its motion to dismiss under Rule 12(b)(6), Thor contends that the counterclaims do not state a claim.  (Id. at 2)

## DISCUSSION

I. **LEGAL STANDARDS**

    A. **Motion to Strike**

Fed. R. Civ. P. 12(f) addresses motions to strike, and provides as follows:

The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.  The court may act:

    (1) on its own; or

    (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

Fed. R. Civ. P. 12(f).

"Rule 12(f), which authorizes a motion to strike an insufficient defense or improper material _in_ a pleading should not be used to dismiss [a] counterclaim." GEOMC Co. v. Calmare Therapeutics Inc., 918 F.3d 92, 101 (2d Cir. 2019) (emphasis in original) (citing Day v. Moscow, 955 F.2d 807, 811 (2d Cir. 1992)).

    B. **When New Counterclaims May Be Filed**

"The timing as to when and how a party must file counterclaims is not specified in [Fed. R. Civ. P.] 15, or [Fed. R. Civ. P.] 13, which addresses counterclaims." Fossil Grp., Inc. v. Angel Seller LLC, No. 20-CV-2441(WFK) (TAM), 2021 WL 5409605, at *4 (E.D.N.Y. Aug. 27, 2021), report and recommendation adopted, 2021 WL 4520030 (E.D.N.Y. Oct. 4, 2021) (citing Ramsay-Nobles v. Keyser, No. 16-CV-5778 (CM), 2018 WL 6985228, at *3 (S.D.N.Y. Dec. 18, 2018)).  As a result, the Federal Rules of Civil Procedure do "not provide clear guidance as to whether and/or when a Defendant can assert a new counterclaim or defense in an

amended pleading as a matter of right, when the Defendant did not raise these claims in response

to earlier pleadings." Ramsay-Nobles, 2018 WL 6985228, at *3.

GEOMC Co. v. Calmare Therapeutics Inc., 918 F.3d 92 (2d Cir. 2019) addresses

this subject in detail, and sets standards for when a new counterclaim may be asserted in

response to an amended complaint, as well as the proper scope of a new counterclaim:

> As to content, a new counterclaim, like all pleadings, must conform to the
> pleading requirements of Twombly and Iqbal.  See 2 Moore's Federal Practice, §
> 12.34[1][a] (3d ed. 2018); 6 Wright & Miller § 1407 (3d ed. 2018).  The closer
> question is whether a new counterclaim may respond as broadly as one included
> in an answer to an original complaint or whether it must respond only to the new
> allegations of an amended complaint. . . .
>
> We think resolution of this issue depends on how far into the litigation the new
> counterclaim is asserted.  If an amended answer with a new counterclaim is
> presented at an early stage of the litigation, the new counterclaim may normally
> be as broad as those filed in response to an original complaint.  At a late stage of
> the litigation, however, a new counterclaim that raises issues beyond the scope of
> the new claims made in the most recent amended complaint will usually cause
> escalating prejudice to the counterdefendant and undue expansion of litigation
> that the court is charged with managing; for those reasons a new counterclaim
> should normally not be permitted if it exceeds the scope of the plaintiff's new
> claims.  "As a general rule, the risk of substantial prejudice increases with the
> passage of time."  6 Wright & Miller, § 1488.  Although "leave to amend 'shall be
> freely given,'" Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222
> (1962) (quoting [Fed. R. Civ. P.] 15(a)), Foman qualifies that advice by adding
> "[i]n the absence of . . . undue prejudice," id.; see McCarthy v. Dun & Bradstreet
> Corp., 482 F.3d 184, 200 (2d Cir. 2007) ("A district court has discretion to deny
> leave [to amend] for good reason, including . . . undue prejudice to the opposing
> party.").  And, as Foman points out, amended pleadings, which include new
> counterclaims, can also be rejected because of "undue delay, bad faith or dilatory
> motive."  371 U.S. at 182, 83 S.Ct. 227.
>
> As to procedure for presenting a new counterclaim, most attempts to amend an
> answer to include a new counterclaim require permission of the court or consent
> of the parties.  See Fed. R. Civ. P. 15(a)(2).  The only exceptions occur when a
> counterclaimant seeks to amend its answer within 21 days after serving its
> original answer, see Fed. R. Civ. P. 15(a)(1)(A), or within 21 days after service
> upon it of (1) a required responsive pleading, e.g., an answer to a counterclaim, or
> (2) a motion under Rule 12(b), (e), and (f), see Fed. R. Civ. P. 15(a)(1)(B).  And
> attempts to amend an answer to include a new counterclaim after an amended

complaint that requires a response has been filed must be made within 14 days after service of the amended complaint. See Fed. R. Civ. P. 15(a)(3).

The proper procedure to challenge a new counterclaim filed in response to an amended complaint depends on the procedure used by the counterclaimant. If the counterclaimant files a Rule 15 motion to amend its answer to include a new counterclaim, the counterdefendant can oppose that motion. But if a counterclaimant files an amended answer that includes a new counterclaim without seeking court permission under Rule 15(a)(2), thereby denying the counterdefendant an opportunity to oppose a counterclaimant's Rule 15 motion, the proper motion for the counterdefendant to use depends on what appears on the face of the pleadings or in the record. . . .

[I]f a new counterclaim raising issues beyond the scope of the most recent amended complaint is filed so late in the litigation that it will cause prejudice to the counterdefendant or unduly expand the litigation, the new counterclaim may be challenged (1) by a Rule 12(b)(6) motion if relevant undisputed facts appear on the face of the pleadings or in the record, (2) by a Rule 56 motion if relevant undisputed facts can be presented by affidavit, or (3) by an answer under Rule 8(c) if relevant facts are in dispute. Rule 12(f), which authorizes a motion to strike an insufficient defense or improper material in a pleading should not be used to dismiss the counterclaim. See Day v. Moscow, 955 F.2d 807, 811 (2d Cir. 1992); 2 Moore's Federal Practice § 12.37[3] (3d ed. 2018); 5C Wright & Miller, § 1380, at n.5 (3d ed. 2018).

In ruling on a motion to dismiss a new counterclaim, a district court can either assess the new counterclaim's legal sufficiency or exercise the discretion the court would have been entitled to use if the counterclaimant had moved under Rule 15 to file the new counterclaim.

GEOMC Co., 918 F.3d at 100-01.

### C.   Motion to Dismiss

"To survive a motion to dismiss, a [counterclaim] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

"In ruling on a motion to dismiss a new counterclaim, a district court can either assess the new counterclaim's legal sufficiency or exercise the discretion the court would have

been entitled to use if the counterclaimant had moved under Rule 15 to file the new counterclaim." GEOMC Co., 918 F.3d at 101.

II.   **ANALYSIS**

As an initial matter, Thor argues that "the [c]ounterclaims should be stricken" under Rule 12(f), because Qatar Group has not shown "good cause" under Rule 16 to obtain leave to add the counterclaims. (Pltf. Br. (Dkt. No. 110-1) at 6) Because the Second Circuit has held that motions to strike under Rule 12(f) "should not be used to dismiss [a] counterclaim," Thor's motion to strike Defendant's counterclaims will be denied. GEOMC Co., 918 F.3d at 101.

The Court considers below Thor's motion to dismiss the counterclaims.

A.   **Whether the Counterclaims Are Timely and**
     **Responsive to the SAC's New Allegations**

Under GEOMC Co., this Court must consider (1) "how far into the litigation the new counterclaim[s] [are] asserted"; and (2) whether they "raise[] issues beyond the scope of the new claims made in the [Second] [A]mended [C]omplaint." Id. at 100.

As for the timing of the new counterclaims, Qatar Group filed them on May 9, 2019, eighteen months after this action was filed and after the close of fact discovery on March 25, 2019. (Dkt. No. 50) Indeed, as of May 9, 2019, the parties were in the midst of briefing cross-motions for summary judgment. (Apr. 30, 2019 order (Dkt. No. 64)) Accordingly, the new counterclaims were filed "[a]t a late stage of the litigation." GEOMC Co., 918 F.3d at 100.

As to the second issue – whether the counterclaims "exceed[] the scope of the plaintiff's new claims" (id.) – the parties disagree. Thor argues that the SAC "did not impart any information to [Qatar Group] that it did not already know" (Pltf. Reply Br. (Dkt. No. 111) at 6), while Qatar Group counters that "Thor significantly changed the scope and theory of its claims

13

in the [SAC]." (Def. Opp. Br. (Dkt. No. 112) at 17)  Qatar Group asserts that it only discovered

the basis for its counterclaims after Thor (1) produced documents in March 2019 addressing its

draws on the letter of credit; and (2) added the reformation claim in the SAC concerning Section

19.2 of the Lease. (Id. at 12-13, 17)  According to Qatar Group, the SAC's reformation claim

establishes that Thor's $12 million drawdown from the letter of credit constitutes an election of

Section 19.2's remedy under the Lease. (Id.)

       Neither of Qatar Group's counterclaims can be said to "respond only to [Thor's]

new allegations" in the SAC. GEOMC Co., 918 F.3d at 99. As discussed above, Thor had

withdrawn the full $12 million from the letter of credit by July 2017, before the Complaint was

filed in November 2017. Accordingly, long before the filing of the SAC in April 2019, Qatar

Group knew that Thor had drawn down on the letter of credit. To the extent that Qatar Group

believed that – in doing so – Thor had either breached the Lease or been unjustly enriched, it

could have sought relief by pleading breach and unjust enrichment counterclaims in its answer.[3]

---

[3]  Indeed, such claims constitute compulsory counterclaims under Fed. R. Civ. P. 13(a). Rule
13(a) provides that

   (1)   A pleading must state as a counterclaim any claim that – at the time of its
       service – the pleader has against an opposing party if the claim:

       (A)   arises out of the transaction or occurrence that is the subject matter of the
          opposing party's claim; and

       (B)   does not require adding another party over whom the court cannot acquire
          jurisdiction.

Fed. R. Civ. P. 13(a). "The test for determining whether a counterclaim is compulsory is
whether a logical relationship exists between the claim and the counterclaim and whether the
essential facts of the claims are 'so logically connected that considerations of judicial economy
and fairness dictate that all the issues be resolved in one lawsuit.'" Adam v. Jacobs, 950 F.2d 89,
92 (2d Cir. 1991) (quoting United States v. Aquavella, 615 F.2d 12, 22 (2d Cir. 1980)). Because
the "essential facts" of Thor's claims and Qatar Group's breach and unjust enrichment

Qatar Group's answers to the Complaint and the First Amended Complaint do not contain counterclaims, however, even though Qatar Group "asserted several affirmative defenses that sought to reduce or eliminate any damages Thor might be awarded based on funds Thor had already recovered . . . under the Letter of Credit." (Def. Opp. Br. (Dkt. No. 112) at 13; <u>see</u> Answer (Dkt. No. 12) at 15; Second Answer (Dkt. No. 25) at 18-19)

In sum, nearly two years before Qatar Group filed its breach and unjust enrichment counterclaims, it was aware that Thor had fully exhausted the $12 million letter of credit as part of an effort to recoup rent that Qatar Fashion had not paid. If Qatar Group believed that Thor's drawing down of the letter of credit constituted a breach of the Lease, or that Thor was thereby unjustly enriched, it could have and should have filed counterclaims to that effect in its answers to the Complaint and First Amended Complaint.

Qatar Group argues, however, that it was not until the filing of the SAC and its receipt of the March 2019 discovery that it understood that Section 19.2 of the Lease served as "the basis for Thor's draws on the Letter of Credit." (Def. Opp. Br. (Dkt. No. 112) at 11-12) "After understanding that Thor's draws were made under Section 19.2, [Qatar Group] determined that it now had viable counterclaims for recovery based on the Letter of Credit draws." (<u>Id.</u> at 13) This is nonsense.

As discussed above, Section 28.1 of the Lease authorizes Thor to draw down on the letter of credit if Qatar Fashion defaults on its Fixed Rent and Additional Rent payment obligations under the lease. Moreover, as is also discussed above, this Court rejected at

---

counterclaims are "logically connected," those counterclaims are "compulsory counterclaims" for purposes of Rule 13(a).

summary judgment Qatar Group's argument that – in drawing down on the letter of credit – Thor had somehow triggered an election of remedies.

In sum, Qatar Group's new counterclaims are not responsive to new allegations in the SAC; Qatar Group was dilatory in not filing its counterclaims at the outset of this litigation in 2017; and Qatar Group filed its counterclaims at a "late stage" in this litigation – after the close of discovery and in the midst of summary judgment motion practice.  For all these reasons, Thor's motion to dismiss Qatar Group's counterclaims will be granted.  GEOMC Co., 918 F.3d at 100 (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)) ("[A]mended pleadings, which include new counterclaims, can . . . be rejected because of 'undue delay, bad faith or dilatory motive.'").

**B.**     **Whether the Counterclaims State a Claim**

Even if Qatar Group's counterclaims were responsive to new allegations in the SAC, and had been asserted in a timely fashion, they would be dismissed for failure to state a claim.

**1.**     **Breach of Contract**

Qatar Group's "Counterclaim Count I" is for "Breach of Contract." (Counterclaims (Dkt. No. 65) ¶ 38)  The contract that Qatar Group alleges that Thor breached is the Lease.  Qatar Group alleges that "Thor unilaterally decided to withdraw both Fixed Rent and Additional Rent under Section 19.2 [of the Lease], despite having no contractual right to withdraw Fixed Rent following termination of the Lease."  (Id. ¶ 40)  But Qatar Group is not a signatory to the Lease (see Lease (Dkt. No. 12-1) at 83-84), and thus lacks standing to assert a breach of contract claim premised on a breach of the Lease.  See Premium Mortg. Corp. v. Equifax, Inc., 583 F.3d 103, 108 (2d Cir. 2009) (quoting Fourth Ocean Putnam Corp. v.

Interstate Wrecking Co., 66 N.Y.2d 38, 45 (1985)) ("A non-party to a contract governed by New York law lacks standing to enforce the agreement in the absence of terms that 'clearly evidence[] an intent to permit enforcement by the third party' in question.").

Qatar Group now claims that Counterclaim I is not a breach of contract claim, but is instead a "breach of warranty claim" brought under N.Y. U.C.C. § 5-110(a)(2).  (Def. Opp. Br. (Dkt. No. 112) at 14-16 ("[Qatar Group] meets all of the requirements under the UCC to assert a claim based on Thor's breach of its warranty under the UCC with respect to the letter of credit."))  This is likewise nonsense.  The heading for Counterclaim I reads "Breach of Contract"; Counterclaim I does not contain any reference to "breach of warranty" or to N.Y. U.C.C. § 5-110(a)(2); and Counterclaim I does not plead any facts that would support a breach of warranty claim.[4]

In sum, Qatar Group has made no effort to demonstrate that its breach of contract counterclaim is factually and legally sufficient.  The Court concludes that Qatar Group lacks standing to pursue a breach of the Lease because it is not a signatory to the Lease.  Accordingly, Counterclaim I will be dismissed for failure to state a claim.

**2.  Unjust Enrichment**

Qatar Group's "Counterclaim Count II" is for unjust enrichment.  Thor argues that "an express contract governs the subject matter" and thus "an unjust enrichment claim does not lie here."  (Pltf. Br. (Dkt. No. 110-1) at 11)  Qatar Group has not opposed Thor's motion to dismiss "Counterclaim Count II."  (See Def. Opp. Br. (Dkt. No. 112))

---

[4]  To the extent that Qatar Group argues that it may bring a breach of warranty claim because it was "the applicant" under the letter of credit (Def. Opp. Br. (Dkt. No. 112) at 14-15), Qatar Group's counterclaims do not plead that it is "the applicant" under the letter of credit.  Moreover, the letter of credit is in the record, and it identifies Qatar Fashion – and not Qatar Group – as "the applicant."  (Xenitelis Decl. (Dkt. No. 111-1) ¶ 2; see id., Ex. A (Dkt. No. 111-2) at 2)

As a general matter, quasi-contract claims such as unjust enrichment are subject to dismissal where there is an enforceable contract.  U.S. E. Telecommunications, Inc. v. US W. Commc'ns Servs., Inc., 38 F.3d 1289, 1298 (2d Cir. 1994) (quoting Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388 (1987)) ("'[T]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.'").  Moreover, "[c]laims for unjust enrichment may be precluded by the existence of a contract governing the subject matter of the dispute even if one of the parties to the lawsuit is not a party to the contract."  American Med. Ass'n v. United Healthcare Corp., No. 00-CV-2800 (LMM), 2007 WL 683974, at *10 (S.D.N.Y. Mar. 5, 2007); see also Debenture v. Maverick Tube Corp., No. 06-CV-14320 (RJS), 2008 WL 4615896, at *13 (S.D.N.Y. Oct. 15, 2008) ("[A] claim for unjust enrichment, even against a third party, cannot proceed when there is an express agreement between two parties governing the subject matter of the dispute.").

Here, as discussed above, Section 28.1 of the Lease authorizes Thor to draw down on the letter of credit where Qatar Fashion has not made a required Fixed Rent or Additional Rent payment.  (Lease (Dkt. No. 12-1) § 28.1)  Given that the Lease is an enforceable contract, an unjust enrichment claim – even when brought by a non-party to the Lease, such as Qatar Group – is barred.

## CONCLUSION

For the reasons stated above, Plaintiff's motion to strike is denied, and Plaintiff's motion to dismiss Defendant's counterclaims is granted.  The Clerk of Court is directed to terminate the motions (Dkt. No. 110).

18

This matter will proceed to trial on **June 13, 2022**.  The joint pretrial order and motions <u>in</u> <u>limine</u> are due on **May 13, 2022**.  Responsive papers are due on **May 20, 2022**.  The parties are directed to consult this Court's Individual Rules as to the procedures for a bench trial.

Dated:  New York, New York
        March 21, 2022

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge